UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

DAVID SGALAMBO, Individually and on
Behalf of All Others Similarly Situated,

                            Plaintiff,

        vs.

CRAIG MCKENZIE, et al.,

                     Defendants.

——————————————————— x

:
:
:
:
:
:
:
:
:
:
:
:
:

Civil Action No. 1:09-cv-10087-SAS

CLASS ACTION

AMENDED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Lead Plaintiff Gino Ströker ("Lead Plaintiff") has alleged the following based upon the investigation of his counsel, which included a review of United States Securities and Exchange Commission ("SEC") and SEDAR filings by Canadian Superior Energy Inc. ("Canadian Superior" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, media reports about the Company, documents filed by BG International Limited ("BG") against Canadian Superior in connection with its Notice of Motion for Interim Measures in the Court of Queen's Bench of Alberta, Judicial District of Calgary, Action No. 0901-02012 ("Notice of Motion"),[1] and documents filed by Canadian Superior in connection with its application for protection under the Companies' Creditors Arrangement Act ("CCAA") in the Court of Queen's Bench of Alberta, Judicial District of Calgary, Action No. 0901-02873, as well as consultation with a petroleum geologist, and Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal class action on behalf of purchasers of the common stock of Canadian Superior between January 14, 2008 and February 17, 2009, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Throughout the Class Period, Canadian Superior, an oil and gas exploration and production company with operations in Western Canada, offshore Trinidad & Tobago, and offshore Nova Scotia, Canada, issued numerous press releases describing the Company's findings and

---

[1]     Filings in connection with the action brought by BG can be found at http://www.deloitte.com/view/en_CA/ca/specialsections/insolvencyandrestructuringproceedings/canadiansuperiorenergy/index.htm

prospects for three wells that it was drilling for gas offshore Trinidad and Tobago. The three wells –

"Victory," "Bounty" and "Endeavor" – were drilled as a joint venture ("Joint Venture"), with

Canadian Superior as the operator and two partners, Challenger Energy Corp. ("Challenger Energy")

and BG, in an area called the "Intrepid" Block 5(c) ("Intrepid Block 5(c)").

      3.      As detailed herein, many of Defendants' statements regarding these wells were

materially false and misleading at the time they were made. For example, in describing the

"Victory" well as "successfully drilled," Defendants failed to disclose that although there may have

been a finding of natural gas, BG – who was described by Defendant Gregory S. Noval ("Noval") as

"an established major gas producer world-wide and in Trinidad" with "a wealth of knowledge and

experience" of liquefied natural gas – had concluded that the gas was not present in sufficient

quantities in the Victory well to justify economic development of the discovery.

      4.      With regard to the "Bounty" well, Defendants made positive statements regarding its

progress, but failed to disclose that the "Bounty" discovery on its own would not be economical to

develop, a relative fact given the true findings of the "Victory" well. Indeed, as set forth in an

affidavit filed by Ewen Denning (the "Denning Affidavit"), Vice President, Commercial of BG

Trinidad and Tobago, in an action commenced by BG near the end of the Class Period, BG had

concluded that, in its opinion, "the Bounty discovery on its own is not economic."

      5.      Moreover, by the time the Company was drilling the third well, the "Endeavor," the

Company's financial state had deteriorated to the point that it was no longer able to pay the vendors

working on the well and, given the global credit crisis, there was no reasonable basis for the

Company to expect that it would be able to raise sufficient funds to complete the Joint Venture.

Nevertheless, the Company continued to make positive statements about the prospects of the wells,

with the false implication that the Company would benefit from their development. Indeed, by that

point, the Company had already failed to pay Maersk Contractors ("Maersk"), the drilling operator of the Intrepid Block 5(c) (even though BG had paid its share of the invoice to Canadian Superior), placing the entire Intrepid Block 5(c) in jeopardy and greatly increasing the risk that Maersk would cease its drilling operations.

6.      Defendants' statements were also materially false and misleading because they failed to disclose that, at all relevant times, Canadian Superior was in violation of the Joint Operating Agreement ("JOA") of the Joint Venture since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis.

7.      Defendants also made numerous statements that Canadian Superior was only responsible for 26-2/3% of the total costs of the Joint Venture. These statements were materially false and misleading because, even though Challenger Energy – a company with close ties to Canadian Superior executives – was a party to the Joint Venture and purported to assume responsibility for 1/3 of the costs associated with the drilling and development of Intrepid Block 5(c), its participation was subject to approval by the Trinidad and Tobago Ministry of Energy and Energy Industries ("Minister") and such approval was never granted. As such, Canadian Superior was responsible for 60% of the costs of Intrepid Block 5(c), not the 26-2/3% that it represented to shareholders.

8.      Many of these previously undisclosed facts came to light through the disclosures made in the Denning Affidavit. Indeed, in that affidavit, BG revealed that, at the end of 2008, it had conducted an audit of Canadian Superior, during which it learned many negative details of Canadian Superior's role as the operator of the Intrepid Block 5(c). For example, BG discovered that

- 3 -

Canadian Superior had breached the JOA by: (i) failing to maintain a separate joint account for funds associated with the JOA; (ii) commingling funds received from BG with Canadian Superior's general funds; (iii) failing to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis; and (iv) failing to pay invoices rendered by suppliers in a timely fashion.

9.    In addition to Canadian Superior's failure to separately account for the funds in the Joint Venture, it was also disclosed that, since at least November 2008, Canadian Superior had not paid Maersk, as well as other vendors, even though BG had advanced its share of the funds required to pay the current invoices. BG also discovered that the Minister had the right to reject – and had rejected – the assignment of a 25% interest in the Joint Venture from Canadian Superior to Challenger Energy, thereby making Canadian Superior responsible for the full 60% of the costs of the Intrepid Block 5(c) project.

10.    BG's views regarding the prospects of the three wells on the Intrepid Block 5(c) were also disclosed in the Denning Affidavit:

- The *Victory* Well was spudded on June 28, 2007. Flow testing was conducted on the Victory Well and natural gas was discovered on January 14, 2008. However, *tests indicated that there are only limited reserves connected to the well and it is BGI's view that the Victory Well is likely to be a sub-economic discovery*. Denning Affidavit, ¶43

- The *Bounty* Well was spudded on February 20, 2008. Flow testing was conducted on the Bounty Well and natural gas was discovered on August 13, 2008. *In BGI's opinion, the Bounty discovery on its own is not economic*. BGI believes that the Bounty Well may become economic if the Endeavour Well discovers sufficient reserves to make the joint development of the two prospects together economic by reason of costs savings realized through shared infrastructure. *Id.* ¶44

- The reserves associated with the *Endeavour* Well must be determined so that a decision on development of the entire Intrepid Block can be made and a development plan established. (*BGI's opinion is that the currently discovered reserves in the Intrepid Block are below economic threshold for development*. The PSC terms together with the capital costs and the price which can be realized for the gas are the key determinants of this conclusion). *Id.* ¶49

- 4 -

11.     On February 12, 2009, Canadian Superior shocked the market by announcing the "appointment, upon the application of BG of an interim Receiver of its participating interest in Intrepid Block 5(c)."

12.     In response to the February 12, 2009 announcement, shares of the Company's stock plummeted $0.40 per share, or 44%, from a close of $0.90 per share on February 11, 2009, the last trading date before the announcement, to close at $0.50 per share, on extremely heavy trading volume.

13.     Then, on February 17, 2009, Canadian Superior issued a press release announcing that it had received a demand letter from Canadian Western Bank ("Canadian Western") for repayment of all monies outstanding under Canadian Superior's $45 million credit facility by no later than February 23, 2009.  The Company also announced that it was in discussions with alternative lenders.

14.     In response to the February 17, 2009 announcement, shares of the Company's stock fell $0.16 per share, or 30%, from a close of $0.54 per share on February 13, 2009, the last trading date before the announcement, to close at $0.38 per share, on extremely heavy trading volume.

15.     In the months prior to the disclosure of these adverse facts, Canadian Superior insiders, including Defendant Leigh Bilton ("Bilton") and Leif Snethun ("Snethun") sold more than 330,000 shares of their personally-held Canadian Superior common stock for gross proceeds of approximately $908,747(CAD).

16.     In the months after the end of the Class Period, as an Interim Receiver, Deloitte and Touch, Inc. ("Deloitte") prepared reports which confirmed that, as Operator, Canadian Superior failed to timely pay invoices, which threatened the departure of Maersk and the decommission of the

drilling rig (the Kan Tan IV) on the Intrepid Block 5(c), which would have resulted in irreparable harm and economic loss.

17.     On March 6, 2009, Canadian Superior filed an application with the Court of Queen's Bench of Alberta for CCAA protection.  In connection for its application for CCAA protection, Defendant Michael E. Coolen ("Coolen") filed an Affidavit ("Coolen Affidavit"), dated March 4, 2009, in which he disclosed his personal knowledge of the events that lead up to Canadian Superior's application and *admitted* that during the months of November and December 2008 and January 2009, the Company did not have sufficient funds to meet its obligations under the JOA.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the false and misleading statements identified herein were distributed throughout this District and, at all relevant times, the Company's stock traded on the American Stock Exchange ("AMEX") which is located in this District.

21.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

22.     Lead Plaintiff Gino Ströker, as set forth in his certification previously filed with the Court and incorporated herein by reference, purchased the common stock of Canadian Superior during the Class Period and has been damaged thereby.

23.     Canadian Superior engages in the exploration for, acquisition, development, and production of petroleum and natural gas, and liquefied natural gas projects primarily in western Canada, offshore Nova Scotia, offshore Trinidad and Tobago, the United States, and North Africa. Canadian Superior has not been named as a defendant herein as it sought protection under Canadian bankruptcy and reorganization laws and has since reorganized.

24.     (a)     Defendant Craig McKenzie ("McKenzie") has served as Chief Executive Officer ("CEO") of Canadian Superior since October 1, 2007 and as a director of the Board of Directors ("Board") since November 15, 2007.

(b)     Defendant Snethun has served as President and Chief Operating Officer ("COO") of Canadian Superior since April 30, 2009.  Prior to joining Canadian Superior, Mr. Snethun was the founder, President and CEO of Seeker Petroleum Ltd., a private oil and gas exploration company based in Calgary, Alberta which was purchased by Canadian Superior in March of 2008. Mr. Snethun joined the Company in March of 2008, and held the position of Vice President for Western Canada until his appointment as COO.

(c)     Defendant Coolen served as President and COO of Canadian Superior from April 2006 to April 2009 and a director of the Board from November 2005.

(d)     Defendant Noval served as Executive Chairman of Canadian Superior from June 26, 2007 to April 24, 2009.  Prior to that, Defendant Noval was Chairman and CEO of Canadian Superior from August 2000 to October 2004.  Additionally, Defendant Noval served as Chairman of the board of directors of Challenger Energy from 2004 until October 23, 2008.

- 7 -

(e)    Defendant Bilton has served as COO of Canadian Superior since April 29, 2009. Defendant Bilton served as Vice President of Western Canada for the Company from February 5, 2008 to April 29, 2009. Prior to joining Canadian Superior, Defendant Bilton served as President and CEO of Seeker Petroleum.

25.    During the Class Period, Defendants, as senior executive officers and/or directors of Canadian Superior, were privy to confidential and proprietary information concerning Canadian Superior, its operations, finances, financial condition and present and future business prospects. Defendants also had access to material adverse non-public information concerning Canadian Superior, as discussed in detail below. Because of their positions with Canadian Superior, Defendants had access to non-public information about the Company's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

26.    Defendants are liable as direct participants in the wrongs complained of herein. In addition, Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, Defendants were able to and did, directly or indirectly, control the conduct of Canadian Superior's business.

27.    Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, Defendants had the opportunity to commit the fraudulent acts alleged herein.

28.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the AMEX and the Toronto Stock Exchange ("TSX"), and governed by the federal securities laws, Defendants had a duty to promptly disseminate accurate and truthful information with respect to Canadian Superior's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Canadian Superior common stock would be based upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.    Defendants are liable as participants in a fraudulent scheme and course of conduct which operated as a fraud or deceit on purchasers of Canadian Superior common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Canadian Superior's business, operations and management and the intrinsic value of Canadian Superior common stock; (ii) enabled Defendants Snethun, Bilton and other Company insiders to collectively sell 330,000 shares of their personally-held Canadian Superior common stock for gross proceeds in excess of $900,000; (iii)

allowed the Company to complete two private placements which jointly raised gross proceeds of over $51 million for the Company; and (iv) caused Plaintiff and members of the Class to purchase Canadian Superior common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

30.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Canadian Superior between January 14, 2008 and February 17, 2009, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

31.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Canadian Superior common stock was actively traded on the AMEX and the TSX. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Canadian Superior or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

32.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

33.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

34.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Canadian Superior;

(c)     whether the price of Canadian Superior common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

35.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### The Company

36.     Canadian Superior describes itself as an oil and gas exploration and production company with operations in Western Canada, offshore Trinidad & Tobago, and offshore Nova Scotia, Canada.

### The Joint Venture in Intrepid Block 5(c)

37.     Prior to the start of the Class Period, in early 2006, in a search for commercially viable hydrocarbons, the Company entered into a contract with the government of Trinidad and

Tobago to allow it to drill wells offshore Trinidad, Port of Spain.  Specifically, Canadian Superior

signed a Production Sharing Contract ("PSC") on July 20, 2005 for the right, commencing in the fall

of 2007, to drill wells in an area called the Intrepid Block 5(c).  To assist with this drilling project,

the Company also entered into an Amended and Restated Participation Agreement dated December

30, 2005 ("Participation Agreement") with Challenger Energy.  The Participation Agreement

provided, among other things, that Challenger Energy had the right to earn a 25% interest in the

PSC.  At all relevant times, Challenger Energy was controlled by Defendant Noval, who served as its

Chairman and also as the Chairman of Canadian Superior.

       38.     In a message to its shareholders and investors in April 2007, Canadian Superior

announced that it would be drilling three back-to-back wells in Trinidad, an area then described by

Defendant Noval as "one of the most coveted and best oil and gas plays in the world."

       39.     At that time, BG, a global energy company similarly engaged in the exploration,

development and production of oil and natural gas, held a number of interests in operations offshore

Trinidad and Tobago.  In August 2007, Canadian Superior and Challenger Energy announced that

BG had entered into a farm-in agreement ("Farm-In Agreement")[2] with Canadian Superior and a

JOA with Canadian Superior and Challenger Energy that would enable BG to participate in the

exploration drilling and development of the Intrepid Block 5(c) as a Joint Venture.  The Joint

Venture involved the drilling of three wells off the coast of Trinidad and Tobago – Victory, Bounty

and Endeavour.  Bringing a prominent and well respected petroleum company into the Joint Venture

was noteworthy, as Defendant Noval commented: "BG Group is an established major gas producer

---

[2]     A Farm-In-Agreement is an arrangement whereby one operator "buys in" or acquires an
interest in a lease or concession owned by another company.

world-wide and in Trinidad and brings a wealth of knowledge, experience and liquefied natural gas marketing strengths to this joint venture."

40.    Under the terms of the JOA, BG was assigned a 30% interest in the PSC by Canadian Superior and would pay 40% of the costs, leaving Canadian Superior with a 70% interest in the PSC and the burden of 60% of the costs. The Farm-In Agreement, which was not available in the public domain, provided that Challenger Energy had the right to acquire a 25% interest in the PSC in connection with the Intrepid Block 5(c) for which it would then pay a third of the costs of the three wells, subject to approval Minister.

### Defendants' Statements Regarding
### the Prospects of the Intrepid Block 5(c) Were Materially False and Misleading

41.    On February 9, 2009, BG filed the Notice of Motion in a Calgary court seeking an order appointing Deloitte as Receiver and Manager of Canadian Superior's rights, interests, duties and obligations as Operator under the JOA, pending BG becoming Operator. Accompanying the Notice of Motion was the Denning Affidavit which disclosed many significant details about Canadian Superior's role as operator of Intrepid Block 5(c). For example, following an audit of Canadian Superior conducted by BG during November and December 2008 (as BG was entitled to do under the JOA), BG concluded that Canadian Superior had breached the JOA by: (i) failing to maintain a separate joint account for funds associated with the JOA; (ii) commingling funds received from BG with Canadian Superior's general funds; (iii) failing to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis; and (iv) failing to pay invoices rendered by suppliers in a timely fashion.

42.    The Denning Affidavit also made clear BG's position regarding the prospects of the three wells on the Intrepid Block 5(c):

- The *Victory* Well was spudded on June 28, 2007. Flow testing was conducted on the Victory Well and natural gas was discovered on January 14, 2008. However, *tests*

*indicated that there are only limited reserves connected to the well and it is BGI's view that the Victory Well is likely to be a sub-economic discovery.* Denning Affidavit, ¶44

- The *Bounty* well was spudded on February 20, 2008. Flow testing was conducted on the Bounty Well and natural gas was discovered on August 13, 2008. *In BGI's opinion, the Bounty discovery on its own is not economic.* BGI believes that the Bounty Well may become economic if the Endeavour Well discovers sufficient reserves to make the joint development of the two prospects together economic by reason of costs savings realized through shared infrastructure. *Id.* ¶45

- The reserves associated with the *Endeavour* Well must be determined so that a decision on development of the entire Intrepid Block can be made and a development plan established. (*BGI's opinion is that the currently discovered reserves in the Intrepid Block are below economic threshold for development.* The PSC terms together with the capital costs and the price which can be realized for the gas are the key determinants of this conclusion). *Id.* ¶49

43.    The Notice of Motion and Denning Affidavit also disclosed that, since at least November 2008, Canadian Superior had not paid Maersk, among other vendors, even though BG had advanced its share of the funds required to pay the current invoice. The Denning Affidavit further disclosed that Canadian Superior advised BG that Challenger Energy failed to pay its cash calls and that Canadian Superior admitted that it was not in a position to pay the approximately $4 million which was charged to Challenger Energy in connection with the Maersk invoice.

44.    The Notice of Motion further stated that Maersk threatened to terminate its drilling contract with Canadian Superior and abandon the Endeavour well unless it was paid. According to the Denning Affidavit, at the end of January 2009, BG received copies of correspondence between Maersk and Canadian Superior demanding payment for Maersk's November invoice for $12,075,000.00 which had not been paid.

45.    In the Notice of Motion, BG explained that if Maersk was to leave the site, the cost to the Joint Venture would be devastating:

If Maersk leaves, the incremental cost to the joint venture of obtaining another similarly specialized rig over testing the Endeavour Well now is estimated to be US $35 million. Furthermore, it may take a year to obtain and relocate a replacement rig

- 14 -

to the Endeavour Well site. The economics of, and prospects for, the development of, among other things, the Endeavour Well will be diminished substantially if Maersk is not paid and the rig being used is decommissioned and leaves the Endeavour Well site at this time and prior to testing. The associated delay will cause irreparable harm and economic loss that cannot be foreseen or quantified at this time because of the many market and other factors at play.

46.     The Denning Affidavit also stated that, on February 1, 2009, BG held an Operating Committee Meeting ("OCM") during which it demanded that Canadian Superior explain why it had not paid Maersk. In response, Canadian Superior explained that Challenger Energy had failed to pay its cash calls and that it was unable to cover Challenger Energy's $4 million shortfall. BG further inquired into the extent and duration of Canadian Superior's failure to pay Maersk but Canadian Superior failed to provide satisfactory answers.

47.     The Denning Affidavit also stated that, on February 2, 2009, BG learned that the Minister had the right to reject – and had in fact rejected – the assignment of a 25% interest in the PSC from Canadian Superior to Challenger Energy, thereby making Canadian Superior responsible for the full 60% of the costs of the Intrepid Block 5(c) project.

48.     Realizing that it could not sustain its 60% of the costs associated with the Intrepid Block 5(c) under the JOA, and in light of the filing for an Interim Receiver by BG, on February 10, 2009, Canadian Superior announced that it proposed to "monetize a 25% or larger interest in its Intrepid Block 5(c)." On February 11, 2009, the District of Calgary signed the Interim Receivership Order appointing Deloitte as Interim Receiver of Canadian Superior's participating interest of the JOA and as Operator under the JOA.

49.     On February 12, 2009, Canadian Superior issued a press releasing announcing the "appointment, upon the application of BG of an interim Receiver of its participating interest in Intrepid Block 5(c)."

50.     In response to the February 12, 2009 announcement, shares of the Company's stock plummeted $0.40 per share, or 44%, from a close of $0.90 per share on February 11, 2009, the last trading date before the announcement, to close at $0.50 per share, on extremely heavy trading volume.

51.     Then, on February 17, 2009, Canadian Superior issued a press release announcing that it had received a demand letter from Canadian Western for repayment of all monies outstanding under Canadian Superior's $45 million credit facility by no later than February 23, 2009. The Company also announced that it was in discussions with alternative lenders.

52.     In response to the February 17, 2009 announcement, shares of the Company's stock fell $0.16 per share, or 30%, from a close of $0.54 per share on February 13, 2009, the last trading date before the announcement, to close at $0.38 per share, on extremely heavy trading volume.

53.     On March 6, 2009, Canadian Superior filed an application with the Court of Queen's Bench of Alberta for CCAA protection. In connection for its application for CCAA protection, Defendant Coolen filed the Coolen Affidavit, dated March 4, 2009, setting forth his personal knowledge of the events that lead up to Canadian Superior's application. In the Coolen Affidavit, it was *admitted* that during the months of November, December and January, the Company did not have sufficient funds to meet its obligations under the JOA. Challenger Energy also failed to pay its obligations for that same time period and Canadian Superior was ultimately responsible for Challenger Energy's obligations under the JOA. The Coolen Affidavit also disclosed that, as a result of the various operations of the Company, the indebtedness to the JOA for the Joint Venture amounted to CAD $14 million and $39.2 million.

- 16 -

54.    In the months prior to the disclosure of these adverse facts, Canadian Superior insiders, including Defendants Bilton and Snethun sold more than 330,000 shares of their personally-held Canadian Superior common stock for gross proceeds of approximately $908,747(CAD).

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

55.    The Class Period begins on January 14, 2008. On that date, Canadian Superior issued a press release announcing the discovery of natural gas on the "Victory" well on Intrepid Block 5(c).

Defendant Noval commented on this discovery, stating, in pertinent part, as follows:

> We are pleased to announce the discovery of natural gas on our first well offshore Trinidad. We have just finished the successful flow testing of the first zone to be completed on our "Victory" well, which is part of an initial 3 well exploration program offshore Trinidad on our 'Intrepid' Block 5(c). *We are encouraged by the initial test results in the first zone and will be moving up hole in the well to test at least one further horizon.* [Emphasis added.]

Defendant McKenzie added, in pertinent part, as follows:

> *The 'Victory' well has an estimated flowing rate of over 100 mmscf/d of natural gas* and is condensate rich. We have just completed the extended flow testing of the first zone to be tested in the well which was flowed on a restricted flow basis with high pressures and *flowed with measured flow rates averaging between 40 and 45 mmscf/d.* The well also tested high gravity condensate of approximately 30 bbl per mmscf of gas produced. The flowing wellhead pressure on a restricted basis and bottom hole pressures are comparable or better than other producing wells and fields in the immediate area. Further analysis of the initial test results will be conducted on the information we have received and we will now focus on the next stage of the testing program by moving up hole to complete at least one more zone in the well before moving the rig to our next prospect on Block 5(c) and spudding the 'Bounty' well. This information will allow Canadian Superior and the other participants in the well to move forward with detailed reserve analysis of the discovered resource." [Emphasis added.]

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c), with its partners,* BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40%

- 17 -

for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added.]

56.    On January 16, 2008, Canadian Superior issued a press release announcing its acquisition of Seeker Petroleum Ltd.  In commenting on the acquisition, Defendant McKenzie referenced the Intrepid Block 5(c) project, stating, in pertinent part, as follows:

> Canadian Superior's strategy is to grow our international business, *as evidenced by our natural gas discovery offshore Trinidad earlier this week*, and to grow our Western Canadian production base internally through the 'drill bit' and by acquisitions. [Emphasis added.]

57.    On January 28, 2008, Canadian Superior issued a press release announcing that, together with its partners BG and Challenger Energy, it had "discovered natural gas in a second zone in the Victory well on Intrepid Block 5(c)." The press release further stated that they "have identified possible further prospective horizons in the 'Victory' well that will be evaluated in other wells planned for the area." Defendant McKenzie added, in pertinent part, as follows:

> *We are very pleased with the natural gas tests from our 'Victory' well on Block 5(c) offshore Trinidad.*  Although drilling of the 'Victory' well took longer than initially anticipated, *we feel the results were well worth waiting for*.  Operational improvements on the Kan Tan IV semi-submersible drilling rig have been made and we look forward to continuing our initial 3 well exploration program on "Intrepid" Block 5(c) with the spudding of the second well called 'Bounty', expected to occur prior to mid-February. [Emphasis added.]

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)*, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added].

58.    The statements referenced above in ¶¶55-57 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)    that Defendants had only reported the positive test results for the Victory well but failed to report other essential data, such as initial and final flowing rates and pressures and the shut-in pressure buildup data, which indicated that there were only limited reserves connected to the well and that the well would likely be a sub-economic discovery, as BG had concluded;

(b)    that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(c)    that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(d)    that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(e)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the prospects of Intrepid Block 5(c).

59.    On February 4, 2008, Canadian Superior announced that the Company and its partners, BG and Challenger Energy, "intend to move the Kan Tan IV semi-submersible drilling rig currently located at the Victory well to the Bounty well on their Intrepid Block 5(c) within the next seven days." With regard to the findings of the Victory well, Defendant McKenzie stated, in pertinent part, as follows:

> I am pleased to report that we have now analyzed and evaluated much of the initial data from the 'Victory' well, and, at this time, Canadian Superior estimates that the

'Victory' well contains approximately 725 feet of gross pay (450 feet of net pay). Based on well log information, other discoveries in the area, seismic data and flow testing results, we estimate on a preliminary basis that the 'Victory' discovery contains up to 1.1 tcf gross natural gas sales reserves with associated liquid natural gas of 3.70 million barrels, with the most likely case being 615 bcf gross sales reserves with associated natural gas liquids of 2.37 million barrels. The 'Victory' well tested natural gas in two main formations and Canadian Superior estimates that the 'Victory' well is capable of producing at flowing rates of over 100 mmscf/d from the lower zone which was the first formation tested; in addition, we estimate that the well is capable of flowing up to 50 mmscf/d from the second formation.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> **Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)**, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest **and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior**. [Emphasis added].

60.    The statements referenced above in ¶59 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)    that Defendants had only reported the positive test results for the Victory well but failed to report other essential data, such as initial and final flowing rates and pressures and the shut-in pressure buildup data, which indicated that there were only limited reserves connected to the well and that the well would likely be a sub-economic discovery, as BG concluded;

(b)    that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(c)    that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG

with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate

interest-bearing account, with interest allocated among the parties on an equitable basis, thereby

jeopardizing the Company's role in the Joint Venture;

       (d)    that, as a result of the foregoing, there was an increased risk that Canadian

Superior would be unable to successfully complete the Joint Venture; and

       (e)    as a result of the foregoing, Defendants lacked a reasonable basis for their

positive statements about the Company's prospects for Intrepid Block 5(c).

      61.    On February 20, 2008, Canadian Superior issued a press release announcing that the

Company and its partners, BG and Challenger Energy, have "successfully spudded the Bounty well

on the Intrepid Block 5(c)." With regard to the Bounty well, Defendant McKenzie stated, in

pertinent part, as follows:

> I am pleased to report that we have commenced drilling the 'Bounty' well and based
> on analysis of reprocessed 3D seismic covering the area and offsetting well data,
> including that of nearby producing fields, the primary objective of the 'Bounty' well
> is to prove up higher pressure horizons that includes multiple potential reservoirs and
> is a deeper, separate geologic structure from that discovered in the 'Victory' well.
> Secondary objectives include possibly drilling into at least one of the productive
> horizons penetrated in the 'Victory' well.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the

press release stated, in pertinent part, as follows:

> **Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost
> to maintain a 45% working interest in Block 5(c)**, with its partners, BG
> International Limited, a wholly owned subsidiary of the BG Group plc, paying 40%
> for a 30% working interest **and Challenger Energy Corp. paying 33-1/3% for a 25%
> working interest through Canadian Superior**. [Emphasis added].

      62.    The statements referenced above in ¶61 were each materially false and misleading

when made because they misrepresented and failed to disclose the following facts, which were

known to Defendants or recklessly disregarded by them:

- 21 -

(a)     that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(b)     that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(c)     that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(d)     as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture.

63.     On March 5, 2008, Canadian Superior issued a press release announcing that it was "**_making good progress_** drilling the 'Bounty' well on the 'Intrepid' Block 5(c) offshore Trinidad." (Emphasis added).

64.     The statement referenced above in ¶63 was materially false and misleading when made because it misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate

interest-bearing account, with interest allocated among the parties on an equitable basis, thereby

jeopardizing the Company's role in the Joint Venture; and

      (b)     as a result of the foregoing, there was an increased risk that Canadian Superior

would be unable to successfully complete the Joint Venture.

     65.    On March 31, 2008, Canadian Superior issued a press release announcing its financial

and operating results for the year ended December 31, 2007.  With regard to the Victory well, the

press release stated, in pertinent part, as follows:

> Subsequent to year end ***Canadian Superior had a large natural gas discovery in Trinidad***. Completed the drilling of its "Victory" well, "Intrepid" Block 5(c), offshore Trinidad, a natural gas discovery; and, two zones were successfully completed in the "Victory" well.  The first zone tested natural gas on a restricted basis at high pressure rates averaging between 40 and 45 mmcf/d; and, the second zone, which was tested independently and separate from the first zone, tested natural gas on a restricted basis at high pressure rates averaging in excess of 30 mmcf/d. Canadian Superior and its partners have identified possible further prospective horizons in the "Victory" well that will be evaluated in other wells planned for the area. . . .

Defendant McKenzie, commenting on the Company's performance, stated, in pertinent part, as

follows:

> Our 2007 physical and financial results demonstrate the strength and delivery of our corporate objective, which is to exponentially grow the business through high-impact international exploration programmes and expansion of our Western Canada core assets through focused drilling and selective, accretive acquisitions. ***We carried out the drilling of our 'Victory' well offshore Trinidad in 2007 as the first of a three-well series, which yielded a successful natural gas discovery in this multi-TCF play. Now we are drilling the 'Bounty' well, and later in 2008, we will drill 'Endeavour' as the third well in this series.*** In Western Canada, we surpassed our 2007 exit production rate of over 3,000 boe/d and now we are focused on our mid-year 2008 target of 5,000 boe/d, but more importantly we have an aspiration to achieve 10,000 boe/d before year end so that more of our international growth is funded from internal cash flows. At the same time our objective is to provide our shareholders significant growth in per share value. [Emphasis added.]

With regard to the Company's operational update for Trinidad and Tobago, the press release stated,

in pertinent part, as follows:

- 23 -

> *The "Victory" natural gas discovery tested natural gas in two main formations and the Corporation estimates that the well is capable of producing at sales gas flow rates of well over 100 mmcf/d from the lower zone alone, which was the first formation tested. In addition, the Corporation estimates that the well is capable of flowing over 50 mmcf/d from the second formation flow tested.* Both zones were tested at restricted rates and had high flowing pressures.
>
> On February 20, 2008, the Corporation successfully spudded the "Bounty" well with the Kan Tan IV semi-submersible drilling rig. The rig has moved approximately 2.2 miles from the "Victory" well. The "Bounty" well is planned to be drilled to a total vertical depth of approximately 18,000 feet subsea in about 1,000 feet of water and is expected to take about 110 days to drill. It is expected that the "Bounty" well and the third well, "Endeavour", will both be drilled and evaluated by year end 2008.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> On August 11, 2007, the BG Group plc partnered with Canadian Superior by acquiring a 30% working interest in Canadian Superior's "Intrepid" Block 5 (c) Production Sharing Contract by paying Canadian Superior approximately US $39 million and on a go forward basis paying approximately 40% of the exploration costs associated with the drilling of the three commitment wells required on Block 5 (c). As a result of this joint venture and one other Canadian Superior entered into on Block 5(c), *Canadian Superior is paying approximately 26-2/3% of the cost to get 45% of the production from the Block.* [Emphasis added].

66.      On May 7, 2008, in a press release issued by Canadian Superior, Defendant McKenzie commented on the progress of the "Bounty" well, stating "I am pleased to report the *good progress* being made in the drilling of 'Bounty' well." [Emphasis added].

67.      The statements referenced above in ¶¶65-66 were materially false and misleading when made because it misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)      that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate

interest-bearing account, with interest allocated among the parties on an equitable basis, thereby

jeopardizing the Company's role in the Joint Venture; and

(b)    that, as a result of the foregoing, there was an increased risk that Canadian

Superior would be unable to successfully complete the Joint Venture.

68.    On May 14, 2008, Canadian Superior issued a press release announcing its financial

and operating results for Q1 2008. Defendant McKenzie, commenting on the Company's financial

results, stated, in pertinent part, as follows:

> Our corporate objective is to remain focused on adding shareholder value with high
> impact offshore exploration in Trinidad, combined with growing cash flow from
> Western Canada. We are pleased to report that in the First Quarter of 2008 our
> average daily production, oil and gas revenues and cash flow from operations have
> all increased over the same period in 2007. *We expect [] the remainder of this year
> will be very exciting and rewarding for Canadian Superior shareholders.*
> [Emphasis added.]

With regard to the Company's operational update for Trinidad and Tobago, the press release stated,

in pertinent part, as follows:

> In January 2008, Canadian Superior announced a large natural gas discovery in
> Trinidad. *Successfully drilled its "Victory" well*, "Intrepid" Block 5(c), offshore
> Trinidad, a natural gas discovery; *with two zones successfully production tested*.
> The first zone tested natural gas on a restricted basis at high pressure rates averaging
> between 40 and 45 mmcf/d; and, the second zone, which was tested independently
> and separate from the first zone, tested natural gas on a restricted basis at high
> pressure rates averaging in excess of 30 mmcf/d. The combined two zones could
> produce natural gas at estimated rates of over 100 mmcf/d, with the first zone being
> condensate rich.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the

press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost
> to maintain a 45% working interest in Block 5(c)*, with its partners, BG
> International Limited, a wholly owned subsidiary of the BG Group plc, paying 40%
> for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25%
> working interest through Canadian Superior*. [Emphasis added].

- 25 -

69.     The statements referenced above in ¶68 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)     that Defendants had only reported the positive test results for the Victory well but failed to report other essential data, such as initial and final flowing rates and pressures and the shut-in pressure buildup data, which indicated that there were only limited reserves connected to the well and that the well would likely be a sub-economic discovery, as BG concluded;

(b)     that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(c)     that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(d)     that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(e)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the prospects of Intrepid Block 5(c).

70.     On June 26, 2008, Canadian Superior issued a press release announcing the "logging of zone of interest in 'Bounty' well offshore Trinidad." Defendants McKenzie commented on the Company's announcement, stating, in pertinent part, as follows:

- 26 -

> *We are very pleased with what we see on the logs that indicate encouraging hydrocarbons prior to fully penetrating all objectives in the well,* and we are excited about drilling to our projected TD of approximately 18,000 feet subsea.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c),* with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior.* [Emphasis added].

71.    On July 9, 2008, Canadian Superior issued a press release announcing that the Company and its partners have "unanimously agreed to case and conduct flow testing on the "'Bounty' well located approximately 65 miles off the east coast of the island of Trinidad." In that regard, Defendant McKenzie stated, in pertinent part, as follows:

> We are pleased to move forward with our partners to conduct flow testing on the "Bounty" well. We have completed the initial drilling of the well to approximately 17,360 feet, along with the wireline logging, and are now proceeding with running casing in preparation for our testing. The testing operation will take approximately 30 days, after which we will then commence operations on our next well, the "Endeavour," as we continue our initial three well programme on the 'Intrepid' Block 5(c) offshore Trinidad.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c),* with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior.* [Emphasis added].

72.    On July 16, 2008, Canadian Superior issued a press release announcing that it "completed the logging and casing of its 'Bounty' well." With regard to the Bounty well, Defendant McKenzie, stated, in pertinent part, as follows:

We are very pleased that the well has come in high. The running of the 7" casing is now complete and it has been cemented in place; we will now proceed with the testing program to conduct flow test(s), along with pressure build up test(s). The entire testing program will take approximately 30 days, after which we will finalize operations on the well and then prepare for our rig move to our next well, the 'Endeavour', as we continue our initial three well program on the 'Intrepid' Block 5(c) offshore Trinidad.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the

press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)*, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added].

73.     The statements referenced above in ¶¶70-72 were each materially false and

misleading when made because they misrepresented and failed to disclose the following facts, which

were known to Defendants or recklessly disregarded by them:

(a)     that the Company was, in fact, responsible for 60% of the costs associated

with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors,

Challenger Energy was required to, but never did, receive approval from the Minister prior to

participating in the drilling on Intrepid Block 5(c);

(b)     that the Company was in violation of the JOA since it: (i) failed to maintain a

separate joint account for funds associated with the JOA; (ii) commingled funds received from BG

with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate

interest-bearing account, with interest allocated among the parties on an equitable basis, thereby

jeopardizing the Company's role in the Joint Venture; and

(c)     that, as a result of the foregoing, there was an increased risk that Canadian

Superior would be unable to successfully complete the Joint Venture.

74.    On August 13, 2008, Canadian Superior issued a press release announcing that it has made a "significant natural gas discovery with the drilling and production testing of its 'Bounty' exploration well." Commenting on this discovery, Defendant Noval stated, in pertinent part, as follows:

> *We are very pleased with the results of the 'Bounty' well and production testing indicates that we have drilled one of the best natural gas wells offshore Trinidad.* The 'Bounty' natural gas discovery represents a significant achievement for Canadian Superior and our partners and shows the tremendous opportunities available to the oil and gas industry in Trinidad and Tobago.

Defendant McKenzie added, in pertinent part, as follows:

> The 'Bounty' discovery has met our expectations and has proven up a large high quality natural gas reservoir that in combination with our extensive 3-D seismic data in the area appears to exceed 7,000 acres in size. *I am confident the 'Bounty' well will initially produce at approximately 200 mmcf/d of sales natural gas at the anticipated pipeline pressure. This compares favorably with production from the nearest analogous field, Dolphin Deep,* where each of the two wells in this field produce at approximately 150 mmcf/d. Given the magnitude of the 'Bounty' discovery, we plan to move forward expeditiously with appraisal and development drilling and production.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c),* with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior.* [Emphasis added].

75.    The statements referenced above in ¶74 were each materially false and misleading for the reasons set forth above in ¶73 and because the Bounty discovery on its own would not be economic to develop, as BG had concluded. Moreover, the statement that this discovery "compares favorably with production from the nearest analogous field, Dolphin Deep" was materially false and misleading because Defendants knowingly or recklessly failed to disclose that each well faced its own risks and the proximity of an exploratory well to a nearby gas-producing field did not ensure

- 29 -

that the exploratory well on a separate project would be gas-producing in sufficient commercial quantities.

76.    On August 15, 2008, Canadian Superior issued a press release announcing its financial and operating results for the three months and six months ended June 30, 2008. With regard to the Intrepid Block 5(c), the press release stated, in pertinent part, as follows:

> *Canadian Superior as Operator of the "Intrepid" Block 5(c) offshore Trinidad announced a significant natural gas discovery with the drilling and production testing of its "Bounty" exploration well.* The "Bounty" well was drilled to a total depth of approximately 17,360 feet and encountered gas bearing horizons with the main targeted zone in the well encountering approximately 200 feet of pay. Initial test results indicate that the "Bounty" well is capable of producing at a rate of approximately 200 mmcf/d from this high pressure zone. The results from the "Bounty" well and interpretations of extensive 3-D seismic and other data indicate a natural gas resource potential of up to 2.6 TCF of natural gas from the tested structure. During the testing of the Bounty well, production testing equipment capacity was maximized resulting in flow testing being restricted to a stabilized rate of 60 mmcf/d of natural gas with a flowing bottomhole pressure of 7186 psi. *Given the magnitude of the "Bounty" discovery, the Company plans to move forward expeditiously with appraisal and development drilling and production. . .*

> \*        \*        \*

> In Trinidad and Tobago, Canadian Superior will soon mobilize the Kan Tan IV drilling rig to commence operations on the "Endeavour" well, the third in the series on the "Intrepid" Block 5(c).

Defendant McKenzie, commenting on the Company's financial results, stated, in pertinent part, as follows:

> These are exciting and rewarding times for Canadian Superior shareholders. We are very pleased to deliver our best quarterly and half year operations performance ever, as well as achieve repeated exploration success offshore Trinidad. *With high-potential exploration continuing offshore Trinidad* and our new growth efforts in the northeast US and North Africa building momentum, *we believe the best is still to come for our shareholders*.

77.    The statements referenced above in ¶76 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

- 30 -

(a)    that, as BG had concluded, the Bounty discovery on its own would not be economic to develop;

(b)    that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(c)    that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(d)    that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(e)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and the prospects of Intrepid Block 5(c).

78.    On September 2, 2008, Canadian Superior announced that the Company successfully "spudded the Endeavour well."

79.    On October 14, 2008, Canadian Superior issued a press release announcing that it "successfully [ran] 13-5/8" Casing on Endeavour Trinidad Well." With regard to the Endeavor well, Defendant Noval stated, in pertinent part, as follows:

> *I'm pleased to report that drilling operations have been going quite well.* At this rate, we will complete drilling this 12-1/4" section of the well before the end of the 4th week in October; to a depth of just over 15,000 feet. [Emphasis added.]

- 31 -

80.     The statement referenced above in ¶79 was materially false and misleading when made because it misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(b)     that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(c)     as a result of the foregoing, Defendant Noval lacked a reasonable basis for his positive statements about the prospects of the Endeavor well.

81.     On October 29, 2008, Canadian Superior announced that the Company along with its partners, BG and Challenger Energy, successfully ran and cemented in place the 9-7/8'' intermediate casing string in the Endeavour well, to a depth of approximately 14,492 feet subsea, and that drilling will commence in the final hole section in the well. With regard to the Endeavour well, Defendant Noval stated, in pertinent part, as follows:

> I am pleased to report that, in just over 2 months from spud, *we are now within striking distance of final [total depth] on 'Endeavour'*; and, will shortly commence drilling the final section of this well, the 8-1/2" hole section, roughly 3,600 feet from here to final [total depth]. The primary objective of 'Endeavour' is to prove up a possible multi − TCF reservoir. Our 3D seismic based geological prognosis for the 'Endeavour' well shows the main target zone to be between our current drilled depth and our final TD, which we expect to reach before the end of November. [Emphasis added.]

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

- 32 -

*Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)*, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added].

82.     The statements referenced above in ¶81 were materially false and misleading when made because Defendants failed to disclose:

(a)     that, as Defendant Coolen later admitted, the Company had insufficient funds at this time to complete the well and satisfy its expense obligations for the Joint Venture;

(b)     that, given the tightening of the global credit markets, the Company had no reasonable prospects for raising additional funds;

(c)     that the Company's financial situation greatly increased the risk that Maersk would resign since it was not being paid;

(d)     that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(e)     that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(f)     that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(g)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and the prospects of the Endeavor well.

- 33 -

83.    On November 17, 2008, Canadian Superior issued a press release announcing its

financial and operating results for the three months and nine months ended September 30, 2008 and

provided an update on the Endeavour well it is drilling on its Intrepid Block 5(c).  With regard to the

Intrepid Block, the press release state, in pertinent part, as follows:

> On August 13, 2008, Canadian Superior announced that it has made a significant
> natural gas discovery with the drilling and production testing of its "Bounty"
> exploration well on its "Intrepid" Block 5(c) offshore Trinidad. The "Bounty"
> exploration well was drilled to a total depth of approximately 17,360 feet and
> encountered gas bearing horizons with the main targeted zone in the well
> encountering approximately 200 feet of pay. Initial test results indicate that the well
> should be capable of producing at a rate of approximately 200 mmcf/d from this high
> pressure zone.  During the testing of the well, production testing equipment capacity
> was maximized, resulting in flow testing being restricted to a stabilized rate of 60
> mmcf/d of natural gas with a flowing bottom hole pressure of 7186 psi;
>
> On August 28, 2008, Canadian Superior announced that it successfully spudded the
> "Endeavour" well, approximately 5.2 miles north from the "Bounty" natural gas
> discovery on its "Intrepid" Block 5(c), planned to be drilled to a total vertical depth
> ("TD") of approximately 18,000 feet subsea. This well is the 3rd well, in an initial 3
> well program, being drilled by Canadian Superior and its partners on the "Intrepid"
> Block, Block 5(c), located approximately 60 miles offshore, off the east coast of
> Trinidad. "Endeavour" is being drilled on a separate prospect determined from the
> analysis and evaluation of extensive 3D seismic on the "Intrepid" Block 5(c). The
> primary objective of "Endeavour" is to prove up a possible multi-TCF reservoir. The
> Company's 3D seismic based geological prognosis for the "Endeavour" well shows
> the main target zone to be between the current drilled depth and final TD, which is
> expected to be reached by mid-December.
>
> Having reached a depth of 15,617 feet subsea in the final section of the well, due to
> well bore instability being encountered in the recently drilled hole section from
> 14,492 to 15,617 feet, the decision was made on November 13, 2008 to pull the
> bottom hole assembly ("BHA") back up to surface and complete various preparations
> in order to re-drill that 1,125 feet section with a mechanical sidetrack, prior to
> drilling to TD. It is expected that the drilling of the mechanical sidetrack will
> commence early this week.

84.    The statements referenced above in ¶83 were each materially false and misleading

when made because they misrepresented and failed to disclose the following facts, which were

known to Defendants or recklessly disregarded by them:

- 34 -

(a)    that, as Defendant Coolen later admitted, the Company had insufficient funds at this time to complete the well and satisfy its expense obligations for the Joint Venture;

(b)    that, given the tightening of the global credit markets, the Company had no reasonable prospects for raising additional funds;

(c)    that the Company's financial situation greatly increased the risk that Maersk would resign since it was not being paid;

(d)    that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(e)    that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(f)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the prospects of Intrepid Block 5(c).

85.    On December 8, 2008, Canadian Superior issued a press release updating the status of the "Endeavour" well in offshore Trinidad.  In the press release, the Company stated that the "'Endeavour' well was spudded on August 28, 2008 and is expected to reach its final total depth ("TD") of approximately 18,000 feet prior to the end of December."  With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)*, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40%

- 35 -

for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added].

86.    On December 29, 2008, Canadian Superior issued a press release announcing an update on the Endeavor well. With regard to the "Endeavor" well, Defendant Coolen stated, in pertinent part, as follows:

> The geological data obtained from the drilling to date of 'Endeavour' is very encouraging. When drilling was stopped to replace a worn drill bit, the data indicates that we had encountered, and were still drilling in, the main targeted zone for this well. Logging While Drilling ('LWD') data indicates that we have penetrated the main targeted zone; and, that the 'Endeavour' well has encountered approximately 162 feet of gross reservoir quality sands over a 168 foot interval to this point. While the data in hand is very useful; it is preferable to drill further into the main target zone to better determine the full extent of the reservoir and to obtain additional information, including full wireline logs, to further evaluate the various reservoir parameters and to have timely data in hand for forward scheduling of any possible appraisal work required. The sidetrack drilling is planned to start just as soon as the blowout preventer ("BOP") undergoes a necessary repair to allow drilling to proceed.

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the press release stated, in pertinent part, as follows:

> *Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c)*, with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior*. [Emphasis added].

87.    The statements referenced above in ¶¶85-86 were each materially false and misleading when made because they misrepresented and failed to disclose the following facts, which were known to Defendants or recklessly disregarded by them:

        (a)    that, as Defendant Coolen later admitted, the Company had insufficient funds at this time to complete the well and satisfy its expense obligations for the Joint Venture;

        (b)    that, given the tightening of the global credit markets, the Company had no reasonable prospects for raising additional funds;

- 36 -

(c)      that the Company's financial situation greatly increased the risk that Maersk would resign since it was not being paid;

(d)      that the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors, Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c);

(e)      that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(f)      that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(g)      as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the prospects of Intrepid Block 5(c).

88.      On January 23, 2009, Canadian Superior issued a press release announcing that the Company along with its partners, BG and Challenger Energy, were preparing to commence flow testing on the "Endeavour" well.  With regard to the Endeavour well, Defendant Coolen, stated, in pertinent part, as follows:

> *We are pleased with what we are learning from 'Endeavour'; not only in terms of this particular well and its related structure, but also in regard to the overall development potential of the entire 'Intrepid' Block 5(c).* Test information from the well is expected to confirm productive characteristics of the reservoir tested and the net pay encountered in the well. *Having information from three successful wells, along with the extensive 3D seismic coverage we have over the block and the nearby fields really makes a difference and encourages us to initiate the further appraisal of resources discovered. We look forward to completing the running and*

*cementing in place of the 7" liner to facilitate moving forward with the flow testing program.* These operations and finalizing all operations on the well will take close to the end of February to complete. At that point, *we will have completed the drilling and testing of all three successful wells, 'Victory', 'Bounty' and 'Endeavour',* in this initial three well exploration program on 'Intrepid' Block 5(c) and we will be releasing the drilling rig. We will have more to say on 'Endeavour' and the ongoing development planning for the 'Intrepid' Block 5(c) in the very near future. [Emphasis added.]

With regard to Canadian Superior's obligation for the costs of the Intrepid Block 5(c) project, the

press release stated, in pertinent part, as follows:

*Canadian Superior is paying 26-2/3% of the Block 5(c) exploration program cost to maintain a 45% working interest in Block 5(c),* with its partners, BG International Limited, a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest *and Challenger Energy Corp. paying 33-1/3% for a 25% working interest through Canadian Superior.* [Emphasis added].

89.     The statements referenced above in ¶88 were each materially false and misleading

when made because they misrepresented and failed to disclose the following facts, which were

known to Defendants or recklessly disregarded by them:

(a)     that, as Defendant Coolen later admitted, the Company had insufficient funds

at this time to complete the well and satisfy its expense obligations for the Joint Venture;

(b)     that, given the tightening of the global credit markets, the Company had no

reasonable prospects for raising additional funds;

(c)     that the Company's financial situation greatly increased the risk that Maersk

would resign since it was not being paid;

(d)     that the Company was, in fact, responsible for 60% of the costs associated

with Intrepid Block 5(c) – and not the 26-2/3% that it claimed – because, unbeknownst to investors,

Challenger Energy was required to, but never did, receive approval from the Minister prior to

participating in the drilling on Intrepid Block 5(c);

- 38 -

(e)    that the Company was in violation of the JOA since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis, thereby jeopardizing the Company's role in the Joint Venture;

(f)    that, as a result of the foregoing, there was an increased risk that Canadian Superior would be unable to successfully complete the Joint Venture; and

(g)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the prospects of Intrepid Block 5(c).

### The Truth Begins to Emerge

90.    On February 8, 2009, the Denning Affidavit was filed in an action commenced by BG and disclosed numerous previously-undisclosed facts regarding Canadian Superior's role as operator of Intrepid Block 5(c).

91.    On February 10, 2009, Canadian Superior issued a press releasing announcing that it "proposes to monetize a 25% or larger interest in its 'Intrepid' Block 5(c) offshore Trinidad and Tobago and its related discoveries."

92.    Then, on February 12, 2009, Canadian Superior shocked the market by announcing the "appointment, upon the application of BG of an interim Receiver of its participating interest in Intrepid Block 5(c). Pursuant to the Court Order, the Receiver, in conjunction with BG, will operate the property and conduct the flow testing of the Endeavour well which Canadian Superior believes will validate its operations to date." The press release continued, in pertinent part, as follows:

> The Court Order allows the Receiver to charge Canadian Superior interest in Block 5(c) with an amount up to U.S. $47 million to pay for its share of the costs under the joint operating agreement with BG. Canadian Superior will continue with the monetization of its interest in Block 5(c) as previously announced and the proceeds

from any sale will be applied to its share of the costs charged against Block 5(c) and to discharge the Receiver.

Canadian Superior questions the motives of BG given the fact that Canadian Superior has announced its intention to monetize all or a portion of its interests in Block 5(c). The Company has to date under its operatorship drilled and flow tested two (2) successful wells and is awaiting results of the flow testing on the third well which will validate our operations on the Block. Expenditures to date on this three (3) well program have totaled approximately U.S. $290 million. Canadian Superior believes there is a significant surplus value in its interests well in excess of its obligations. Canadian Superior has instructed its legal counsel to pursue all available legal remedies including an appeal.

93.     In response to the February 12, 2009 announcement, shares of the Company's stock plummeted $0.40 per share, or 44%, from a close of $0.90 per share on February 11, 2009, the last trading date before the announcement, to close at $0.50 per share, on extremely heavy trading volume.

94.     Then, on February 17, 2009, Canadian Superior issued a press release announcing that it had received a demand letter from Canadian Western for repayment of all amounts outstanding under Canadian Superior's $45 million credit facility with the Bank by February 23, 2009. The Company also announced that it was in discussions with alternative lenders.

95.     In response to the February 17, 2009 announcement, shares of the Company's stock fell $0.16 per share, or 30%, from a close of $0.54 per share on February 13, 2009, the last trading date before the announcement, to close at $0.38 per share, on extremely heavy trading volume.

96.     On March 11, 2009, Canadian Superior issued a press release confirming that NYSE Alternext US LLC had halted trading in its common shares on March 5, 2009.

97.     On April 27, 2009, the board of directors of Canadian Superior issued a press release announcing the departure of Defendant Noval as Executive Chairman of the Company and Defendant Coolen as President and CEO of the Company.

**Additional Scienter Allegations**

98.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Canadian Superior, their control over, and/or receipt and/or modification of Canadian Superior's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Canadian Superior, participated in the fraudulent scheme alleged herein.

99.    Defendants were motivated to engage in this course of conduct in order to allow Canadian Superior to benefit from the closing of two private placements that the Company completed on August 26, 2008 and November 21, 2008, for total gross proceeds of $16,000,000 and $35,000,000, respectively. Additionally, Defendants were motivated to engage in this course of conduct in order to allow certain Company insiders to collectively sell more than 330,000 shares of their personally-held Canadian Superior common stock for gross proceeds of approximately $908,747(CAD). The insider shares sold during the Class Period are set forth more fully in the following chart:

| Insider Name | Date | Shares | Price | Proceeds (CAD) |
|---|---|---|---|---|
| Bilton, Leigh | 04/07/08 | 15,000 | $3.11 | $46,724 |
|  | 04/07/08 | 15,177 | $3.21 | $48,689 |
|  | 09/08/08 | 8,400 | $3.75 | $31,500 |
|  | 09/16/08 | 100,000 | $2.98 | $297,710 |
| Total |  | 138,577 |  | $424,623 |
|  |  |  |  |  |
| Snethun, Leif | 09/30/08 | 22,900 | $2.64 | $60,456 |

| Insider Name | Date | Shares | Price | Proceeds (CAD) |
|---|---|---|---|---|
| | 10/01/08 | 44,400 | $2.60 | $115,440 |
| | 10/02/08 | 36,000 | $2.40 | $86,400 |
| | 10/03/08 | 89,809 | $2.47 | $221,828 |
| Total | | 193,109 | | $484,124 |

### Loss Causation/Economic Loss

100.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of Canadian Superior's common stock and operated as a fraud or deceit on Class Period purchasers of Canadian Superior common stock. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Canadian Superior common stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of Canadian Superior common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

101.    Defendants' false and misleading statements had the intended effect and caused Canadian Superior's common stock to trade at artificially inflated levels throughout the Class Period.

102.    As a direct result of Defendants' disclosures set forth above, the price of Canadian Superior common stock fell precipitously. These drops removed the inflation from the price of Canadian Superior common stock, causing real economic loss to investors who had purchased Canadian Superior common stock during the Class Period.

103.    The declines in the price of Canadian Superior common stock after the disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in Canadian Superior common stock negates any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*,

damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Canadian Superior common stock and the subsequent significant decline in the value of Canadian Superior common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

104.    On February 12, 2009, Canadian Superior issued a press releasing announcing the "appointment, upon the application of BG of an interim Receiver of its participating interest in Intrepid Block 5(c)."

105.    In response to the February 12, 2009 announcement, shares of the Company's stock fell $0.40 per share, or 44%, from a close of $0.90 per share on February 11, 2009, the last trading date before the announcement, to close at $0.50 per share, on extremely heavy trading volume.

106.    Then, on February 17, 2009, Canadian Superior issued a press release announcing that it had received a demand letter from Canadian Western for repayment of all monies outstanding under Canadian Superior's $45 million credit facility by no later than February 23, 2009.    The Company also announced that it was in discussions with alternative lenders.

107.    In response to the February 17, 2009 announcement, shares of the Company's stock fell $0.16 per share, or 30%, from a close of $0.54 per share on February 13, 2009, the last trading date before the announcement, to close at $0.38 per share, on extremely heavy trading volume.

### Applicability of Presumption of Reliance:
### Fraud on the Market Doctrine

108.    At all relevant times, the market for Canadian Superior common stock was an efficient market for the following reasons, among others:

(a)    Canadian Superior common stock met the requirements for listing, and was listed and actively traded on the AMEX and TSX, highly efficient and automated markets;

(b)     as a regulated issuer, Canadian Superior filed periodic public reports with the SEC;

(c)     Canadian Superior regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Canadian Superior was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

109.    As a result of the foregoing, the market for Canadian Superior common stock promptly digested current information regarding Canadian Superior from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Canadian Superior common stock during the Class Period suffered similar injury through their purchase of Canadian Superior common stock at artificially inflated prices and a presumption of reliance applies.

**No Safe Harbor**

110.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are

liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Canadian Superior who knew that those statements were false when made.

### COUNT I

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

111.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

112.    During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

113.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

114.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Canadian Superior common stock. Lead Plaintiff and the Class would not have purchased Canadian Superior common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

115.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of Canadian Superior common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against All Defendants

116.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

117.    The Individual Defendants acted as controlling persons of Canadian Superior within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of Canadian Superior and their ownership of Canadian Superior stock, Defendants had the power and authority to cause Canadian Superior to engage in the wrongful conduct complained of herein. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Lead Plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

DATED:  April 30, 2010

ROBBINS GELLER RUDMAN
   & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
CAROLINA C. TORRES


_____
       DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Co-Lead Counsel for Lead Plaintiff

DYER & BERENS LLP
JEFFREY A. BERENS
300 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

Additional Counsel for Lead Plaintiff

## CERTIFICATE OF SERVICE

I, Kelly Stadelmann, hereby certify that on April 30, 2010, I caused a true and correct copy of the attached:

Amended Complaint for Violation of the Federal Securities Laws

to be: (i) filed by hand with the Clerk of the Court; and (ii) served by first-class mail to all counsel listed below.

Dyer & Berens LLP
Jeffrey A. Berens
303 East 17th Street, Suite 300
Denver, CO 80203

Holzer Holzer & Fistel, LLC
Michael I. Fistel, Jr.
200 Ashford Center North, Suite 300
Atlanta, GA 30338

Morrison & Foerster, LLP
Jack C. Auspitz
1290 Avenue of the Americas
New York, NY  10104-0050

Kelly Stadelmann