UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID SGALAMBO, Individually and on
Behalf of All Others Similarly Situated,

                    Plaintiff,

       -against-

CRAIG MCKENZIE, et al.,

                    Defendants.

Civil Action No. 1:09-cv-10087-SAS

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

MORRISON & FOERSTER LLP
1290 Avenue of the Americas
New York, New York  10104
(212) 468-8000
*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii-v

PRELIMINARY STATEMENT ........................................................................................... 1

SUMMARY OF FACTUAL ALLEGATIONS...................................................................... 3

    A.  Canadian Superior's Business Risks and Disclosures ...................................................... 3

    B.  The Intrepid Block 5(c) Development ............................................................................. 4

    C.  Agreements with Canadian Superior's Partners on the Intrepid Block ............................ 5

    D.  The Global Credit Crisis in the Fall of 2008 and the Precipitous Events Leading to BGI's Receivership Motion in February 2009................................................................. 7

    E.  The Challenged Statements and Defendants' Cautionary Language.............................. 12

ARGUMENT ..................................................................................................................... 13

I.    PLAINTIFF FAILS TO ALLEGE SCIENTER AGAINST ANY DEFENDANT .............. 13

    A.  Allegations of Motive Based on Routine Corporate Transactions and Stock Sales of Two of Five Defendants and One Defendant Who Bought During The Class Period Fail to Support the Required Strong Inference of Scienter ..................................................... 13

    B.  Plaintiff Cannot Allege Conscious Misbehavior or Recklessness When the Complaint Fails to Show Alleged Misstatements Were False When Made .................................... 16

        1.  Alleged Undisclosed Information About the Likely Economic Viability of the Wells Does Not Render Any of the Company's Statements False or Misleading or Support a Strong Inference of Scienter.................................................................19

        2.  Alleged Failure to Disclose JOA Accounting Irregularities is Immaterial and Cannot Support Inference of Conscious Misbehavior or Recklessness....................21

        3.  The Company's Statements About Cost-Sharing Were Accurate and the Alleged Failure to Disclose Challenger's and Canadian Superior's Financial Difficulties is Contradicted by the Public Record.....................................................................23

II.   SPECULATIVE OR FORWARD-LOOKING STATEMENTS CONCERNING THE WELLS' "LIKELY ECONOMIC VIABILITY" ARE NOT ACTIONABLE.................... 26

    A.  Allegations of Falsity Are Speculative and Do Not Adequately Specify How the Statement Was False When Made .................................................................................. 27

    B.  Statements Concerning the Wells' Economic Viability Are Forward Looking ............. 28

III.  PLAINTIFF CANNOT ALLEGE LOSS CAUSATION BECAUSE THEY CANNOT POINT TO ANY CONCEALED RISKS THAT CAUSED THE LOSS .............................. 30

IV.  THE CLASS SHOULD BE NARROWED TO ELIMINATE FOREIGN PURCHASERS WHO BOUGHT ON A FOREIGN EXCHANGE .............................................................. 32

CONCLUSION.................................................................................................................. 33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Acito v. IMCERA Group,*
     47 F.3d 47 (2d Cir. 1995) ...................................................................................15

*AEP Energy Servs. Gas Holding Co. v. Bank of America,*
     05 Civ. 4348, 2007 WL 4458117 (S.D.N.Y. Dec. 18, 2007) ...................................8

*ATSI Comm's, Inc. v. Shaar Fund Ltd.,*
     493 F.3d 87 (2d Cir. 2007)..........................................................................3, 13, 16

*Beleson v. Schwartz,*
     599 F. Supp. 2d 519 (S.D.N.Y. 2009)...................................................................26

*Bersch v. Drexel Firestone, Inc.,*
     519 F.2d 974 (2d Cir. 1975)....................................................................................32

*Boguslavsky v. Kaplan,*
     159 F.3d 715 (2d Cir. 1998)....................................................................................32

*Caiafa v. Sea Containers Ltd.,*
     525 F. Supp. 2d 398 (S.D.N.Y. 2007)..............................................................27, 28

*Cohen v. Koenig,*
     25 F.3d 1168 (2d Cir. 1994)...................................................................................27

*Denny v. Barber,*
     576 F.2d 465 (2d Cir. 1978)...................................................................................18

*Dura Pharms., Inc. v. Broudo,*
     544 U.S. 336 (2005)...........................................................................................30, 31

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,*
     553 F.3d 187 (2d Cir. 2009)...............................................................................14, 16

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
     343 F.3d 189 (2d Cir. 2003)...................................................................................31

*Ganino v. Citizens Utils. Co.,*
     228 F.3d 154 (2d Cir. 2000)...............................................................................15, 22

*Gross v. Summa Four,*
     93 F.3d 987 (1st Cir. 1996)....................................................................................27

*Horizon Asset Mgmt. v. H&R Block, Inc.*,
  580 F.3d 755 (8th Cir. 2009) ............................................................22

*In re Aetna, Inc. Sec. Litig.*,
  34 F. Supp. 2d 935 (E.D. Pa. 1999) .................................................15

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 346 (S.D.N.Y. 2005)...............................................32

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008)...............................................33

*In re Centerline Holdings Co. Sec. Litig.*,
  678 F. Supp. 2d 150 (S.D.N.Y. 2009)................................20, 21, 22

*In re China Life Sec. Litig.*,
  No. 04 Civ. 2112(TPG), 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008)................................33

*In re Duane Reade Sec. Litig.*,
  No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003) ........................13

*In re Health Mgmt. Sys. Sec. Litig.*,
  No. 97 Civ. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998)..............27

*In re IBM Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998)...............................................................30

*In re KeySpan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) ...............................................14

*In re Livent, Inc. Noteholders Sec. Litg.*,
  151 F. Supp. 2d 371 (S.D.N.Y. 2001).................................................30

*In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*,
  272 F. Supp 2d 243 (S.D.N.Y. 2003)..................................................32

*In re NovaGold Resources Inc. Sec. Litig.*,
  629 F. Supp. 2d 272 (S.D.N.Y. 2009).................................................32

*In re Optionable Sec. Litig.*,
  577 F. Supp. 2d 681 (S.D.N.Y. 2008).................................................24

*In re Ramp Corp. Sec. Litig.*,
  No. 05 Civ. 6521, 2006 WL 2037913 (S.D.N.Y. July 21, 2006) ................31

*In re Regeneron Pharms., Inc. Sec. Litig.*,
  No. 03 Civ. 3111, 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ...............14

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d. 63 (2d Cir. 2001)........................................................................16

*In re SCOR Holding (Switzerland) AG Litig.*,
    537 F. Supp. 2d 556 (S.D.N.Y. 2008)........................................................33

*In re Sec. Capital Assur. Sec. Litig.*,
    No. 07 Civ. 11086, 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) ...........17

*In re Sierra Wireless, Inc. Sec. Litig.*,
    482 F. Supp. 2d 365 (S.D.N.Y. 2007)........................................................30

*In re Silicon Storage Tech.*,
    No. C 05-0295, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006).................14

*In re Sotheby's Holdings, Inc.*,
    No. 00 Civ. 1041, 2000 WL 1234601 (S.D.N.Y. Aug. 31, 2000) ...........17

*In re Tower Auto Sec. Litig.*,
    483 F. Supp. 2d 327 (S.D.N.Y. 2007)........................................25, 26, 30

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ........................................................32

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) ......................................................14

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir.2001)..................................................................14, 16

*Keeney v. Larkin*,
    306 F. Supp. 2d 522 (D. Md. 2003) ............................................................26

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005)................................................................30, 31

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994) ......................................................................14

*Morrison v. Nat'l Austl. Bank*,
    457 F.3d 167 (2d Cir. 2008), *cert. granted,* 130 S. Ct. 783 (2009) ("*NAB*") ...................32, 33

*Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*,
    No. 08 Civ. 8143 (WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010)................16

*Pozniak v. Imperial Chem. Indus.*,
    No. 03 Civ. 2457(NRB), 2004 WL 2186546 (S.D.N.Y. Sept. 28, 2004) ...............33

*Roots Partnership v. Lands' End, Inc.*,
    965 F.2d 1411 (7th Cir. 1992) ...................................................................................27

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000).........................................................................................6

*San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*,
    75 F.3d 801 (2d Cir. 1996).......................................................................................15

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994).....................................................................................18

*Slayton v. American Express*,
    ____ F.3d ____, 2010 WL 1960019 (2d Cir. May 17, 2010)..........................28, 29

*Suez Equity Investors L.P. v. Toronto-Dominion Bank*,
    250 F.3d 87 (2d Cir. 2001).......................................................................................13

*Teamsters Local v. Dynex Capital*,
    531 F.3d 190 (2d Cir. 2008).....................................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)...........................................................................................13, 16

## STATUTES

15 U.S.C. 78t.................................................................................................................32

15 U.S.C. 78u-5(c)........................................................................................................28

15 U.S.C. § 78u-4(b) (2)...............................................................................................13

15 U.S.C. § 78u-5(i)(1)(B)&(C)....................................................................................28

15 U.S.C. § 78u-5(c)(1)(B)(ii)(II)................................................................................29

## OTHER AUTHORITIES

17 C.F.R. § 230.405.....................................................................................................32

17 C.F.R. § 240.12b-2..................................................................................................32

Fed. R. Civ. P. 8...........................................................................................................30

Fed. R. Civ. P. 9(b)................................................................................................17, 27

## PRELIMINARY STATEMENT

Plaintiff brings a case against former officers of Canadian Superior Energy, Inc. ("Canadian Superior" or "Company"), an oil and natural gas exploration company, in connection with disclosures made in 2008 and early 2009 about the inherently risky exploration for natural gas wells on a tract of land off Trinidad and Tobago called Intrepid Block 5. Plaintiff challenges the alleged failure to disclose (1) unquantified "essential data," which Plaintiff alleges "would likely" render the wells "sub-economic," (2) that the Company allegedly did not observe some contractual accounting procedures, and (3) that the Company was allegedly responsible for a larger percentage of the project's development costs because of its partner's failure to get government approval. In addition to the fact that Plaintiff's allegations are undermined by the contracts and documents referenced in the Amended Complaint (the "Complaint" or "AC"), the allegedly missing information was either already disclosed, immaterial or arose long after the impugned statements were made.

Plaintiff chooses to ignore that Canadian Superior repeatedly disclosed to investors the risky nature of this exploration and the many factors, economic and geological, that could cause the project to fail. Indeed, the Company never stated the wells would be economical, the Company specifically warned that "the accumulations or estimated accumulations *may not be economically viable or technically feasible to produce*." In any event, the speculation by Plaintiff that the wells were "likely" not to be economical is, at best, vague and premature and cannot be the basis of a fraud claim. Significantly, Plaintiff's claim is based on the untested and unsupported statement of Ewen Denning, an employee of Canadian Superior's former partner BG International, Ltd. ("BGI"), made at a time when BGI was seeking to buy Canadian Superior's interest in the Block. Denning's statement that the Intrepid Block is "likely" to be "below the economic threshold for development" is contradicted not only by Denning's

concession that further testing necessary to determine the viability of the Intrepid Block, but is further belied by the fact that shortly thereafter, BGI purchased a 45% interest in the Intrepid Block for $142 million, on top of the $125.2 million BGI had already invested in the project.

As to the second and third allegations, that Canadian Superior was in violation of certain (but far from all) technical accounting procedures in its contract with BGI, Plaintiff ignores that Canadian Superior had disclosed months before that its accounting controls were unreliable and that it would take until the end of the Class Period to fix them.  That fact, and the trivial nature of the accounting issues alleged, make this claim immaterial as well as old news.  Finally, Plaintiff's claim that Canadian Superior was responsible for Challenger Energy Corp.'s ("Challenger") share of the costs because Challenger did not get government approval simply ignores and misreads the relevant contract.  Challenger was responsible for its share of the costs whether or not the government of Trinidad and Tobago approved of the assignment of interest in the project.  Plaintiff seizes upon the precipitous economic events of late 2008 and early 2009 that ultimately led to Canadian Superior's March 2009 bankruptcy filing, and uses that bankruptcy to allege by hindsight that defendants must have been concealing information, but as the public documents show, the market was well aware of the project's overall risks as well as Canadian Superior's financial strain and its continued, yet not-guaranteed, need for capital.  In all, Plaintiff's claims amount to nothing more than speculation and improper fraud by hindsight.

Plaintiff also fails to allege scienter as to any defendant.  There are no proper allegations of motive – indeed, one defendant *bought* stock and two others held their shares as the price tumbled – nor can an inference be drawn other than that all the defendants believed the Company's statements to be true and complete.  Finally, Plaintiff cannot point to any allegedly concealed risk that caused Canadian Superior's stock to drop.  The stock dropped as a result the

Company's announcements of an interim receiver and a demand from its principal lender for

repayment.  These statements have nothing to do with the allegedly concealed risks at issue in

the Complaint and the market was also already well aware of the Company's financial

difficulties.  Thus, Plaintiff fails to allege the elements of securities fraud and the Complaint

should be dismissed.

**SUMMARY OF FACTUAL ALLEGATIONS**

A.    **Canadian Superior's Business Risks and Disclosures**

Canadian Superior is an Alberta-based oil and natural gas exploration company.

(11/19/08 Form F-3 at 4, Ex. 1, row 24.)[1]  The Company's core business involves a high degree

of risk:  as the Company warned its investors, its long-term commercial success depends on the

daunting task of finding, acquiring, developing and commercially producing oil and natural gas

reserves in sufficient quantities.  (*Id*.)  Environmental hazards can greatly increase the cost of

operations, and various field conditions, from the need to obtain governmental approvals to

extreme weather conditions – may adversely affect the production even from successful wells.

Finally, the price of natural gas fluctuates over time and the majority of "the Company's

production is . . . sold at spot prices that are subject to volatile trading activity" and thus efforts

to identify and produce new reserves may prove unprofitable.  (2007 Annual MD&A filed

3/31/08 at 15, Ex. 1, row 10; *see also* 2007 Annual Information Form "2007 AIF" filed 3/31/08

at 37, Ex. 1, row 11) ("[c]ertain wells or other projects may become uneconomic as a result of a

---

[1]    References to "Ex." are to exhibits to the Declaration of Damion K. L. Stodola, dated June 4, 2010.  On a motion to dismiss, a court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference … and documents possessed by or known to the plaintiff and upon which it relied in bringing suit." *ATSI Comm's, Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The Complaint quotes the Company's press releases.  Mindful of the Court's individual practices concerning exhibits, defendants attach a chart summarizing the public press releases relevant to this motion along with their web addresses in the event the Court wishes to consult the full versions.  (Ex.1.)

decline in . . . natural gas prices . . .").

More significantly for this case, investors were well aware that the Company was exposed to the risk of total loss of its properties and possible termination of its operations if it did not have access to sufficient capital from its cash flow or the financial markets. The Company always required significant capital, which was generated by cash flow from operations, equity financing and credit facilities. (*Id.*) The Company clearly warned that these financial resources "*may not be sufficient to fund the necessary capital requirements to undertake or complete future drilling programs*, and if so, *there can be no assurance that additional debt or equity financing will be available* to meet the requirements on acceptable terms." (2007 Annual MD&A at 15, Ex. 1, row 10) (emphasis added). Canadian Superior also advised investors that "[a] sustained and material decline in [natural gas] prices from historical average prices could limit the [Company]'s borrowing base, therefore reducing the bank credit available to the [Company]." (2007 AIF at 37, Ex. 1, row 11.) The Company further stated that "[f]ailure to obtain [] financing on a timely basis *could cause the Corporation to forfeit its interest in certain properties . . . and reduce or terminate its operations*." (*Id.*(emphasis added).)

B.     **The Intrepid Block 5(c) Development**

Plaintiff focuses on a natural gas development project offshore Trinidad and Tobago known as Intrepid Block 5(c) (the "Intrepid Block"). On July 20, 2005, Canadian Superior signed a Production Sharing Contract ("PSC") with the government of Trinidad and Tobago that gave the Company the right to (1) *explore* the Intrepid Block (*id.* at 10) and (2) "*evaluate* three large separate *potential* hydrocarbon bearing structures" identified as three "exploration" wells called Victory, Bounty, and Endeavour. (*Id.* at 11 (emphasis added).) The Victory well was "spudded" on June 29, 2007 (*i.e.*, the date drilling was initiated), and by the end of 2007 the Company "*estimate[d] on a preliminary basis*" that it *could* contain commercial natural gas

4

reserves.  (2/4/08 Press Release at 1, Ex. 1, row 6 (emphasis added).).  The Bounty Well was spudded on February 20, 2008, with a "primary objective . . . to prove up the presence of *potential* . . . reservoirs which are deeper, and higher pressure than the 'Victory' discovery." (5/7/08 Press Release at 1, Ex. 1, row 12 (emphasis added).)  The last exploration well, Endeavour, was spudded on August 28, 2008, but encountered several publicly disclosed setbacks in November and December 2008.  (*See* AC ¶ 78; *see also id.* ¶ 83 (quoting 11/17/08 Press Release regarding well bore stability problems); 12/8/08 Press Release at 1 (citing equipment failure), Ex. 1, row 25.)  By the end of December, the Company and its partners decided that further drilling as originally planned was no longer practicable and the Company announced a change in procedure.  (12/29/08 Press Release at 1, Ex. 1, row 26.)  Nonetheless, drilling and testing on the Endeavour well continued right through January 2009, when it finally reached total depth.  (1/23/2009 Press Release at 1, Ex. 1, row 27.)  On January 23, 2009, the Company announced that it was "pleased with what we are learning from 'Endeavour'" and that "[t]est information from the well *is expected* to confirm productive characteristics of the reservoir."  (*Id.* (emphasis added).)

The Company made no further announcements about the Intrepid Block wells during the class period.  Most importantly, the Company *never* stated that any of the three exploration wells, which are a preliminary step in the development of a natural gas site, would be "economically viable."  The Company reported on the progress of drilling and testing and potential reserves – *never* on the "economics" of the wells, which requires analysis of numerous factors including quantity of reserves, capital costs to extract and produce, and the price of gas.

### C.    Agreements with Canadian Superior's Partners on the Intrepid Block

Three agreements between and among Canadian Superior, Challenger Energy Corp.

("Challenger")[2] and BGI pertaining to the Intrepid Block are pertinent to Plaintiff's allegations that Canadian Superior misrepresented the division of payment responsibility between it and Challenger when it said Challenger would pay 33 1/3% of the costs.  The first is a Participation Agreement executed on December 30, 2005 between Canadian Superior and Challenger, as amended on August 11, 2007.  (*See* Exs. 2, 3)[3]  Challenger was contractually obligated to pay one third of Intrepid's costs to earn a 25% "working interest" in the "rights and obligations derived from the [PSC]," which was payable only after all work on the Intrepid Block was complete.  (Ex. 2 §§ 2.4, 4.1; Ex. 3 §§ 2.4, 4.3.)  The Participation Agreement did *not* grant or guarantee Challenger any interest in the PSC in exchange for its payment obligations under the Participation Agreement; instead, Canadian Superior agreed only to hold a 25% interest in the PSC in trust for Challenger and to use "best efforts" to have Challenger recognized as a party to the PSC, *provided* Challenger had first earned its working interest by making all payments due under the Participation Agreement.  (Ex. 2 § 5.1; Ex. 3 § 2.4.)  As discussed below, Plaintiff claims that Challenger did not have to pay its share because it never got approval from the Government of Trinidad and Tobago.  But, Challenger's contractual obligation to pay 33 1/3% of the costs incurred in connection with the Block project existed *whether or not* an actual interest in the PSC was ever assigned to it.

---

[2]    Challenger is an Alberta-based oil and gas exploration company with ties to defendant Noval. AC ¶ 17 (Challenger had "close ties" to Canadian Superior executive); AC ¶ 24(d).

[3]    The Complaint references and cites to the Participation Agreement, as amended, (AC ¶ 37), as well as a Joint Operating Agreement ("JOA") (AC ¶¶ 6, 7, 17, 39, 40, 41, 48, 53, 58, 60, 62, 64, 67, 68, 73, 77, 82, 84, 87, 89), and a Farm-In Agreement (AC ¶¶ 39, 40).  Selected pages from the JOA are attached to the Stodola Declaration as Exhibit 4.  A full version of the JOA can be accessed at Ex. 1, row 2.  The Farm-In Agreement can be accessed at Ex. 1, row 1. Theses agreements were attached as exhibits in both the public records of the Canadian receivership and bankruptcy proceedings discussed at length in the Complaint.  For purposes of a motion to dismiss, it is proper for this Court to consider both the full text of the contractual agreements cited by Plaintiff and the public record of bankruptcy proceedings.  *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000).

The other two relevant agreements are the Farm-In Agreement between Canadian Superior and BGI, and the Joint Operating Agreement ("JOA") among Canadian Superior, BGI and Challenger, both dated August 11, 2007. (Ex. 4.) Pursuant to the Farm-In Agreement, BGI had the right to earn a 30% interest in the PSC in exchange for paying 40% of the costs associated with the Intrepid Block. The JOA stated that Challenger would not receive its 25% interest in the PSC until Canadian Superior formally assigned that interest to Challenger (which would require approval from the Minister of Energy of Trinidad and Tobago), but again nothing absolved Challenger of its obligation under the Participation Agreement to pay its share of costs. (Ex. 4 § 3.2(C).) Under the terms of these agreements, the partners contributed over $260 million to costs of the Intrepid Block exploration. (Ex. 5 ¶ 22.) Of that total, BGI paid $125.2 million, Canadian Superior paid $66.6 million, and Challenger paid $69.3 million. (*Id.* ¶ 22.)

### D.    The Global Credit Crisis in the Fall of 2008 and the Precipitous Events Leading to BGI's Receivership Motion in February 2009

In September 2008, Challenger was engaged in a stock offering with a minimum closing threshold of $30 million CAD and a maximum of $40 million CAD. (*Id.* ¶ 29(a).) Because market conditions were quickly deteriorating, Challenger approached Canadian Superior and asked the Company to extend a short-term credit facility to Challenger that would allow it to close its financing. (*Id.* ¶ 29(f).) Once the financing was closed on October 2, 2008, Challenger paid all of its then-outstanding payables under the Participation Agreement of approximately US $20 million. (*Id.*) But Challenger fully disclosed in its third quarter 2008 filings that it "will [] require additional financing to fulfill its obligations on the third exploration well in the three exploration well commitment in the [Intrepid] Block 5(c) program."(Challenger's 2008 Q3 MD&A filed 11/13/08 at 3, Ex. 1, row 21). Challenger further stated, under the heading "Liquidity," that "[m]anagement estimates the funds from the October 2, 2008 offering and the

[b]ridge [f]acility are less than Challenger's remaining share of the costs with respect to funding the [Intrepid] Block 5(c) commitment. [. . .]  [Challenger] plans to fund the shortfall with debt or equity financing.  There is no guarantee that such financing will be available on commercially suitable terms or at all."  (*Id*. at 7)

Canadian Superior similarly warned the market in the fall of 2008 that it faced liquidity problems.  In addition to the risk disclosures warning investors that Canadian Superior could, at any time, face the loss of properties or termination of operations if sufficient financing were not available, the Company specifically disclosed in its third quarter 2008 filings (i) that it had a working capital deficit of $16.7 million; (ii) that it had drawn $43.3 million on its $45 million bank credit facility; (iii) that "[s]ubsequent to September 2008, the Company's bank advised that it does not anticipate remaining as the Company's lender indefinitely"; (iv) that the Company was "reviewing alternatives to replace its existing facility"; and (v) that it was considering "strategic alternatives and potential asset dispositions with a view to funding its capital program." (2008 Q3 MD&A filed 11/14/08 at 6, Ex. 1, row 22.)  Compounding the Company's liquidity problems was the fact that natural gas prices had collapsed in the fall of 2008, and had dropped more than 50% from an average price of $11.32 per thousand cubic feet ("mmscf") in July 2008 to just $5.50 mmscf in November 2008.  (Ex. 12 at 2.)[4]  This decline continued throughout the rest of 2008 and well into 2009, and, as noted, Canadian Superior had warned the market that "[a] sustained and material decline in [natural gas] prices from historical average prices could limit the [Company]'s borrowing base, therefore reducing the bank credit available to the [Company]." (2007 AIF at 37, Ex. 1, row 11.)

---

[4] This Court may take judicial notice of natural gas prices reported in "reliable industry reports" on a motion to dismiss.  *AEP Energy Servs. Gas Holding Co. v. Bank of America*, 05 Civ. 4248, 2007 WL 4458117, at *4 (S.D.N.Y. Dec. 18, 2007).

In the fall of 2008, the global credit markets were in the grip of a historic seizure and access to further financing quickly became increasingly difficult. (*See*, *e.g.*, AC ¶¶ 82(b), 84(b), 87(b).) Challenger was no exception, and during the fall of 2008, it was unable to raise the financing necessary to continue to meet its cash calls under the Participation Agreement and JOA, and failed to repay amounts due under the credit facility extended by Canadian Superior. (Ex. 5 ¶¶ 29(f), 29(g).) By November 2008, although Canadian Superior itself was able to close a $35 million private placement, it did not have sufficient funds to meet all of its obligations under the JOA, in large part because Challenger failed to make the cash call due for November 2008. (*Id.* ¶ 24; AC ¶¶ 17, 46.) According to Plaintiff, this led to the non-payment of the November invoice for Maersk Drilling ("Maersk"), the sub-contractor operating the drilling rig for the Intrepid Block. (AC ¶ 46.) But Plaintiff ignores the fact that the invoice – a small fraction of the $110 million paid to Maersk up to that date – was not due and payable *until January 2, 2009*. (Denning Aff., Ex. 6 ¶ 23; 2/4/09 letter, Ex. 7.) Correspondence between Maersk and Canadian Superior in January and early February, 2009 shows that the parties were working toward an amicable resolution of the payment. (*See* 1/26/09 Maersk letter, 1/30/09 Maersk letter, and 2/4/09 letter, Ex. 7.)

At the same time, BGI inquired about the payment to Maersk and met with Canadian Superior executives on February 2, 2009 to discuss the matter. Notes from that meeting indicate that Canadian Superior disclosed to BGI that it intended to "negotiate a payment schedule with Maersk together with corporate guarantees" and that a conference call was scheduled for February 5, 2009. (*See* 2/2/09 meeting notes, Ex. 7.) Notwithstanding that Canadian Superior was in the middle of negotiations with Maersk to resolve the payment issue, BGI acted precipitously to remove Canadian Superior as operator of the Intrepid Block and to seize the

Company's interest in the project.  BGI sent a rapid series of letters on February 5 and 6, 2009

(without allowing Canadian Superior any meaningful opportunity to reply) (i) demanding

information from Canadian Superior regarding the joint account established under the JOA; (ii)

noting that Challenger was in default; and (iii) giving Canadian Superior notice that BGI

considered it to be in material breach and default under the JOA due to the Maersk non-payment

and that BGI would seek to remove Canadian Superior as operator for the Intrepid Block.  (*See*

2/5/09 BGI letters, Ex. 7; 2/6/09 BGI letters, Ex. 8.)  Under the terms of the JOA, BGI was

contractually bound to assume control of the joint account and payment of Intrepid Block

payables if Canadian Superior remained in default for more than 30 days (Ex. 4 §§ 4.10(B),

8.3(C)), but rather than provide Canadian Superior with an opportunity to cure the default, BGI

immediately instituted arbitration proceedings in the London Court of International Arbitration

on February 9, 2009, and, on the same day, BGI moved the Court of Queen's Bench in Alberta,

Canada to appoint a receiver for Canadian Superior's assets in the Intrepid Block.  (*See* Exs. 8,

9.)  In its motion, BGI undertook to fund Canadian Superior's payments due under the JOA and

to pay all trade creditors for the Intrepid Block.  (Ex. 9.)

     In support of its receiver motion, BGI filed an affidavit signed by Ewen Denning, its Vice

President, Commercial of Trinidad and Tobago.  (Ex. 6.)  Plaintiff's allegations are drawn

largely from this affidavit.[5]  Without reference to any supporting data, Denning said baldly that

"it is BGI's view that the Victory Well is likely to be a sub-economic discovery" and that the

"Bounty discovery on its own is not economic . . . [but] *may become economic if the Endeavour*

*Well discovers sufficient reserves* to make the joint development of the two prospects together

---

[5]    Plaintiff relies heavily on this affidavit, but Denning's testimony was never tested under
cross-examination and contains numerous unsupported and unsubstantiated statements of
opinion that Denning was in no position to make.  (Ex. 6.)  Moreover, BGI's later purchase of a
45% interest in the Block for $142.5 million contradicts Denning's claims.  (Ex. 10.)

economic. . . ." (*Id.* ¶¶ 44-45 (emphasis added).)  Denning noted that drilling of the Endeavour

Well was "at target depth" and that "the only significant work to be done by Maersk is the testing

of the Endeavour Well."  (*Id.* ¶ 47.)  Denning then stated, in contradictory fashion, that testing of

the Endeavour Well was necessary "so that a decision on development of the entire Intrepid

Block can be made" but then stated, again without any data or support, that "BGI's opinion is

that the currently discovered reserves in the Intrepid Block are below the economic threshold for

development."  (*Id.* ¶ 49.)  Yet in the face of Denning's statements, BGI nevertheless sought to

take over as operator of the Intrepid Block, to pay Canadian Superior's approximately $47

million share of the outstanding costs for the Endeavour Well (subject to a lien on Canadian

Superior's interest in the Intrepid Block), and ultimately purchased 45% of Canadian Superior's

interest in the Intrepid Block for the sum of $142.5 million.  (8/14/2009 CCAA Plan, Ex. 10

§1.8(a).)  BGI's actions – investing over $250 million in the Intrepid Block – and its desire to

obtain Canadian Superior's assets at a favorable price belie Denning's untested statements.

Denning further attested and Plaintiff repeatedly alleges that "[d]uring November and

December 2008, BGI conducted an audit" which allegedly revealed that Canadian Superior had

failed to maintain a separate bank account for the joint venture; had "commingled" the

Company's funds with BGI's; and did not "account for interest" as required in the Accounting

Procedures appended to the JOA.  (Ex. 6 ¶ 22.)  Significantly, neither Denning nor BGI ever

suggested that Canadian Superior misappropriated any funds paid to it under the JOA or

Participation Agreement, and there was no complaint that Canadian Superior had not otherwise

complied with the Accounting Procedures, including the provision of monthly reports setting

forth (i) the advances of funds received from each party to the JOA; (ii) the share of each party in

total expenditures; (iii) the accrued expenditures; (iv) the current account balance of each party;

(v) a summary of costs, credits and expenditures on a current month, year-to-date and inception-to-date basis; (vi) details of any unusual charges in excess of US $50,000.  (Ex. 4 § 1.5.1.)

On the basis of Denning's unsupported and untested testimony, the Alberta Court of Queen's Bench granted the receivership motion on the day it was filed, and denied Canadian Superior's request for adjournment.  Canadian Superior immediately appealed, but ultimately needed to seek protection under Canadian bankruptcy laws by early March due, in material part, to the receivership order over one of its most valuable assets.  (*See* Coolen Aff., Ex. 5.)

### E.    The Challenged Statements and Defendants' Cautionary Language

Plaintiff cites from Canadian Superior press releases and public disclosures, followed by a laundry list of allegedly undisclosed information that supposedly rendered the impugned statements "false and misleading."  (*See*, AC ¶¶ 58, 60, 62, 64, 67, 69, 73, 75, 77, 80, 82, 84, 87, 89.)  Although the Complaint is not clear, it appears to challenge any statement about the Intrepid Block during the year-long class period – whether a statement of historical fact; a forward-looking statement about future plans; or an immaterial statement of corporate optimism – for failure to disclose (1) allegedly "essential data," such as initial and final flow rates and pressure, which Plaintiff alleges "would likely" render the wells "sub-economic" (*e.g.*, AC ¶58(a)), (2) that the Company allegedly failed to observe certain Accounting Procedures under the JOA, or (3) that the Company was allegedly responsible for 60% of Intrepid's development costs because of Challenger's failure to get government approval.  In addition to the fact that this information was immaterial, forward-looking, or already disclosed, these alleged undisclosed circumstances all arose in late 2008, long <u>after</u> most of the impugned statements had been made.  And, the Company repeatedly warned investors of these very risks*, e.g,* "if discovered, in this or any other discovery, the accumulations or estimated accumulations may not be economically viable or technically feasible to produce."  (*See*, *e.g.*, 2/4/08 Press Release at 2, Ex. 1, row 6.)

**ARGUMENT**

**I.    PLAINTIFF FAILS TO ALLEGE SCIENTER AGAINST ANY DEFENDANT**

Plaintiff fails to plead sufficient facts "(1) showing that defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); 15 U.S.C. § 78u-4(b) (2). Plaintiff's allegations of scienter are neither cogent nor compelling by any measure, and, in fact, strongly support an opposing inference that defendants had absolutely no intent to defraud investors.[6]

> **A.    Allegations of Motive Based on Routine Corporate Transactions and Stock Sales of Two of Five Defendants and One Defendant Who Bought During The Class Period Fail to Support the Required Strong Inference of Scienter**

Plaintiff's allegations of motive and opportunity fail for two reasons. First, Plaintiff's alleged "concrete benefits" are those that have been rejected by the courts because they do not accrue to the individual defendants, but rather to the corporation as a whole. *In re Duane Reade Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *8-9 (S.D.N.Y. Nov. 25, 2003). Plaintiff alleges, in a single sentence, that defendants' motive—which allegedly stretched all the way back to January 2008—was "to allow Canadian Superior to benefit from the closing of two private placements" in August and November 2008. (AC ¶ 99.) Nothing in the Complaint indicates how these private placements presented any benefit to the defendants. On this basis alone, the allegation fails. *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001) (plaintiff must allege "defendants could realize 'concrete benefits' from the deception" to show "motive and opportunity") (citation omitted). The more plausible inference

---

[6] *ATSI*, 493 F.3d at 99 ("[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences.")(citation omitted); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007) ("[t]o qualify as 'strong' . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and *at least as compelling as* any opposing inference of nonfraudulent intent").

is that defendants who seek to raise capital for their company possess the same motives held by officers and directors of every company. *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.,* 553 F.3d 187, 198 (2d Cir. 2009) (motives generally possessed by officers and directors are insufficiently concrete and personal to qualify as a motive supporting the inference of scienter).[7]  Indeed, the Company repeatedly disclosed that its cash flow was dependent in part on raising capital through equity financing.  (*See, e.g.*, 2007 AIF at 37, Ex. 1, row 11.)  The private placements in late 2008 were the sort of "routine" corporate transactions that necessarily fail to support the required strong inference of scienter.  *In re Silicon Storage Tech.*, No. C 05-0295, 2006 WL 648683 at *19 (N.D. Cal. Mar. 10, 2006) ("[a]llegations that defendants engaged in routine business activities or were motivated by concerns that are shared by all companies and executives [are] not sufficient to establish scienter.").

        Second, Plaintiff's allegations of stock sales are equally insufficient to allege motive and opportunity.  One defendant, CEO Craig McKenzie, *bought* 100,000 shares valued at $315,392 during the class period.  (Record of stock purchases recorded with Canadian securities regulators, Ex. 11.)[8]  Fraudsters do not buy the false goods they are selling.  *In re Regeneron Pharms., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005) ("purchase of additional company shares during the . . . period [of alleged fraud] . . . is inconsistent with an intent to commit fraud"); *In re KeySpan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ("[A]cquisition of shares cuts against the notion that defendants sought to unload their holdings of . . . stock before their likely diminution in value following the

---

[7]    *See also Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir.2001); *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994)(interest in a successful IPO and secondary offering insufficient to allege fraudulent motive).

[8]    This Court may take judicial notice of documents filed publicly pursuant to the laws of Canada.  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1158-59 (C.D. Cal. 2007).

disclosure of negative insider information.").

Of the remaining four defendants, Plaintiff can only point to stock sales by two, Snethun and Bilton, neither of whom are even alleged to have had any involvement in the Intrepid Block development. (*See* 2008 Annual Information Form at 45-46, Ex. 1, row 28.)[9] In addition, the timing of their sales was neither unusual nor suspicious, as required to support the necessary strong inference of scienter. *Acito v. IMCERA Group*, 47 F.3d 47, 54 (2d Cir. 1995). Instead, the sales took place in April and late September/early October 2008 while the stock price was already sharply declining. The relatively small alleged proceeds – not profits – of less than CAD $500,000 total for each of Snethun and Bilton also undermines any notion that the sales were suspicious. Courts have routinely dismissed complaints alleging far greater gains. *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) (US$2 million gain did not support inference of fraud); *In re Aetna, Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 955 (E.D. Pa. 1999) (proceeds of $130 million by outside director insufficient to show sales were suspicious).

The remaining two defendants, Noval and Coolen, the Chairman and former COO respectively, are not alleged to have sold a single share during the class period, while the stock price tumbled from $3.70 to $0.38.[10] "[T]he fact that other defendants did not sell their shares during the relevant class period sufficiently undermines plaintiff's claim" that the defendants were motivated to commit fraud in order to gain personally through stock sales. *San Leandro*, 75 F.3d at 814 (rejecting allegations of scienter based on stock sales of just one defendant); *Acito*,

---

[9]   The Complaint alleges irrelevant information concerning Snethun and Bilton's position *after* the class period to suggest they were senior officers. Yet, during the class period, neither defendant was a director. Bilton was a non-executive vice-chairman, and Snethun was VP for Western Canada. Both were *solely* responsible for Western Canadian operations. (*Id.*)

[10]   A district court may take judicial notice of well-publicized stock prices on a motion to dismiss. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167, n.8 (2d Cir. 2000).

47 F.3d at 54 (same where only one defendant sold stock). If the defendants were committing a fraud, they would have sold their shares rather than lose money holding on to a declining investment. *Plumbers & Steamfitters Local 773 v. Canadian Imperial Bank of Commerce*, No. 08 Civ. 8143 (WHP), 2010 WL 961596, at *9 (S.D.N.Y. Mar. 17, 2010) (concluding it was "nonsensical to impute dishonest motives to the [defendants] when each of them suffered significant losses in their stock holdings . . . .') (citation omitted). The only "cogent and compelling" inference that these facts support is that defendants had absolutely no intent to defraud. *Tellabs*, 551 U.S. at 314.

### B. Plaintiff Cannot Allege Conscious Misbehavior or Recklessness When the Complaint Fails to Show Alleged Misstatements Were False When Made

Plaintiff's circumstantial allegations of "conscious misbehavior" in the Complaint rest on the notion that defendants "knew facts or had access to information suggesting that their public statements were not accurate." *ECA*, 553 F.3d at 199 (quoting *Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000).[11] Plaintiff does not succeed with this tack, because he improperly relies on general and conclusory averments, rather than "specifically identify[ing] the reports or statements containing" the alleged undisclosed information. *Teamsters Local v. Dynex Capital*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d. 63, 72 (2d Cir. 2001) (requiring plaintiff "to specify the internal reports, who prepared them and when, and how firm the numbers were or which company officers reviewed them") (citation omitted). Thus, "broad allegations that [d]efendants received

---

[11]    Where there is no motive for the alleged fraud, "the strength of the circumstantial allegations must be correspondingly greater . . . ." *ATSI*, 493 F.3d at 99; *Kalnit*, 264 F.3d at 142. And the "strong" inference of scienter drawn from circumstantial allegations of intentional wrongdoing or recklessness must be "cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324) (emphasis in original).

and were aware of information contradicting their public statements because they held management roles is not enough to allege scienter." *In re Sec. Capital Assur. Sec. Litig.*, No. 07 Civ. 11086, 2010 WL 1372688, at *25 (S.D.N.Y. Mar. 31, 2010) (citation omitted); *see also In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041, 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000) ("boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter") (citations omitted).

Furthermore, because scienter allegations must be pled with particularity, "the PSLRA and Rule 9(b) preclude attribution of knowledge or intent from one defendant to another" and plaintiff must therefore plead, *as to each individual defendant*, a factual basis for alleged conscious misbehavior or recklessness. *In re Sec. Capital Assur. Sec. Litig.*, 2010 WL 1372688, at *25-26, citing *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 381 (S.D.N.Y. 2004). Plaintiff's allegations of scienter based on "access to information" fail on this basis alone. A *single* paragraph in the Complaint states generically that defendants "recei[ved] []information reflecting the true facts regarding Canadian Superior" but Plaintiff never pleads any facts to show how or when this alleged "true" information was communicated to each of the individual defendants. (AC ¶ 98.) Indeed, two defendants (Snethun and Bilton) held regional positions in Western Canada – and Plaintiff does not allege these Canada-specific managers had any involvement in or access to information about the Trinidad and Tobago project.

Even a cursory review of the Complaint shows that the alleged "information" supposedly rendering Canadian Superior's public statements "inaccurate" arose very late in the class period – indeed, 14 of the 20 challenged statements were issued long before Challenger and Canadian Superior began to experience liquidity problems in the fall of 2008 and 19 of the 20 challenged

statements were issued before the non-payment of Maersk in January 2009. Plaintiff simply latches onto circumstances that arose late in the class period leading to the Company's bankruptcy filing in early March 2009, and then casts backward the notion that these adverse circumstances must have been known and concealed for as long as a year. This is nothing more than fraud by hindsight that has long and consistently been dismissed in this Circuit as inadequate and which cannot support any inference that the impugned statements were false when made, much less that they were made with fraudulent intent. *See Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).

Specifically, Plaintiff alleges that every statement issued by the Company concerning the Intrepid Block for an entire year – from January 2008 to January 2009 – was false because defendants allegedly failed to disclose some or all of the following:

1. "essential data," such as initial and final flow rates and pressures, showing that the Victory well "would likely be a sub-economic discovery, as BG[I] had concluded" (AC ¶¶ 58(a), 60(a), 69(a); *see* also ¶¶ 75; 77(a)) and that "the Bounty [Well] discovery on its own would not be economic to develop," also according to BGI (AC ¶¶ 75; 77(a));

2. that the Company had allegedly failed to observe all Accounting Procedures under the JOA (AC ¶¶ 58(c); 60(c); 62(b); 64(a); 67(a); 69(c); 73(b); 75; 77(c); 80(a); 82(e); 84(d); 87(e); 89(e));

3. Canadian Superior was responsible for 60% of the costs associated with the Intrepid Block because Challenger "was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block . . . ." (*See*, *e.g.*, AC ¶ 58(b); 62(a); 69(b); 73(a); 77(b); 82(d); 87(d); 89(d).); and that the Company and Challenger were experiencing financial difficulties. (AC ¶¶ 82(a); 84(a); 87(a); 89(a).)

When each of these alleged undisclosed circumstances is examined in turn, however, it is apparent that Plaintiff completely distorted the events of fall 2008 and the allegations of scienter (and falsity) consequently fall apart.

    1.      **Alleged Undisclosed Information About the Likely Economic Viability of the Wells Does Not Render Any of the Company's Statements False or Misleading or Support a Strong Inference of Scienter**

In support of the allegation the Defendants misstated the viability of the wells, Plaintiff seizes upon two conclusory statements by Denning – whose self-serving February 2009 affidavit in support of the BGI receivership motion was never subject to cross-examination – that "it is *BGI's view* that the Victory Well is likely to be a sub-economic discovery" and that "*BGI believes* the Bounty Well on its own is not economic." (Ex. 6 ¶¶ 44-45 (emphasis added).) BGI's opinion about the wells in February 2009 does not render false and misleading the factual statements made by the Company about the drilling and testing of the Intrepid Block over the prior year, for at least three reasons.

    First, and most significantly, *Canadian Superior never stated that the Intrepid Block or any particular well would be "economic."* Canadian Superior disclosed only the progress of drilling and testing the wells. Even the very last statement issued about the progress of the Intrepid Block on January 23, 2009 states only the Company was "pleased with what we are learning from 'Endeavour'; not only in terms of this particular well . . ., but also in regard to the overall *development potential* of the entire 'Intrepid Block' . . . ." (1/23/09 Press Release at 1, Ex. 1, row 27 (emphasis added).) The Company went on to state that "[h]aving information from three successful wells . . . really makes a difference and encourages us to initiate the further appraisal of resources discovered." (*Id.*) The Company estimated that testing of the "initial three well exploration program on Intrepid Block" would be concluded by the end of February 2009. (*Id.*) In fact, all of the Company's statements about progress on Intrepid Block drilling and testing were similarly qualified to make clear that the three wells were exploratory in nature. Plaintiff cannot point to a statement where defendants assured investors, either expressly or impliedly, that any of the wells would be "economic" and successfully produce commercial

quantities of natural gas.  To the contrary, defendants explicitly cautioned against such assumption: "[t]here is no [guarantee] that any portion of these accumulations or estimated accumulations . . . may not change materially; and that, if discovered, in this or any other discovery, the accumulations or estimated accumulations may not be economically viable or technically feasible to produce."  (*See*, *e.g.*, 2/4/08 Press Release at 2, Ex. 1, row 6.) (*See also infra*, Part II.B.)

Second, even if the Company had represented that the Intrepid Block was economically viable (and it did not), BGI's unsubstantiated and untested opinion in February 2009 would not render false all of the Company's assessments of the wells for an entire year *prior* to that time. Denning's opinion as of February 2009 does not purport to speak for earlier dates—and the economic viability of a natural gas well may change over time, particularly as natural gas prices fluctuate.  Canadian Superior specifically disclosed this risk to investors.  (*See* 2007 AIF at 37, Ex. 1, row 11) ("[c]ertain wells or other projects *may become uneconomic* as a result of a decline in . . . natural gas prices . . ." (emphasis added).)  As it happened, natural gas prices were in steep decline in the second half of 2008 and the decline continued throughout 2009.  (*See* Historical Gas Prices, Ex. 12 at 2.)  Thus, even if Denning believed in February 2009 based on economic factors extant *at that time* that the wells would not be economic, it does not follow that BGI or anyone else would have arrived at the same opinion 3, 6, 9 or 11 months earlier.  *In re Centerline Holdings Co. Sec. Litig.*, 678 F. Supp. 2d 150, 159 (S.D.N.Y. 2009) (SAS) (plaintiffs failed to allege that "defendants knew or should have known that the statements were false *at the time any their misstatements were made*" where alleged misstatements predated alleged contrary information).

Third, Denning is careful to couch his statements as "beliefs" or "views."  As this Court

has held, on a motion to dismiss, "opinions couched as factual allegations," such as the opinions

touted in Denning's affidavit, are not "accord[ed] . . . a presumption of truthfulness." *Id.* at 155-

56, *citing In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007).  Plaintiff overlooks

that BGI contradicted its own "opinion" insofar as Denning stated in the very same affidavit that

"[t]he value of the Endeavour Well and the Intrepid Block *remains uncertain*" pending further

testing of the Endeavour Well, and that "[t]he reserves associated with the Endeavour Well must

be determined *so that a decision on development of the entire Intrepid Block can be made* and a

development plan established."  (Ex. 6 ¶¶ 48-49 (emphasis added).)  As such, Denning's

"opinion" in fact *accords* with the statements made by defendants, and does not support any

inference that defendants knew their factual statements about the progress of the Intrepid Block

were false when made.  Most tellingly, Denning's February opinion is flatly contradicted by the

fact that BGI exercised its right of first refusal to pay $142.5 million for a 45% interest in the

Block shortly thereafter.  (CCAA Plan, Ex. 10.)  Finally—and notwithstanding Denning's

allegations—claims based on the "*likely* economic viability" of the wells must fail, because they

are both (1) speculative and (2) forward looking and not subject to liability.  *See Infra* Part II.

### 2.  Alleged Failure to Disclose JOA Accounting Irregularities is Immaterial and Cannot Support Inference of Conscious Misbehavior or Recklessness

Plaintiff similarly relies on Denning's statements that BGI conducted an audit of

Canadian Superior "[d]uring November and December 2008" that purportedly revealed that the

Company had failed to observe certain of the Accounting Procedures required under the JOA,

such as maintaining a separate bank account for the Joint Venture and accounting for interest.

(AC ¶ 41; Ex. 6 ¶ 22.)  Once again, there are no facts pled to show when or whether the

individual defendants ever learned of these alleged accounting issues, and certainly if the issues

came to light in "November and December 2008," they do not render false any of defendants'

statements *prior to that time* or support any inference of scienter in connection with such statements.  *See In re Centerline Holdings*, 678 F. Supp. 2d at 159 (dismissing Section 10(b) claim where alleged undisclosed circumstances arose after challenged statements issued).

In any event, beginning in March 2008, Canadian Superior disclosed that it suffered from accounting control problems and stated bluntly that "[t]here are no effective controls or procedures related to all significant accounts and processes to provide reasonable assurance that transactions are recorded accurately, are recorded timely and are complete."  (2007 Annual MD&A at 11, Ex. 1, row 10))  The Company undertook a remediation plan to address the disclosed material weakness in accounting controls and estimated that remediation would continue through "2008 year-end."  (*Id.*)  The market already incorporated these disclosures into the stock price and thus information concerning technical non-compliance with some of the Accounting Procedures would not have added anything to the information already in the marketplace about Canadian Superior's accounting problems.[12]  As such, the alleged undisclosed information about the JOA Accounting Procedures is immaterial under the "truth-on-the-market" doctrine.  *Ganino*, 228 F.3d at 167 (describing doctrine as representing assumption that "a misrepresentation is immaterial if the information is already known to the market").  Moreover, these fulsome disclosures about Canadian Superior's accounting controls undermines any inference that defendants were trying to defraud investors by knowingly withholding information.  *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755 (8th Cir. 2009) (defendants' disclosures regarding internal accounting control failures and ongoing efforts to remedy them fail to support the inference that defendants "intended to deceive the public or

---

[12]   As noted above, there is no allegation, and no suggestion from BGI, that Canadian Superior misappropriated any of the Joint Venture funds, nor that any of the reporting obligations required under the Accounting Procedures were not fully and accurately met.

acted with severe recklessness" when they later revealed need for accounting restatement).

### 3. The Company's Statements About Cost-Sharing Were Accurate and the Alleged Failure to Disclose Challenger's and Canadian Superior's Financial Difficulties is Contradicted by the Public Record

Plaintiff fundamentally misinterprets the contractual arrangements underlying the development of the Intrepid Block. Plaintiff repeatedly alleges that, *at all times* during the year-long class period, "the Company was, in fact, responsible for 60% of the costs associated with Intrepid Block . . . because . . . Challenger Energy was required to, but never did, receive approval from the Minister prior to participating in the drilling on Intrepid Block 5(c)." (*See*, *e.g.*, AC ¶¶ 58(b), 60(b), 62(a).) This allegation is contradicted by the express terms of the Participation Agreement, which makes clear that Challenger's obligation to pay its share of costs for the Intrepid Block is not tied to "Minister approval" over its participation in the project. (*See* Ex. 2.) Instead, Challenger contracted for the right to *earn* a participating interest in the Intrepid Block over time if it met its payment obligations. (Ex. 2 § 4.3; Ex. 3 § 2.4.) In exchange, Canadian Superior undertook only to hold a 25% interest in trust for Challenger and to use "best efforts" to effect the formal assignment of that interest, through the Ministry of Energy, once it was earned by Challenger. (Ex. 2 § 5.1(a).) Challenger's contractual obligation to pay 33 ⅓% of costs (and Canadian Superior's contractual right to recover such costs) thus exists independently of, and is not contingent upon, any "Minister approval." (*Id.*)

Although Denning asserted that, "as between BGI and [Canadian Superior]," BGI could hold Canadian Superior responsible for 60% of the costs until Challenger's share was formally assigned, the JOA allowed the Company to hold Challenger to its contractual payment obligations. (Ex. 4 §§ 4.10(B), 8.3(C) (under JOA, if a party defaulted on its obligations, the remaining parties were required to take over control of the joint account established for payment of Intrepid Block creditors and to satisfy all payment obligations); *id.* § 8.4(E) (the parties each

granted to the other "a mortgage and security interest on [its] [PSC] Interest, whether now owned or [later] acquired" that could be enforced where a party failed to remedy its default within 30 days.)  The Coolen affidavit, upon which Plaintiff also relies, states that Challenger defaulted under the JOA beginning in November 2008, but Challenger would have 30 days under the JOA to cure such default. (*See* Ex. 5 ¶ 24.)[13]  Even if the default were not cured by the December 2008 deadline, Canadian Superior could still pursue other remedies to extract Challenger's share of the costs.  Thus allegations that defendants failed to disclose that they were "responsible for 60% of the costs" at all times during the class period simply has no basis.  Instead, Canadian Superior's disclosure that it was paying for 26 2/3% of costs on the Intrepid Block was fully accurate and consistent with its contractual rights under the JOA and Participation Agreement. Since Plaintiff cannot even show that Canadian Superior's statements about cost-sharing were false when made, it follows that Plaintiff cannot allege any fraudulent intent on the part of defendants in connection with these statements.  *See, e.g., In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 694 (S.D.N.Y. 2008) (complaint dismissed because "sources [of false statements] do not support the inference defendants' statements were false or misleading with regard to a material fact.").

Furthermore, by November, the market knew that Canadian Superior was experiencing liquidity problems: the Company disclosed a significant working capital deficit of $16.7 million; it had drawn $43.3 million on its $45 million bank credit facility; and its bank advised that it would not be the Company's lender "indefinitely."  (2008 Q3 MD&A at 6, Ex. 1, row 21.)  The Company announced that it was "reviewing alternatives" to replace the credit facility and was

---

[13]   On November 13, 2008, Challenger informed the market that it would "require additional funds … to satisfy its share of the costs associated with the Endeavour Well and completing its obligations under the Block 5(c) participation agreement" and that "Challenger plans to fund the shortfall with debt or equity financing."  (Challenger 2008 Q3 MD&A at 6, 7, Ex. 1, row 21.)

considering "strategic alternatives and potential asset dispositions" in order to fund its capital requirements.  (*Id.*)  Given that the Company had previously disclosed that "failure to obtain [] financing on a timely basis *could cause the Corporation to forfeit its interest in certain properties . . . and reduce or terminate its operations*," the market was on notice that the Company's liquidity problems could adversely affect its properties, including the Intrepid Block. (2007 AIF at 37, Ex. 1, row 11) (emphasis added).)  Once again, there is no basis for plaintiff's allegation that defendants somehow knowingly misled investors concerning the financial situation.  *In re Tower Auto Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007) (disclosures about company's liquidity problems sufficient to put investors on notice of financial condition).

The same analysis applies to Plaintiff's assertion that Defendants failed to disclose (i) that the Company "had insufficient funds . . . to complete the [Endeavour] well and satisfy its obligations for the Joint Venture; (ii) that the Company had "no reasonable prospects" for additional funding because of the "tightening of the global credit markets"; and (iii) that these circumstances "greatly increased the risk that Maersk would resign since it was not being paid." (AC ¶ 84.)  These allegations are flatly contradicted by the public record, which shows that (1) Canadian Superior's financial difficulties had, in fact, been disclosed (as discussed above); (2) Canadian Superior was, in fact, able to raise $35 million in a private placement in November 2008 and thus had "reasonable prospects" for additional funding; and (3) Maersk's unpaid invoice was not due and payable until January 2, 2009, and up to that time, Maersk *was* being paid – to the tune of over $110 million.  (Ex.6 ¶ 23; 2/4/09 letter, Ex. 7.)

More importantly, the record in the BGI receivership proceeding shows very clearly that Canadian Superior continued to work in good faith with Maersk to find an amicable solution to the non-payment.  Canadian Superior proposed a payment schedule to Maersk on February 5,

2009 that would have provided the rig operator with full payment, including interest.  (2/4/09 letter, Ex. 7.)  These records undermine Plaintiff's allegation that Defendants fraudulently failed to disclose the "increased risk that Maersk would resign" (*see, e.g.*, AC ¶¶ 82, 84, 87, 89) since the Company had every expectation it would arrive at a negotiated solution with Maersk.

In any event, the Company was fully entitled to pursue this business solution to its liquidity problems without being forced to broadcast a play-by-play of each and every negotiation, which would only trigger an unnecessary crisis.  *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009) (there are important "public policy justifications for allowing a company operating near insolvency to make careful deliberations about its future . . . .") *citing In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007).[14]  Because the market was well-apprised of Canadian Superior's financial problems, the Company was under no obligation to make further disclosures as it "ma[de] careful deliberations about its future" and negotiated with its creditors and partners.  *Beleson*, 599 F. Supp. 2d at 527 (citation omitted).

## II.    SPECULATIVE OR FORWARD-LOOKING STATEMENTS CONCERNING THE WELLS' "LIKELY ECONOMIC VIABILITY" ARE NOT ACTIONABLE

To the extent Plaintiff alleges Defendants misled the market concerning the "*likely economic viability*" of the wells (*see, e.g.*, AC ¶¶ 58(a), 60(a), 69(a), 75, 77(a)), these allegations are speculative and the statements at issue are forward-looking.

---

[14]    In *Tower Auto*, the court held that "failure to disclose [] bankruptcy planning did not make . . . other disclosures misleading" and that defendants' warnings that the company was "pursuing options for easing the company's liquidity problems" provided sufficient disclosure to the market about the company's financial condition.  *Id.* (citation omitted).  Canadian Superior made those disclosures as it began to experience liquidity problems in late fall 2008.  *See also Beleson*, 599 F. Supp. 2d at 527; *Keeney v. Larkin*, 306 F. Supp. 2d 522, 539-40 (D. Md. 2003) (disclosures about efforts to obtain credit sufficient to put investors on notice of company's financial straights).

### A.   Allegations of Falsity Are Speculative and Do Not Adequately Specify How the Statement Was False When Made

Plaintiff's allegations that statements about the wells' economic viability were false when made are entirely speculative.  Even if Defendants had implied the wells would be economically viable—and they did not (*supra* Part I.B.1)—the truth or falsity of such implication remains unknown to this day.  BGI paid $142.5 million for a 45% interest in the Intrepid Block and the only plausible inference is that the economic viability remains an open question.  In the absence of a misstatement, there can be no liability under the securities laws.  *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398 (S.D.N.Y. 2007) (complaint dismissed for failure to adequately plead falsity).  Here, allegations of falsity do not rely on any restatement or disclosure that the Intrepid Block was not viable.  Instead, Plaintiff's already speculative accusation rests on nothing more than a conclusory allegation that "there were only *limited reserves* connected to the well …". (*see, e.g.*, ¶¶ 58(a), 60(a), 69(a), 75, 77(a) (emphasis added).)  No well on Earth has limitless reserves.  Thus Plaintiff's failure to allege how low reserves had to be before they become "subeconomic" fails the pleading standards of Rule 9(b), much less the heightened pleading standard of the PSLRA.  *See, e.g.*, *Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir. 1992) (where issuer was accused of failing to "establish adequate reserves for its excessive and outdated inventory," Rule 9(b) not satisfied when Plaintiff did not allege "what the reserves were or how great the reserves should have been").[15]  Where, as here, there is no

---

[15] *See also Gross v. Summa Four*, 93 F.3d 987 (1st Cir. 1996)(plaintiff "has not alleged the amount of the putative overstatement or the net effect it had on the company's earnings"); *In re Health Mgmt. Sys. Sec. Litig.*, No. 97 Civ. 1865 (HB), 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998), citing *Lands' End* (allegations that defendant was "suffering from 'increased competition,' lower margins, decreased profitability and 'fee erosion' were insufficient to plead fraud without specifics and quantification); *cf. Cohen v. Koenig*, 25 F.3d 1168, 1173 (2d Cir. 1994)(complaint survived motion to dismiss where plaintiff specifically identified and compared disclosed financial figures with alleged actual financial figures).

plausible allegation or quantification, much less explanation of the statement's falsity, the complaint must be dismissed. *Caifa*, 525 F. Supp. 2d at 411 (allegations that asset values were misstated were insufficient where plaintiff failed to specify amount of overvaluation").

### B. Statements Concerning the Wells' Economic Viability Are Forward Looking

The impugned statements of implied future economic viability are also, by definition, forward looking and not subject to liability. *Slayton v. American Express*, ____ F.3d ____, 2010 WL 1960019 (2d Cir. May 17, 2010); *see also*, 15 U.S.C. 78u-5(c) ("defendant is not be liable for a forward-looking statement if it is "identified as a forward-looking statement, and . . . accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.").

<u>First</u>, statements involving discussion of management's future plans for the Intrepid Block and/or a discussion of management's expectations for the wells' future performance based on preliminary testing and estimates are all forward looking. (*See e.g.*, AC ¶ 65 ("[i]t is *expected* that the 'Bounty' well and the third well, 'Endeavour', will both be drilled . . . by year-end 2008") (emphasis added); *id*. ¶ 88 ("[t]est information from the well is *expected* to confirm productive characteristics . . . .") (emphasis added).) *See Slayton*, 2010 WL 1960019 at *8 (finding "facts and circumstances of the language used" make clear that company is projecting into future and use of word "expect" to identify forward-looking statement to be "common-sense proposition"); 15 U.S.C. § 78u-5(i)(1)(B)&(C) (defining as forward-looking "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the [Company], and "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management . . . .").

In addition, the Company's disclosures specifically identified as forward-looking any

statement "relating to estimates, results, events and expectations" or "estimates, projections, interpretations, prognoses, and other information that may relate to current or future production, development(s), testing, well test results, project start-ups and future capital [costs]." (*See*, *e.g.*, 2/4/08 Press Release at 2, Ex. 1, row 6.) The Company warned that "[t]here is no guarantee that any portion of these accumulations or estimated accumulations . . . may not change materially; and that, if discovered, in this or any other discovery, *the accumulations or estimated accumulations may not be economically viable or technically feasible to produce*." (*Id.*) For these reasons alone, claims that Defendants misstated the "likely economic viability" of the wells must be rejected. *Slayton*, 2010 WL 1960019 at *10 (cautions and warnings about forward-looking estimates "'convey[ed] substantive information about factors that realistically could cause results to differ materially from projections'").

Second, Plaintiff cannot "prove that the forward-looking statement . . . was . . . made or approved by [an executive] officer with actual knowledge by that officer that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B)(ii)(II). Where, as here, plaintiff has not plead a "strong inference of scienter," *supra* Part I.B.1, the standard for pleading "actual knowledge" under the PSLRA safe harbor necessarily has not been met. *Slayton*, 2010 WL 1960019, at *12, *citing Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) ("the scienter requirement for forward-looking statements is stricter than for statements of current fact. Whereas liability for the latter requires a showing of either knowing falsity or recklessness, liability for the former attaches only upon proof of knowing falsity" and plaintiff must also plead facts to support a strong inference of scienter that more "cogent and compelling" than any plausible opposing inference). The facts in the Complaint and the documents referenced therein strongly support the non-fraudulent inference that Defendants were making every effort to

shepherd the Company through a tumultuous period while providing the market with pertinent, timely disclosures of these developments as required.  Accordingly, as discussed above, Defendants' forward-looking statements are protected by the safe harbor.[16]

### III. PLAINTIFF CANNOT ALLEGE LOSS CAUSATION BECAUSE THEY CANNOT POINT TO ANY CONCEALED RISKS THAT CAUSED THE LOSS

To plead loss causation, Plaintiff must allege *facts* (not conclusions) to show that alleged misstatements or omissions were the proximate cause of a decline in the Company's stock price. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005).  In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-75 (2d Cir. 2005), the Second Circuit extended the holding in *Dura* and ruled that to plead loss causation for a Section 10(b) claim, Plaintiff must allege facts to show "that the misstatement or omission concealed something from the market that, *when disclosed*, *negatively affected the value of the security*."  396 F.3d at 173 (emphasis added).

Here, according to Plaintiff, the "truth emerged" (1) on February 12, 2009, when Canadian Superior disclosed that an interim receiver had been appointed over its Intrepid Block interest (AC ¶ 92); and (2) on February 17, 2009 when Canadian Superior issued a press release

---

[16]    In violation of Rule 8, Plaintiff excerpted lengthy passages from the Company's public disclosures, leaving Defendants to guess what statements Plaintiff finds objectionable.  Among these lengthy passages are numerous forward looking statements which are unactionable forward looking statements for the same reasons discussed above.  (*See, e.g.*, AC ¶ 59 ("we estimate on a preliminary basis that the Victory discovery contains up to 1.1 tcf gross natural gas sales reserves").)  Likewise, there are many 'expressions of puffery and corporate optimism' (*see, e.g.*, AC ¶ 68 "we expect the remainder of this year will be very exciting and rewarding for Canadian Superior shareholders") which are similarly unactionable.  *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d at 336 *citing Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).  *See, also*, *id. citing San Leandro*, 75 F.3d at 811 ("[v]ague and non-specific pronouncements" that would not mislead a reasonable investor); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 373 (S.D.N.Y. 2007) ("expressions of puffery and corporate optimism do not give rise to securities violations") (internal quotations omitted)(citation omitted); *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 106 (2d Cir. 1998) ("the statements challenged by [P]laintiff[] are expressions of optimism or projections about the future") *In re Livent, Inc. Noteholders Sec. Litg.*, 151 F. Supp. 2d 371, 440 (S.D.N.Y. 2001) (statement that company is "operationally" very strong is forward-looking).

stating that it had received a demand letter from its principal bank lender for repayment of all amounts outstanding (AC ¶ 94). Plaintiff never explains what "concealed risk" materialized when these statements were issued. Instead, Plaintiff just states, in conclusory fashion, that the drop in stock price following the February announcements "was a direct result of the nature and extent of [d]efendants' fraud finally being revealed." (AC ¶ 103.) But these particular disclosures revealed *nothing* relating to the alleged undisclosed information about the economic viability of the wells, the compliance with Accounting Procedures, or cost-sharing among the Intrepid Block partners. At most, the February 2009 statements disclosed that Canadian Superior had experienced a financial setback, but the market was already well aware of the Company's financial difficulties from its November 2008 disclosures as discussed above. As such, Plaintiff has not plead facts to show specifically that *disclosure of the alleged concealed information* led to a decline in stock price and has failed to allege loss causation based on any concealment of the supposed "risks" identified in the Complaint. *See Dura*, 544 U.S. at 345 (securities actions are not intended to provide investors with broad insurance against market losses, "but to protect them against those economic losses that misrepresentations actually cause"); *Lentell*, 396 F.3d at 174 (loss causation requirement "fix[es] a legal limit on a person's responsibility") (citation omitted). Thus, "[u]nless plaintiffs can allege that their losses were attributable to some form of revelation to the market of wrongfully concealed information, they are not recoverable in a private securities action." *In re Ramp Corp. Sec. Litig.*, No. 05 Civ. 6521, 2006 WL 2037913, at *9 (S.D.N.Y. July 21, 2006). Plaintiff has pled nothing more than artificial inflation of the stock price, which is insufficient to plead loss causation for a Section 10(b) claim based on alleged misstatements and omissions. *See Dura*, 544 U.S. at 345-346; *Lentell*, 396 F.3d at 173-75; *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189 (2d Cir. 2003). The

Complaint should, therefore, be dismissed. [17]

## IV.   THE CLASS SHOULD BE NARROWED TO ELIMINATE FOREIGN PURCHASERS WHO BOUGHT ON A FOREIGN EXCHANGE

If the Court denies any part of Defendants' motion to dismiss, the purported class should

be limited for lack of jurisdiction over the claims of foreign and non-resident individuals who

purchased shares on the Toronto Stock Exchange (TSX).  (AC ¶¶ 30, 31.)  The federal securities

laws do not support jurisdiction over foreigners and non-residents who purchased their shares on

foreign exchanges.  *See Morrison v. Nat'l Austl. Bank*, 457 F.3d 167, 174-175 (2d Cir. 2008),

*cert. granted,* 130 S. Ct. 783 (2009) ("*NAB*") (jurisdiction over federal securities laws exists only

where "the heart of the alleged fraud" occurred in the United States); *In re Alstom SA Sec. Litig.,*

406 F. Supp. 2d 346, 367-368, n.12 (S.D.N.Y. 2005); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d

974, 993 (2d Cir. 1975).  Courts have found no jurisdiction over claims of foreign purchasers

purchasing on a foreign exchange where the only alleged fraudulent conduct in the U.S., as in

this case, was the dissemination of SEC filings and press releases.  *See*, *e.g.*, *In re NovaGold*

*Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272 (S.D.N.Y. 2009) (excluding foreign purchasers

---

[17]   Plaintiff's secondary liability claims under Section 20(a) of the Exchange Act should also be dismissed.  (*See* AC ¶¶ 116-17.)  Section 20(a) imposes liability on those who "controlled" any person liable for a primary violation of the relevant securities laws.  15 U.S.C. 78t; *17 C.F.R. § 240.12b-2*; *17 C.F.R. § 230.405*.  First, the claim fails against all Defendants because in the absence of any well pled predicate violation, the control person claims must also be dismissed. *In re Merrill Lynch & Co. Inc. Research Reports Sec. Litig.*, 272 F. Supp 2d 243, 264 (S.D.N.Y. 2003).  Second, 20(a) claims against defendants Snethun and Bilton should be dismissed for the independent reason that the Complaint says *nothing* about Snethun and Bilton *during the class period* other than that they were "Vice President of Western Canada." (AC ¶¶ 24(b),(e)). Plaintiff does not explain how these managers – who are not even alleged to hold senior officer positions during the class period and whose responsibilities were Canada-specific – had any involvement in or control over the Intrepid Block project in Trinidad and Tobago.  *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (plaintiff must allege defendant had (1) "'control of the primary violator'" and (2) that they were "'in some meaningful sense a culpable participant' in the primary violation")(citation omitted); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 208 (E.D.N.Y. 2000)(stock ownership and conclusory allegations of knowledge of operations and finances of Company were insufficient).

from class where issuer was Canadian and alleged fraud concerned a mine in Canada, noting that

dissemination of filings in U.S. did not constitute conduct); *In re AstraZeneca Sec. Litig.*, 559 F.

Supp. 2d 453, 466 (S.D.N.Y. 2008); *Pozniak v. Imperial Chem. Indus.*, No. 03 Civ. 2457(NRB),

2004 WL 2186546, at *8 (S.D.N.Y. Sept. 28, 2004) (no jurisdiction over foreign purchasers

where alleged fraud consisted of misrepresentations in press releases, quotes in news articles,

shareholder reports and SEC filings; *In re China Life Sec. Litig.*, No. 04 Civ. 2112(TPG), 2008

WL 4066919, at *8-9 (S.D.N.Y. Sept. 3, 2008) (jurisdiction did not extend to Chinese plaintiff

who purchased shares on the Hong Kong Stock Exchange).

      Here, no fraud is alleged in the U.S., because the only alleged U.S. conduct is the filing

of SEC disclosures.  The Complaint is about a Canadian company headquartered in Calgary and

a mining project located in Trinidad and Tobago.  The Complaint must be dismissed to the extent

it purports to include persons residing abroad who purchased their shares outside the U.S.  *NAB*,

547 F.3d at 177 (affirming dismissal of securities action due to lack of subject matter

jurisdiction); *In re SCOR Holding (Switzerland) AG Litig.*, 537 F. Supp. 2d 556 (S.D.N.Y. 2008)

(same); *Pozniak*, 2004 WL 2186546, at * 8 (same).

## CONCLUSION

      For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York          MORRISON & FOERSTER LLP
       June 4, 2010

                      By:  /s/ Jack C. Auspitz_____
                         Jack C. Auspitz (jauspitz@mofo.com)
                         Jamie A. Levitt (jlevitt@mofo.com)
                         Damion K. L. Stodola (dstodola@mofo.com)
                         Hilary M. Williams (hwilliams@mofo.com)
                         1290 Avenue of the Americas
                         New York, New York 10104-0050
                         (212) 468-8000
                         *Attorneys for Defendants*