UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————— x
DAVID SGALAMBO, Individually and on : Civil Action No. 1:09-cv-10087-SAS
Behalf of All Others Similarly Situated, :
                           : CLASS ACTION
                 Plaintiff, :
                           : MEMORANDUM OF LAW IN
     vs. : OPPOSITION TO DEFENDANTS' MOTION
                           : TO DISMISS THE AMENDED
CRAIG MCKENZIE, et al., : COMPLAINT FOR VIOLATIONS OF THE
                           : FEDERAL SECURITIES LAWS
                 Defendants. :
                           :
———————————————— x

## TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ...................................................................1

II.  STATEMENT OF FACTS .......................................................................4

    A.   The Company .............................................................................4

    B.   The Joint Venture........................................................................4

    C.   Defendants' False and Misleading Statements ................................5

    D.   Canadian Superior's Participation Interest is Placed Into Receivership ...............7

III. ARGUMENT ......................................................................................8

    A.   Standards on a Motion to Dismiss .................................................8

    B.   Defendants' Class Period Statements Are Actionable .........................9

        1.   Defendants' Statements Were Not Speculative ........................9

        2.   Defendants' Misleading Statements Are Not Protected by the PSLRA's Safe Harbor Provision .......................................12

    C.   The AC Adequately Alleges Scienter .............................................16

        1.   The AC Adequately Alleges Conscious Misbehavior and Recklessness...................................................................16

            a.   Defendants Knew their Statements Regarding the Progress of the Wells Were Misleading ...................................17

            b.   Defendants Misrepresented Canadian Superior's Financial Obligations Under the Joint Venture ...........................20

            c.   Defendants Knew that Canadian Superior Was in Material Breach of the JOA.......................................................21

        2.   Defendants' Positions at Canadian Superior Further Support a Showing of Scienter ...................................................23

        3.   The AC Adequately Alleges Motive and Opportunity.............24

    D.   The AC Adequately Alleges Loss Causation ...................................27

    E.   Plaintiff has Adequately Alleged a Claim Under Section 20(a)..........29

**Page**

IV.    CONCLUSION ............................................................................................................30

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)....................................................................................8

*Beleson v. Schwartz,*
    599 F. Supp. 2d 519 (S.D.N.Y. 2009) ..........................................................21

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ....................................................................................8, 9

*Caiola v. Citibank, N.A.,*
    2958 F.3d 312 (2d Cir. 2002)..........................................................................12

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,*
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) ....................................................15, 24

*Cosmas v. Hassett,*
    886 F.2d 8 (2d Cir. 1989).................................................................................24

*Dura Pham., Inc. v. Broudo,*
    544 U.S. 336 (2005) .......................................................................................27

*Edison Fund v. Cogent Inv. Strategies Fund, Ltd.,*
    551 F. Supp. 2d 210 (S.D.N.Y. 2008) ...........................................................14

*Freudenberg v. E\*Trade Financial Corp.,*
    07 Civ. 9538, 2010 U.S. Dist. LEXIS 46053
    (S.D.N.Y. May 10, 2010).............................................................9, 10, 13, 17

*Ganino v. Citizens Utils. Co.,*
    228 F.3d 154 (2d Cir. 2000)................................................................8, 16, 24

*Hall v. Children's Place Retail Stores, Inc.,*
    No. 07 Civ. 8252 (SAS), 2008 U.S. Dist LEXIS 54790
    (S.D.N.Y. July 18, 2008) .........................................................................11, 29

*Heller v. Goldin Restructuring Fund, L.P.,*
    590 F. Supp. 2d 603 (S.D.N.Y. 2008) ...............................................12, 13, 22

*Horizon Asset Mgmt. v. H&R Block, Inc.,*
    580 F.3d 755 (8th Cir. 2009).........................................................................22

**Page**

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
  159 F.3d 723 (2d Cir. 1998) ........................................................................ 14

*In re Amaranth Natural Gas Commodities Litig.*,
  No. 07 Civ. 6377 (SAS), 2008 U.S. Dist. LEXIS 79235
  (S.D.N.Y. Oct. 4, 2008) .............................................................................. 30

*In re APAC Teleservices, Inc. Sec. Litig.*,
  No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908
  (S.D.N.Y. Nov. 19, 1999) ............................................................................ 26

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2001) ................................................... 23, 24

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) .............................................................. 24

*In re Centerline Holdings Co. Secs. Litig.*,
  678 F. Supp. 2d 150 (S.D.N.Y. 2009) .......................................................... 20

*In re Complete Mgmt. Sec. Litig.*,
  153 F. Supp. 2d 314 (S.D.N.Y. 2001) .......................................................... 27

*In re Emex Corp. Sec. Litig.*,
  No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528
  (S.D.N.Y. Sept. 18, 2002) ........................................................................... 30

*In re eSpeed, Inc.*,
  457 F. Supp. 2d 266 (S.D.N.Y. 2006) .......................................................... 23

*In re Geopharma*,
  399 F. Supp. 2d 432 (S.D.N.Y. 2005) .......................................................... 10

*In re Globalstar Secs. Litig.*,
  01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496
  (S.D.N.Y. Dec. 12, 2003) ............................................................................ 22

*In re Initial Pub. Offering Sec. Litig.*,
  241 F. Supp. 2d 281 (S.D.N.Y. 2003) .......................................................... 25

*In re MBIA, Inc. Sec. Litig.*,
  Case No. 08-CV-264 (KMK), 2010 U.S. Dist. LEXIS 31430
  (S.D.N.Y. Mar. 31, 2010) ...................................................................... 11, 28

**Page**

*In re Motorola Sec. Litig.,*
505 F. Supp. 2d 501 (N.D. Ill. 2007)...........................................................29

*In re Nortel Networks Corp. Sec. Litig.,*
238 F. Supp. 2d 613 (S.D.N.Y. 2003) ............................................ 13, 15, 16

*In re NYSE Specialists Sec. Litig.,*
405 F. Supp. 2d 281 (S.D.N.Y. 2005) .......................................................27

*In re Oxford Health Plans Sec. Litig.,*
187 F.R.D. 133 (S.D.N.Y. 1999)................................................................25

*In re Par Pharm., Inc. Sec. Litig.,*
733 F. Supp. 668 (S.D.N.Y. 1990) ............................................................12

*In re Scholastic Corp. Sec. Litig.,*
252 F.3d 63, 74 (2nd Cir. 2001)................................................................25

*In re Scottish Re Group Sec. Litig.,*
524 F. Supp. 2d 370 (S.D.N.Y. 2007) ...................................................29, 30

*In re Sec. Capital Assur. Secs. Litig.,*
07 Civ. 11086 (DAB), 2010 U.S. Dist. LEXIS 33954
(S.D.N.Y. Mar. 31, 2010) .........................................................................28

*In re Top Tankers, Inc. Sec. Litig.,*
528 F. Supp. 2d 408 (S.D.N.Y. 2007) .......................................................16

*In re Tower Auto. Sec. Litig.,*
483 F. Supp. 2d 327 (S.D.N.Y. 2007) ...................................................21, 30

*In re Twinlab Corp. Sec. Litig.,*
103 F. Supp. 2d 193 (E.D.N.Y. 2000) .......................................................25

*In re Vivendi Universal, S.A. Sec. Litig.,*
381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................14

*In re Winstar Commc'ns*
No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618
(S.D.N.Y. Feb. 27, 2006).....................................................................17, 23

*In re Xerox Corp. Sec. Litig.,*
165 F. Supp. 2d 208 (D. Conn. 2001)........................................................26

**Page**

*Katz v. Image Innovations Holdings, Inc.,*
    542 F. Supp. 2d 269 (S.D.N.Y. 2008) .......................................................29

*Lentell v. Merrill Lynch & Co. Inc.*
    396 F. 3d 161 (2d Cir. 2005) .................................................................27

*McMahan & Co. v. Wherehouse Ent., Inc.,*
    900 F.2d 576 (2d Cir. 1990) ....................................................................9

*Morrison v. Nat'l Australia Bank Ltd.,*
    561 U.S. __, 2010 U.S. LEXIS 5257
    (June 24, 2010) .......................................................................................30

*Nathel v. Siegal,*
    No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297
    (S.D.N.Y. Oct. 20, 2008) ........................................................................22

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000) ...........................................................16, 18

*P. Stolz Family P'ship L.P. v. Daum,*
    355 F.3d 92 (2d Cir. 2004) .............................................................13, 14

*Patane v. Clark,*
    508 F.3d 106 (2d Cir. 2007) ....................................................................9

*Phelps v. Kapnolas,*
    308 F.3d 180 (2d Cir. 2002) ....................................................................8

*Pommer v. Medtest Corp.,*
    961 F.2d 620 (7th Cir. 1992) .................................................................10

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004) ..................................................................15

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000) ....................................................................25

*Cortec Indus., Inc. v. Sum Holding L.P.,*
    949 F.2d 42, 48 (2d Cir. 1991) .............................................................30

*Slayton v. Am. Express Co.,*
    604 F.3d 758 (2d Cir. 2010) ..................................................................13

- vi -

**Page**

*Stevelman v. Alias Res.*,
   174 F.3d 79 (2d Cir. 1999)......................................................................25, 27

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001)...........................................................................29

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506
   (S.D.N.Y. Sept. 6, 2005)..............................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007).................................................................. 16, 23, 25

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
   §78u-5(c)(1)(B) ............................................................................................13

Federal Rules of Civil Procedure
   Rule 8......................................................................................................29
   Rule 8(a)(2)...........................................................................................27
   Rule 12(b)(6).............................................................................................8
   Rule 15(a)..............................................................................................30

Lead Plaintiff respectfully submits this memorandum of law in opposition to the motion to dismiss the Amended Complaint For Violations of the Federal Securities Laws (the "AC") filed by Defendants Craig McKenzie ("McKenzie"), Gregory S. Noval ("Noval"), Michael E. Coolen ("Coolen"), Leigh Bilton ("Bilton") and Leif Snethun ("Snethun") (collectively, "Defendants").

## I.     PRELIMINARY STATEMENT

This securities fraud class action, which is brought on behalf of purchasers of the common stock of Canadian Superior between January 14, 2008 and February 17, 2009, inclusive (the "Class Period"), concerns materially false and misleading statements made by Defendants – former executives of Canadian Superior Energy, Inc. ("Canadian Superior" or the "Company"), an oil and gas exploration and production company – about their findings at three exploratory wells – "Victory," "Bounty" and "Endeavor." These wells were being drilled by Canadian Superior Energy offshore Trinidad and Tobago in a joint venture (the "Joint Venture") with BG International Limited ("BG"), an established major gas producer and a leading offshore operator, and Challenger Energy Corp. ("Challenger Energy").

As detailed in the AC, Defendants portrayed these wells, which were all situated on a block known as Intrepid Block 5(c), as having positive test results as they were being drilled in search of economically viable natural gas. What Defendants did not disclose, however, was that, despite making numerous positive statements of their findings regarding these wells, the Victory well did not have gas in sufficient quantities to justify its economic development. Indeed, at the end of the Class Period, it was revealed that BG, Canadian Superior's more-experienced partner, had reached this exact conclusion. Likewise, Defendants' positive statements regarding the Bounty well failed to disclose that the Bounty discovery on its own would not be economical to develop, a relative fact given the true findings of the Victory well.

By the time the Company was drilling the third well, the Endeavor, the Company's financial state had deteriorated to the point that it was no longer able to pay the vendors working on the well – as conceded by Defendant Coolen – and, given the global credit crisis, there was no reasonable basis for the Company to expect that it would be able to raise sufficient funds to complete the Joint Venture. Nevertheless, the Company continued to make positive statements about the prospects of the wells, with the false implication that the Company would benefit from their development.

Defendants also failed to disclose that, at all relevant times, Canadian Superior was in violation of the Joint Operating Agreement ("JOA") (attached hereto as Ex. A) of the Joint Venture since it: (i) failed to maintain a separate joint account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; and (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis. Defendants also misrepresented the extent of their liability for the costs associated with the Joint Venture, by repeatedly stating that the Company was only responsible for 26-2/3% of the total costs, when, in fact, it was responsible for 60% – an important distinction given the financial condition of Canadian Superior.

In the face of these strong allegations, Defendants have filed a motion to dismiss, contending that they never represented that the wells would be economically viable and that they adequately disclosed the inherent risks associated with drilling an exploratory well. This, however, is not a case about a company's failure to discover gas in a speculative well. Rather, the basis for Plaintiff's claims is that Defendants made numerous statements regarding their findings at the wells, which lead investors to believe that there were positive developments in the Company's drilling efforts such that there was an increased likelihood that economically viable gas would be discovered, when, in fact, there had been no developments that would justify or support such a finding.

Defendants also contend that their failure to disclose their non-compliance with the terms of the JOA are not actionable because they had previously disclosed that the Company had unreliable accounting controls. What Defendants fail to mention is that the terms of the JOA were not public during the Class Period and investors therefore did not know – and had no way of knowing – that the Company's accounting problems would cause it to be in breach of the JOA. Thus, any disclosure of accounting problems – to the extent that such disclosure even related to the violations of the JOA – did not put investors on notice of anything regarding the Company's non-compliance with the terms of the JOA.

Defendants also try to justify their false statements regarding Canadian Superior's liability for costs under the JOA. While Defendants represented that the Company was paying 26-2/3% of the Intrepid Block 5(c) exploration program costs and that Challenger Energy was paying 33-1/3% of the costs, Defendants failed to disclose that Canadian Superior was responsible for the full share of Challenger Energy's cost. This increased liability was never disclosed to investors and when Challenger Energy filed for bankruptcy, Canadian Superior was forced to assume responsibility for Challenger Energy's portion of the costs.

The balance of Defendants' arguments, such as failure to allege scienter and loss causation, are belied by the allegations of the AC and do not serve as a basis for dismissal. For these reasons, and as set forth herein in further detail, Defendants' motion to dismiss should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     The Company

Canadian Superior is an oil and gas exploration and production company that depends on "finding, acquiring, developing and commercially producing oil and natural gas reserves" for its financial success.  Def. Brf. at 3; ¶36.[1]

### B.     The Joint Venture

On July 20, 2005, the Company entered a Production Sharing Contract ("PSC") with the government of Trinidad & Tobago to drill for natural gas on the Intrepid Block 5(c).  ¶37.  Shortly after entering the PSC, Canadian Superior engaged other companies to assist in exploring the Intrepid Block 5(c).  On December 30, 2005, the Company signed an Amended and Restated Participation Agreement ("Participation Agreement") (Def. Brf. Ex. 2)[2] with Challenger Energy which provided, among other things, that Challenger Energy had the right to earn a 25% interest in the PSC.  *Id.*  The Company failed to disclose, however, that the assignment required approval by the Trinidad and Tobago Ministry of Energy and Energy Industries ("Minister") which, in fact, it never received.  ¶¶40, 47.

In April 2007, Canadian Superior announced its intention to drill three wells off the coast of Trinidad & Tobago pursuant to the PSC.  ¶38.  By August 2007, Canadian Superior had entered into a farm-in agreement with BG, whereby BG would participate in the exploration drilling and development of the Intrepid Block 5(c) in exchange for paying a portion of the costs (the "Farm-In

---

[1]     Def. Brf. refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss. ¶__ refers to paragraphs of the Amended Complaint.

[2]     Def. Brf. Ex. __ refers to Exhibits attached to the Declaration of Damian K. L. Stodola in Support of Defendants' Motion to Dismiss.

- 4 -

Agreement"). ¶¶39-40. At the same time, Canadian Superior, Challenger Energy and BG entered into the JOA to facilitate the drilling of the three wells, which were to be called Victory, Bounty and Endeavour, respectively. *Id.* Under the JOA, BG was assigned a 30% interest in the PSC while paying 40% of the costs, leaving Canadian Superior with a 70% interest in the PSC and the burden of 60% of the costs (the "Joint Venture"). ¶40. Pursuant to the Farm-In Agreement, Challenger Energy had the right to acquire a 25% interest in the PSC in connection with the Intrepid Block 5(c) for which it would then pay a third of the costs of the three wells, subject to approval by the Minister. *Id.*

### C. Defendants' False and Misleading Statements

On January 14, 2008, the first day of the Class Period, Canadian Superior announced the discovery of natural gas at the Victory well. ¶55. Defendant McKenzie informed investors that the Company was "pleased to announce the discovery of natural gas" and was "encouraged by the initial test results." *Id.* On January 28, 2008, Defendant McKenzie further commented on the Victory well, stating that the Company was "pleased with the natural gas tests from our 'Victory' well" and that the Company "[felt] the results were well worth waiting for." ¶57. However, by the time these announcements were made, the Company had already materially breached the JOA, and Defendants knew the Victory well contained only limited natural gas reserves. ¶60(a), (c). Further, Defendants began issuing the first in a series of false statements regarding Canadian Superior's obligation to pay only 26-2/3% of the costs associated with the drilling, when in fact the Company was obligated for the liability of more than twice that amount. ¶¶55, 57, 59, 60(b).

Canadian Superior also made materially false and misleading statements concerning the Bounty well. ¶¶61, 72. On August 13, 2008, Defendant Noval declared he was "very pleased with the results of the 'Bounty' well" and claimed "production testing indicate[d] that [Canadian Superior] drilled one of the best natural gas wells offshore Trinidad." ¶74. Defendant McKenzie

added that he "was confident the 'Bounty' well [would] initially produce at approximately 200 mmcf/d of sales natural gas at the anticipated pipeline pressure [which] compared favorably with production from the nearest analogous field, Dolphin Deep[.]" ¶74. Two days later, Canadian Superior issued a press release declaring the Bounty well a "significant natural gas discovery" of such "magnitude" that the Company was compelled to move forward with its development "expeditiously[.]" ¶76. Defendants bolstered these claims with hard numbers regarding the well's anticipated productivity, and Defendant McKenzie declared that "the best is still to come for [Canadian Superior] shareholders." *Id.* Throughout this time, Defendants continued to misrepresent that Canadian Superior was only liable for 26-2/3% of the costs when they were actually liable for more than double that amount. ¶¶61, 65, 68, 71, 72, 74.

By October 2008, drilling had begun on the third and final well in the Intrepid Block 5(c), Endeavour. ¶79. On November 17, 2008, Canadian Superior issued a press release reiterating the prior positive statements it made about the Bounty well, while downplaying problems at the Endeavour site. ¶83. Defendant Coolen, however, would later admit that by this time the Company faced dire financial constraints that made the ultimate success of the Joint Venture improbable. ¶¶82(a), 84(a). Tightening of the global credit markets compounded the Company's financial problems. ¶¶82(b), 84(b). Yet, Defendants concealed the impact this information was having on the Joint Venture's progress and continued making false and misleading positive statements about the Intrepid Block 5(c) development. ¶¶82(g), 84(g). For example, on January 23, 2009, Defendants continued to characterize the Intrepid Block 5(c) as containing "three successful wells." ¶88. Defendants also continued to misrepresent that Canadian Superior was only liable for 26-2/3% of the costs while in fact they were also liable for Challenger Energy's entire interest. ¶¶82(d), 85, 88.

**D.    Canadian Superior's Participation Interest is Placed Into Receivership**

On February 12, 2009, just seventeen days after Defendant Coolen provided a positive assessment of the wells, Canadian Superior announced the "appointment, upon application of BG of an interim Receiver of its participating interest in Intrepid Block 5(c)."  ¶92.  BG's reasons for seeking appointment of a receiver shocked the market and resulted in shares of the Company's stock plummeting $0.40 per share, or 44%, on extremely heavy trading volume. ¶¶92, 93.

In support of its application seeking an interim receiver, BG filed an affidavit by Ewen Denning, Vice President, Commercial of BG Trinidad and Tobago (the "Denning Affidavit" or "Denning Aff.") (Def. Brf. Ex. 6).  ¶4.  The Denning Affidavit revealed that BG had performed an audit of Canadian Superior in November and December 2008 and concluded that Canadian Superior was in breach of several material terms of the JOA since: (i) Canadian Superior had comingled funds; and (ii) failed to maintain the funds in an interest-bearing account as required by the JOA. ¶41.  It also revealed that Canadian Superior had failed to timely pay Maersk, the drill operator, $12,075,000 which threatened to derail the Joint Venture's completion.  ¶¶44-45.  If Maersk was to remove the rig from the site it would take tens of millions of additional dollars and at least a year to replace the rig and complete the drilling project.  ¶45.

The Denning Affidavit further revealed that Canadian Superior had grossly overstated the significance and materiality of the Intrepid Block 5(c)'s findings, especially as they related to the wells' future prospects.  BG believed the Victory well contained only limited reserves of natural gas and was likely to be sub-economic, which stood in stark contrast to Canadian Superior's earlier positive statements about its findings at the same well.  ¶¶10, 59, 61, 63, 65.  Likewise, BG disputed Canadian Superior's claim that the Bounty well was one of the best wells in the best natural gas plays in the world.  ¶¶38, 76.  Instead, BG believed the Bounty well "on its own is not economic."

¶10.  And while BG acknowledged that no final decision had yet been made as to the Intrepid Block 5(c), it felt that the Bounty well lacked sufficient gas reserves to justify further development.  ¶10.

Then, on February 17, 2009, Canadian Superior announced that it received a demand letter from Canadian Western Bank ("Canadian Western") for repayment of all amounts outstanding under Canadian Superior's $45 million credit facility with the bank by February 23, 2009.  In response to this announcement, shares of the Company's stock fell $0.16 per share, or 30%, on extremely heavy trading volume. ¶95.

Canadian Superior sought bankruptcy protection on March 6, 2009 through the Court of Queen's Bench of Alberta.  ¶17.  On April 27, 2009, Defendant Noval resigned as Executive Chairman of the Company and Defendant Coolen resigned as President and CEO.  ¶97.

## III.    ARGUMENT

### A.    Standards on a Motion to Dismiss

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must accept all factual allegations as true and draw all reasonable inferences in plaintiffs' favor.  *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  "The fundamental issue . . . is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."  *Phelps v. Kapnolas*, 308 F.3d 180, 184-85 (2d Cir. 2002).  Accordingly, a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," but rather must simply provide the grounds of entitlement to relief and raise a right to relief above the speculative level.  *Bell Atl. Corp. v. Twombly* ("*Twombly*"), 550 U.S. 544, 555 (2007).

Reaffirming the pleading standard set out in *Twombly*, the United States Supreme Court held that, to survive a motion to dismiss, a complaint must simply "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  *Twombly* cautioned, however, that

"[a]sking for plausible grounds . . . does not impose a probability requirement at the pleading stage;" it simply requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to prove the claim. 550 U.S. at 556. Under this standard, "[o]nly a statement of facts so conclusory that it fails to give notice of the basic events and circumstances on which a plaintiff relies should be rejected as legally insufficient under [Rule] 12(b)(6)." *Patane v. Clark*, 508 F.3d 106, 116 (2d Cir. 2007).

## B. Defendants' Class Period Statements Are Actionable

### 1. Defendants' Statements Were Not Speculative

Throughout the Class Period, Defendants made numerous positive statements regarding the drilling efforts at the three Intrepid Block 5(c) wells. While Defendants contend that their statements "concerning the economic viability" of the wells are speculative and not actionable, Def. Brf. at 26, they misconstrue what Plaintiff is alleging. Plaintiff's allegations are not only that Defendants misled investors as to the likelihood of the wells' future success but also that their reports of positive findings at the wells were materially false and misleading. *See Freudenberg v. E*Trade Financial Corp.*, 07 Civ. 9538, 2010 U.S. Dist. LEXIS 46053 (S.D.N.Y. May 10, 2010) *citing McMahan & Co. v. Wherehouse Ent., Inc.,* 900 F.2d 576, 579 (2d Cir. 1990) ("although literally accurate, [statements] can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . .").

Even assuming *arguendo* that the Company's statements regarding the reported test results were literally true, they were misleading in context since those test results were not meaningful and

would not support a finding that the wells would be economically successful.[3]  *See id.*; *see also In re Geopharma*, 399 F. Supp. 2d 432, 441 (S.D.N.Y. 2005) ("[A] statement or omission is actionable misleading when a reasonable investor would have been misled" and such a "determination is fact-specific, rarely amenable to disposition as a matter of law").  Indeed, economic viability of a natural gas discovery depends upon numerous factors, including the size of the discovered reserves, production rate, capital development and operating costs, as well as the price of gas.  ¶58.  By emphasizing the positive, concealing the negative (such as initial and final test flow rates and pressures), and speaking of the wells' future productivity in very positive terms, Defendants gave the impression to investors that it was their belief that the wells would be economical.[4]  *See Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *14-15 ("If a company. . . puts the topic of the cause of its financial success at issue, then it is obligated to disclose information concerning the source of

---

[3]    *See, e.g.,* ¶55 (Victory well had "measured flow rates averaging between 40 and 45 mmscf/d"); ¶59 (statistical analysis of estimated production ability of Victory); ¶61 ("objectives include possibly drilling into *at least one* of the productive horizons penetrated" in Victory); ¶65 (describing the Victory well as "large natural gas discovery"); ¶74 ("testing indicate[d] that [Canadian Superior] drilled one of the best natural gas wells offshore Trinidad."); *Id. (*Defendant McKenzie "confident the 'Bounty' well" would initially produce more gas than a nearby, successful well); ¶76 (Bounty well as "a significant natural gas discovery"); *Id.* ("the best was yet to come" for Canadian Superior shareholders).

[4]    Defendants point to BG's post-Class Period purchase (in March 2009 *after* the results of the Endeavor well were made known) of a 45% interest in the Intrepid Block as evidence that economic viability of the area remains a possibility. Def. Brf. at 27.  This argument, however, ignores that at the time Defendants were making their positive statements about each of the three wells, these wells had not been determined to be economically viable.  *See* Denning Aff. at ¶47 ("*currently discovered reserves* in the Intrepid Block are below the economic threshold").  Indeed, that there *may* be some economic viability from one or more of the three wells at some future time does not detract from the fact that Defendants' statements were materially false and misleading when made. *See Pommer v. Medtest Corp.*, 961 F.2d 620, 623 (7th Cir. 1992) ("The securities laws approach matters from an ex ante perspective: just as a statement true when made does not become fraudulent when things go unexpectedly wrong, so a statement materially false when made does not become acceptable because it happens to come true.").

its success, since reasonable investors would find that such information would significantly alter the mix of available information.").

Moreover, the limited reserves identified in the wells,[5] as set forth in the Denning Affidavit, rendered Defendants' positive statements concerning the wells false and misleading. ¶10. *Hall v. Children's Place Retail Stores, Inc.,* No. 07 Civ. 8252 (SAS), 2008 U.S. Dist LEXIS 54790, at *28 (S.D.N.Y. July 18, 2008) (complaint need only provide sufficient allegations of omitted facts that existed at the time of the claimed misstatements).

Further, at all times during the Class Period Canadian Superior was in material breach of the JOA by comingling funds when it was required to maintain them in a separate interest-bearing account. ¶¶8, 58(c), 60(c), 62(c), 67(a), 69(c), 73(b), 77(c). Canadian Superior also repeatedly misrepresented its financial obligations under the JOA by claiming it owed only 26-2/3% of the costs associated with the project when it was ultimately responsible for 60%. ¶¶7, 9, 58(a). Defendants even knew the Company was unable to pay Maersk's November invoice and that it threatened to remove its rig from the project.[6] ¶¶44-46, 83. Yet, in face of these problems Defendants continued

---

[5]     Defendants' contention that Plaintiff's "failure to allege how low reserves had to be before they become 'subeconomic' fails the pleading standard of . . . the PSLRA," Def. Brf. at 27, is misguided. Plaintiff's allegation is not that there needed to be a certain level of reserves; rather, the allegation is that Defendants falsely gave the impression that the tests on the wells were producing strong and positive results, such that investors were led to believe that the reserves discovered at the well would be economically viable. The cases relied on by Defendants are thus inapposite because they concern allegations questioning the adequacy of levels of accounting reserves, not whether a well's test results gave sufficient indication of its economic viability.

[6]     While Defendants argue that the unpaid amount owed to Maersk was "a small fraction" of the amount Maersk had previously been paid, it was still for millions of dollars that the Company did not have. Moreover, the costs of completing the Joint Venture would have increased dramatically if Maersk removed the rig from the site due to non-payment, and the entire project would have been substantially delayed. ¶¶16, 45 ("cost to the joint venture of obtaining another similarly specialized rig over testing the Endeavor Well now is estimated to be US $35 million."); *In re MBIA, Inc. Sec. Litig.,* Case No. 08-CV-264 (KMK), 2010 U.S. Dist. LEXIS 31430 (S.D.N.Y. Mar. 31, 2010)

to emphasize positive results from the project, including progress at the Endeavour well, until at least January 23, 2009. ¶¶86, 88, 92-95. By concealing these facts, Defendants violated the securities laws and left investors unable to accurately assess the progress of the Joint Venture until the Company's assets were placed in receivership. *See Caiola v. Citibank, N.A.,* 2958 F.3d 312, 331 (2d Cir. 2002) ("upon choosing to speak, one must speak truthfully about material issues."); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("once corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading."). Thus, Defendants' statements are clearly actionable.

## 2. Defendants' Misleading Statements Are Not Protected by the PSLRA's Safe Harbor Provision

Defendants erroneously contend that their statements regarding the Joint Venture, even if false and misleading, are not actionable because they are protected by the safe harbor provision of the PSLRA. Def. Brf. at 28-30. However, Plaintiff identifies numerous false and misleading statements that – even if considered forward-looking – were not accompanied by meaningful cautionary language.[7] Further, forward-looking statements that are known to be false and misleading

---

("[m]ateriality depends on all relevant circumstances, and a complaint normally should not be dismissed based on materiality 'unless [the statements or omissions] are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'") (internal citations omitted).

[7]    Again, Defendants seek to label Plaintiff's allegations regarding Defendants' misrepresentations about the wells as "statements of implied future economic viability." Def. Brf. at 28. However, Plaintiff's allegations concern the reported drilling results announced by Defendants based on tests that had already taken place. Thus, as statements of present or historical fact that mislead investors, these statements are not protected by the PSLRA's safe harbor provision. *Heller v. Goldin Restructuring Fund, L.P.,* 590 F. Supp. 2d 603, 617 (S.D.N.Y. 2008). To the extent Defendants projected future success for the wells, those statements are not protected for the reasons described herein.

- 12 -

at the time they are made are not protected by the PSLRA's safe harbor. *See* 15 U.S.C. §78u-5(c)(1)(B); *see also Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Freudenberg*, 2010 U.S. Dist. LEXIS 46053, at *55 (noting that "[d]efendants cannot be immunized for knowingly false statements even if they include some warnings").

First, contrary to Defendants' assertion, many of the statements about which Plaintiff complains are statements of existing fact that misled investors in violation of the federal securities laws.[8] Defendants again seek to label these as "statements of implied future economic viability." Def. Brf. at 28; *see In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003) (noting that "it is well recognized that even when an allegedly false statement has both a forward-looking aspect and an aspect that encompasses a representation of present fact, the safe harbor provision of the PSLRA does not apply"). But as described above, Defendants' announcements of the drilling results were statements of present fact that mislead investors and are therefore not protected by the PSLRA's safe harbor provision. *See P. Stolz Family P'ship L.P. v. Daum*, 355 F.3d 92, 97 (2d Cir. 2004) ("[M]isrepresentation of present or historical facts cannot be cured by cautionary language."); *Heller,* 590 F. Supp. 2d at 617.

Second, Defendants failed to provide adequate cautionary language to protect their misleading statements regarding the future economic success of the project. *See Slayton*, 604 F.3d at 772 ("To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed

---

[8]       *See, e.g.,* ¶55 (results of tests on Victory and misrepresentation regarding costs owed by Company under JOA); ¶59 (Canadian Superior "has now analyzed and evaluated much of the initial data from the 'Victory' well" and disclosing results of tests); ¶65 (test results showing high pressure in Bounty well and gas produced at rates averaging in excess of 30 mmcf/d); *Id.* (Victory well expected to produce "sales gas flow rates of well over 100 mmcf/d").

substantive information."). Defendants gave investors specific numbers that Canadian Superior expected the wells to produce – even comparing the test results to a nearby well – but did not limit those projections in any quantitative way. *See P. Stolz,* 355 F.3d at 97 ("the cautionary language must be examined in the context of the representations to determine whether the language warns of the specific contingency that lies at the heart of the alleged misrepresentation."); *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language, however, must relate directly to that by which the plaintiffs claim to have been misled."). The only warnings Defendants did provide were too vague to be meaningful. Def. Br. at 12 ("if discovered, in this or any other discovery, the accumulations or estimated accumulations may not be economically viable or technically feasible to produce."); *id.* at 29 ("[t]here is no guarantee that any portion of these accumulations or estimated accumulations . . . may not change materially"). Defendants' generic warnings also failed to address, *inter alia,* that: (i) the Company was at all times in material breach of the JOA; (ii) Canadian Superior was exposed to significantly higher costs in its exploration efforts; and (iii) the Company was faced with the imminent departure of Maersk from the drill site because of Canadian Superior's failure to pay its invoice. Thus, Defendants' "warnings" gave no indication of these specific problems and were therefore inadequate. *See Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 226 (S.D.N.Y. 2008) ("If a party is aware of an actual danger or cause for concern, the party may not rely on a generic disclaimer in order to avoid liability."). *In re Vivendi Universal, S.A. Sec. Litig.*, 381 F. Supp. 2d 158, 183 (S.D.N.Y. 2003) ("The generic warning that 'actual results may differ,' . . . does not come close to the cautionary language [needed] to render reliance on the misrepresentation unreasonable.").

Finally, Canadian Superior's purported warnings were not meaningful because Defendants knew their positive assessments of the Joint Venture were false and misleading, thereby making the

statements actionable even if accompanied by cautionary language.  *See Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.").  For example, Defendants knew that Maersk's November invoice for more than $12 million could not be paid at the time they issued positive statements on November 27, 2008, December 29, 2008 and January 23, 2009.  ¶¶16, 43-45, 83, 86, 88.  Canadian Superior's third quarter 2008 disclosures regarding the Company's financial condition failed to convey any meaningful information to investors regarding the true, known risks to the project beyond theoretical problems the Company could face.  Thus, Defendants' argument that investors were adequately advised of the risk that Company assets could be placed in receivership is contrary to law. Def. Brf. at 8; *Freudenberg*, 2010 U.S. Dist. LEXIS at *55 ("the law provides 'no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away") (internal citations omitted);  *Nortel Networks*, 238 F. Supp. 2d at 629 (cautionary language accompanying forward-looking statements must "precisely address the substance of the specific statement or omission that is challenged.").[9]

---

[9]    Similarly, Defendants' citation to Company filings on March 31, 2008 regarding the potential impact of its failing to raise capital and the potential impact of falling gas prices are not sufficient to warn investors of the financial shortfalls the Company actually faced. Def. Brf. at 4, 8. In the midst of the 2008 economic downturn, and at the same time gas prices were falling, Canadian Superior successfully closed a $35 million private placement. ¶¶89,99. The fact that it was able to raise this money directly conflicts with the Company's generic warnings of potential financial problems. In contrast, the serious and very real problems that the Joint Venture was facing were not timely disclosed. *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356 (S.D.N.Y. 2006) (warning must be precise and "address the substance of the specific statement or omission that is challenged").

### C.    The AC Adequately Alleges Scienter

In the Second Circuit, a "strong inference" of scienter is established by facts that constitute evidence of conscious misbehavior or recklessness, or which show that defendants had motive and opportunity to commit fraud. *Ganino v. Citizens Utils. Co.,* 228 F.3d 154, 168-69 (2d Cir. 2000). Even in light of this standard, great specificity is not required. *See, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.,* No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *29 (S.D.N.Y. Sept. 6, 2005). "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 127 S. Ct. 2499, 2509 (2007) (emphasis in original). The inference must merely be "*at least as likely* as any plausible opposing inference." *Id.* at 2513 (emphasis in original). In other words, a tie between facts that give rise to an inference of scienter and plausible opposing inferences is sufficient to avoid dismissal. *In re Top Tankers, Inc. Sec. Litig.,* 528 F. Supp. 2d 408, 414 (S.D.N.Y. 2007). As discussed below, Plaintiff easily meets these pleading requirements.

#### 1.    The AC Adequately Alleges Conscious Misbehavior and Recklessness

To plead scienter based on conscious misbehavior or recklessness, a plaintiff must allege facts showing that defendants' conduct "represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Nortel Networks,* 238 F. Supp. 2d at 631. Moreover, where a complaint alleges that defendants knew facts or had access to non-public information contradicting their public statements, an inference arises that "defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation." *Novak v. Kasaks,* 216 F.3d 300, 308 (2d Cir. 2000). Even in the absence of specific information contradicting their

public statements, "knowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the core operations of their company that would have led them to the realization that the company's financial statements were false when issued." *In re Winstar Commc'ns,* No. 01 CV 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 27, 2006).  However, "[p]rior to discovery, plaintiffs cannot be expected to allege the time and place that each individual defendant received documents containing the alleged contradictory information." *In re Tronox, Inc. Sec. Litig.*, 09 Civ. 6220, slip op. at 16 (S.D.N.Y. June 28, 2010) (SAS).

Here, the AC alleges the existence of specific facts Defendants plainly knew, or were reckless in not knowing, that undermined their numerous positive statements during the Class Period concerning the wells at the Intrepid Block 5(c).

### a.  Defendants Knew their Statements Regarding the Progress of the Wells Were Misleading

Defendants, who have extensive experience drilling exploratory wells, knew that their Class Period statements regarding Canadian Superior's findings at the Intrepid Block 5(c) misleadingly portrayed the results of the well tests as highly positive and meaningful, when, in fact, they were not. *See Freudenberg*, 2010 U.S. Dist. LEXIS 46053 at *15 ("A statement is misleading if a reasonable investor would have received a false impression from the statement.").[10]

---

[10]    Defendants attempt to deflect their liability in issuing false and misleading statements concerning the Intrepid Block 5(c) by stating that they did not represent that the wells were "economic." Def. Brf. at 20.  However, Plaintiff cites 20 press releases during the 13 month Class Period in which Defendants made highly optimistic statements about findings made at the wells. For example, Defendants represented that "Canadian Superior had a large natural gas discovery in Trinidad," (¶65), that the Bounty well had natural gas resource potential of up to 2.6 TCF (¶76) and would produce 200 mmcf/d of natural gas (¶74), that the Intrepid Block 5(c) had "high potential exploration," and that the "best [was] still to come for our shareholders" (¶76).  Since the purpose of drilling the wills was to discover if the wells could produce gas in sufficient quantities to make them

For example, in January 2008, Defendant McKenzie reported that the Company had tested the Victory well and was "pleased with the natural gas tests from our 'Victory' well and the "results were well worth waiting for." ¶57. However, Defendants knew that these "results" were not meaningful and did not include findings of essential data regarding the well, such as initial and final flowing rates and pressures and the shut-in pressure buildup data, which are necessary in order to determine the economic viability of an exploratory well. In fact, these "results" indicated that there were only limited reserves connected to the well and that the well would likely be a sub-economic discovery, as BG, Canadian Superior's more-experienced partner, had concluded. ¶58. Like the Victory well, Defendant Noval represented that the Company was also "pleased with the results of the 'Bounty' well and production testing indicates that we have drilled one of the best natural gas wells offshore Trinidad," ¶74, and the Company reported that "*[g]iven the magnitude of the 'Bounty' discovery*, the Company plans to move forward expeditiously with appraisal and development drilling and production." (Emphasis added.) ¶76. Defendants, however, knew, or were reckless in not knowing, that the Bounty well, on its own, was not economic, and that it only might become economic *if* sufficient reserves would be discovered in Endeavor, the third well, to make the joint development of the two wells economic by reason of cost savings realized through shared infrastructure. ¶42. Similarly, Defendant Coolen's statement that the Company was "pleased with what [it] was learning from 'Endeavour'; not only in terms of this particular well and its related structure, but also in regard to the *overall development potential of the entire 'Intrepid' Block 5(c),*" ¶88, was also materially false and misleading because, as admitted by Defendant Coolen, Defendants

---

economically viable to develop, it is reasonable to infer that any positive reports about the progress of the drilling would be supportive of the stated drilling purpose. By alleging that Defendants made these positive statements knowing that they did not support any such finding, Plaintiff has adequately plead scienter. *See Novak,* 216 F.3d at 308.

knew at the time that this statement was made that the Company had insufficient funds to complete the well and to satisfy its financial obligations under the Joint Venture. ¶89. Thus, the statements that the Company was "pleased" with the well and its "potential" were misleading because Defendants knew that the well's "potential" would not inure to the benefit of the Company or its shareholders.

Defendants dispute these allegations and contend that the Denning Affidavit, filed in February 2009, could not address the economic viability of a natural gas well tested months earlier because economic factors, such as the price of natural gas, fluctuate over time. Def. Brf. at 20. However, the price of natural gas is not the only factor that determines whether a natural gas well is economically viable and was not the factor cited to by Denning for his determination that the well was not economically viable (Denning based his finding on tests that indicated that there were only "limited reserves connected to the well"). *See* Denning Affi. ¶44. Factors such as gas pressure data, the quality and continuity of the natural gas reservoir, the volume of reservoir and the cost of the well's infrastructure are other factors that determine the economic viability of a well, and are known at the time of, or shortly after, the time of initial testing. Indeed, as Plaintiff alleges, the failure of the Company to report these results – while the Company did report the outcome of other positive, albeit non-conclusive, test results – creates a reasonable inference that the unreported results did ***not*** support a finding that it would be economical to develop the wells.

Moreover, Denning, due to his position as Vice President of Commercial, BG Trinidad and Tobago,[11] was intimately familiar with oil and gas production offshore Trinidad and with the tests

---

[11]    It is worth reiterating at this point that this is the same BG about whom Defendant McKenzie referred to as "an established major gas producer world-wide and in Trinidad" with "a wealth of knowledge and experience" of liquefied natural gas.  ¶3.

performed on each well by Canadian Superior (and their results) and thus, he and his engineering staff were in a position to comment on the economic viability of the wells.[12]   It is therefore reasonable to presume that Denning had sufficient data available to him from the testing performed on each well to state in his Affidavit whether the wells would be sub-economic,[13] which Defendants, as a partner in the Joint Venture and as its Operator, also had access to.  ¶10.

###   b.    Defendants Misrepresented Canadian Superior's Financial Obligations Under the Joint Venture

Instead of disclosing that Canadian Superior was liable for 60% of the costs under the JOA, the Company mislead shareholders about the extent of its liability.  In nearly every press release throughout the Class Period, Defendants represented that the Company was "paying 26-2/3% of the Block 5(c) exploration program cost" and that Challenger Energy was paying 33-1/3% of the Block 5(c) exploration costs for a 25% interest in the Joint Venture.  ¶¶55, 57, 59, 61, 65, 68, 71, 72, 74, 81, 85, 86, 88.  However, Defendants failed to disclose that, during the Class Period, the Company had not yet received the Minister's approval to assign Challenger Energy a 25% interest in the PSC, as was required, and thus had no basis to state that the Company was only liable for 26-2/3% of the costs as it repeatedly reported.  *Id.*  Indeed, under the terms of the JOA, (*see* Ex. A) if Challenger

---

[12]    Defendants' reliance on *In re Centerline Holdings Co. Secs. Litig.*, 678 F. Supp. 2d 150 (S.D.N.Y. 2009), is inapposite because, unlike there, the Denning Affidavit here confirms that there was never any basis for Defendants to make their positive statements about the progress and prospects of the well since the available data at that time did not support such representations.

[13]    The Joint Venture was subject to a confidentiality clause and the parties agreed that "all information in relation with Joint Operations or Exclusive Operations shall be considered confidential and shall be kept confidential and not be disclosed during the term of the contract and for a period of five (5) years thereafter to any person or entity not a Party to this Agreement."  JOA §15.2 ; Additionally, the Production Sharing Contract between the government of Trinidad and Tobago and Canadian Superior contained a similar provision.  PSC §28 (attached hereto as Ex. B).  Thus, Denning was limited as to what he could disclose in his Affidavit and therefore, arguments that Denning's statements were unsubstantiated are irrelevant.

Energy failed to make a payment, that payment would have to be made by Canadian Superior.

Ultimately, as was later revealed in the Denning Affidavit, the Minister rejected the assignment and,

as a result, Canadian Superior was accountable for the full 60% of the exploration costs and 70% of

all obligations under the JOA since Challenger Energy had filed for bankruptcy.

Defendants dispute this allegation and contend that, under the JOA, Challenger Energy had

30 days to cure a default and that the Company had remedies to extract Challenger Energy's share of

the costs regardless of the fact that Challenger Energy defaulted under the JOA. Def. Brf. at 23-24.

While that may be, it cannot be disputed that Canadian Superior was liable under the JOA for the full

amount of its costs and Challenger Energy's costs since Challenger Energy was not approved by the

Minister. The risk of this increased liability was never disclosed to investors and caused additional

exposure to Canadian Superior after Challenger Energy filed for bankruptcy. As such, Defendants'

Class Period statements concerning the extent of its exposure to the costs of the Joint Venture were

materially false and misleading.[14]

### c.    Defendants Knew that Canadian Superior Was in Material Breach of the JOA

In November and December 2008, Defendants knew, or were reckless in not knowing, that

due to its precarious financial state – which was confirmed by an audit performed by BG at the time

– the Company was in material breach of the JOA since it: (i) failed to maintain a separate joint

---

[14]    Defendants also cite to *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327 (S.D.N.Y. 2007), and *Beleson v. Schwartz*, 599 F. Supp. 2d 519 (S.D.N.Y. 2009), to argue that concerns about the Company's ability to finance the joint venture were already known since the Company's financial troubles were widely reported. Unlike in those cases, however, Plaintiff here has alleged that Defendants' numerous positive statements regarding the progress and prospects of the wells led investors to believe that the Company's financial problems would not be negatively impacted by factors directly related to the Joint Venture. That, however, was not the case, as the Company's undisclosed additional liability from Challenger Energy, as well as its multiple material breaches of the JOA, were notable factors in its financial downfall.

account for funds associated with the JOA; (ii) commingled funds received from BG with Canadian Superior's general funds; (iii) failed to maintain the joint funds in a separate interest-bearing account, with interest allocated among the parties on an equitable basis; and (iv) failed to pay invoices rendered by suppliers in a timely fashion. ¶6. In his affidavit, Defendant Coolen *admitted* that during the months of November, December and January, the Company did not have sufficient funds to meet its obligations under the JOA.[15]  ¶53. Indeed, this resulted in its failure to make a multi-million dollar payment to Maersk and its filing for receivership.

These facts support a strong inference that Defendants knew or had access to information that undermined or contradicted their statements to the market. *See, e.g., Heller*, 590 F. Supp. 2d at 622 (allegations that Defendants had knowledge of facts that explicitly contradicted their public statements were, alone, enough to satisfy the pleading requirement for scienter); *Nathel v. Siegal*, No. 07 Civ. 10956 (LBS), 2008 U.S. Dist. LEXIS 86297, at *21-*22 (S.D.N.Y. Oct. 20, 2008) (scienter was established where complaint alleged that defendants "had access to internal documents that contradicted their public statements to Plaintiffs"); *Lapin*, 506 F. Supp. 2d at 241 (holding that

---

[15]     Defendants misleadingly contend that Plaintiff should have known that the Company's role in the JOA was in jeopardy because the Company had previously disclosed that it had accounting and liquidity problems, and thus shareholders were put on notice that the Company may not fulfill its obligations under the JOA. (Def. Brf. at 21, 24). What Defendants fail to mention is that the terms of the JOA were not public during the Class Period and investors therefore did not know – and had no way of knowing – that the Company's accounting problems would cause it to be in breach of the JOA. Thus, any disclosure of accounting problems – to the extent that such disclosure even related to the violations specified in the Denning Affidavit, *see In re Globalstar Secs. Litig.*, 01 Civ. 1748 (SHS), 2003 U.S. Dist. LEXIS 22496 at *29 (S.D.N.Y. Dec. 12, 2003) ("The question of whether, and when, the market had received enough information to counteract the allegedly misleading statements is best resolved on a summary judgment motion or at trial, not at [the motion to dismiss] stage of the litigation") – did not put investors on notice of anything regarding the Company's non-compliance with the terms of the JOA. As such, Defendants' reliance on *Horizon Asset Mgmt. v. H&R Block, Inc.*, 580 F.3d 755, (8th Cir. 2009), where defendants adequately disclosed specific deficiencies and the results of those deficiencies, is inapposite.

defendant "had access to information about the conflicts and the fact that its [statements] did not accurately reflect analysts' true opinions and chose not to disclose this to the public" supports a finding that defendant "knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation").

Taking the AC's allegations collectively and accepting them as true, Plaintiff's inference that Defendants knowingly or recklessly made materially false and misleading statements is more likely than the inference that Defendants were justifiably unaware that their statements were false or misleading. *See Tellabs*, 551 U.S. at 328.

### 2.    Defendants' Positions at Canadian Superior Further Support a Showing of Scienter

Where a corporation's "high-level executive officer" makes public statements that are contradicted by facts that are available when the statements are made, an inference arises that the officer "had intimate knowledge of those facts or should have known them." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2001). In fact, "even in the absence of specific information contradicting their public statements," knowledge of contradictory information may be imputed to individual defendants where the statements concern matters that are "sufficiently significant" to the company. *In re eSpeed, Inc.*, 457 F. Supp. 2d 266, 293 (S.D.N.Y. 2006); *see also In re Winstar Communications*, No. 01 cv 3014 (GBD), 2006 U.S. Dist. LEXIS 7618, at *22 (S.D.N.Y. Feb. 24, 2006) (imputing scienter to key officers who filed false financial statements).

The AC alleges facts that adequately support a strong inference that Defendants were aware of, or at the very least, by the nature of their positions, recklessly disregarded, the falsity of statements made throughout the Class Period. As high-level executives of the Company who made positive statements about the progress and findings on Intrepid Block 5(c), Defendants Noval,

McKenzie and Coolen were certainly in a position to know the true facts regarding the wells on the Intrepid Block 5(c). At the very least, their issuance of positive statements regarding the wells without having knowledge as to its economic viability, was reckless. *See Atlas Air,* 324 F. Supp. 2d at 489.

Moreover, the fact that the wells on the Intrepid Block 5(c) were a potentially large source of the Company's future revenues further supports knowledge of its progress to Defendants. *See Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989) (holding that directors are imputed with knowledge of the removal of a "potentially significant source of income for the company"); *see also City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,* 423 F. Supp. 2d 348, 362 (S.D.N.Y. 2006) (imputing knowledge of falsity to key officers who should have been informed about a company's core operations, which was responsible for nearly a third of the company's entire profit); *In re Campbell Soup Co. Sec. Litig.,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001) ("knowledge may be imputed to individual defendants when the disclosures involve the company's core business").

As such, the AC alleges facts that adequately support a strong inference that Defendants were aware of, or at the very least, by the nature of their positions, recklessly disregarded, the falsity of statements made throughout the Class Period.

### 3.      The AC Adequately Alleges Motive and Opportunity

Since Plaintiff has established a strong inference of Defendants' scienter by alleging their conscious misbehavior or recklessness, it is not necessary to allege motive and opportunity. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000). Nonetheless, allegations of motive and opportunity serve to further strengthen the inference of scienter.[16] *See Rothman v. Gregor*, 220

---

[16]      Defendants do not contest that they had the "opportunity" to commit fraud, which is generally presumed for high-level corporate executives. *See, e.g., In re Scholastic,* 252 F.3d at 74.

- 24 -

F.3d 81, 93-94 (2d Cir. 2000); *see also Tellabs*, 127 S. Ct. at 2511; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2nd Cir. 2001).

As an initial matter, the AC alleges that Defendants were motivated to artificially inflate the price of Canadian Superior stock so that Canadian Superior could successfully raise in excess of $50 million from two private placements on favorable terms. ¶99. These monies were used to fund the Company's exploratory costs under the Joint Venture. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 370 (S.D.N.Y. 2003), quoting *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (holding that allegations that issuer "inflated the stock price to maximize revenue from the secondary offering" was a "sufficient allegation of motive").

Motive is further demonstrated by the insider sales of two defendants. It is well settled in this Circuit that motive can be established by unusual insider trading sales. *See Stevelman v. Alias Res.*, 174 F.3d 79, 85 (2d Cir. 1999). Stock sales by insiders usually imply a strong inference of scienter when those sales are "unusual." *In re Scholastic*, 252 F.3d at 74. Sales may be unusual because of the size of the sales, the timing of the sales, the portion of holdings sold or the number of insiders selling. *Id.* at 74-75; *In re Oxford Health Plans Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y. 1999) (holding that "[t]rades made a short time before a negative public announcement are suspiciously timed"). However, there is no minimum level of sales at which insider trading becomes unusual per se; rather, each case must be decided on its own facts. *In re Scholastic*, 252 F.3d 63 at 74.

Here, the insider sales of two defendants are unusual, particularly when considered in context. Defendants Bilton and Snethun, both of whom were executives of the Company,[17] sold

---

[17]    While Defendants argue that Bilton and Snethun were located in Canada and therefore not involved in the project in Trinidad and Tobago, *see* Def. Brf. at 32, Defendants ignore that these

approximately $908,747 (CAD) worth of their personal holdings in the Company at suspicious times. Defendant Bilton sold 30,177 shares of stock receiving $95,413 (CAD) on April 7, 2008 shortly after the March 31, 2008 press release in which Defendant McKenzie represented that "Canadian Superior had a large natural gas discovery in Trinidad" and that the Victory well "yielded a successful natural gas discovery in this multi-TCF play." ¶65. Defendant Bilton's September sales of 108,400 shares for proceeds of $329,210 (CAD) followed the announcement of optimistic news from August 15, 2008, that the Company had made a "*significant natural gas discovery* with the drilling and production testing of its 'Bounty' exploration well" and Defendant McKenzie's statement that "*we believe the best is still to come to shareholders.*"  (Emphasis added.)  ¶76. Additionally, Defendant Leif sold 193,109 shares, reaping a benefit of $484,124 between September 30, 2008 and October 3, 2008, that also benefitted from the August 15, 2008 press release and the September 2, 2008 press release that the Company had successfully "spudded the Endeavour well."[18] ¶78. Defendants Bilton and Leif plainly benefited from the Company's positive announcements by selling after the issuance of these positive press releases. *See In re Xerox Corp. Sec. Litig.*, 165 F. Supp. 2d 208, 222 (D. Conn. 2001) (sales that took place shortly after false or misleading statements were indicative of scienter).

---

wells were potentially a large source of income to the Company and were therefore being watched closely by the Company's executives, regardless of where they were physically located.

[18]    Defendants contend that Plaintiff can only point to stock sales by two defendants. The fact that the other defendants did not sell during the Class Period does not defeat Plaintiff's motive allegations because it is not necessary to allege that all insiders sold shares in order to adequately allege scienter. *See In re APAC Teleservices, Inc. Sec. Litig.*, No. 97 Civ. 9145 (BSJ), 1999 U.S. Dist. LEXIS 17908, at *21 (S.D.N.Y. Nov. 19, 1999) ("[t]he fact that not every one of the defendants may have sold stock does not defeat an inference of scienter"). For this same reason, one insider purchasing shares does not defeat Plaintiff's motive allegations.

Moreover, Defendants Bilton and Snethun sold a substantial percentage of their stock holdings, further strengthening an inference of scienter: Defendant Bilton sold approximately 72% of his personally-held shares, while Snethun sold more than 90% of his shares. *See Stevelman*, 174 F.3d at 85 (sale of 40% of holdings permitted an inference of bad faith and scienter); *In re Complete Mgmt. Sec. Litig.*, 153 F. Supp. 2d 314, 328 (S.D.N.Y. 2001) (sales of 33% and 90% of holdings were sufficient to establish scienter). Taking into consideration both the timing of the sales and the percentages sold by the two selling defendants, Plaintiff has sufficiently alleged motive.

Accordingly, Plaintiff's allegations, taken collectively and accepted as true, raise a strong inference of scienter and Defendants have not presented a more compelling non-fraudulent inference.

### D.    The AC Adequately Alleges Loss Causation

The AC sufficiently alleges loss causation as it sets forth a "short plaint statement" that provides Defendants "with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *See Dura Pham., Inc. v. Broudo,* 544 U.S. 336, 337 (2005); Fed. R. Civ. P. 8(a)(2). This standard may be satisfied by alleging "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Lentell v. Merrill Lynch & Co. Inc.* 396 F. 3d 161, 173 (2d Cir. 2005) (loss causation is satisfied where "the loss [was] caused by the materialization of the concealed risk"). In other words, a plaintiff must allege that the "misrepresentation[s] (or other fraudulent conduct) proximately caused the plaintiff['s] economic loss." *In re NYSE Specialists Sec. Litig.,* 405 F. Supp. 2d 281, 315 (S.D.N.Y. 2005) (citing *Dura,* 544 U.S. at 346).

Here, Plaintiff alleges Canadian Superior's February 2009 disclosures revealed the materialization of numerous negative facts that the Company previously concealed and that negatively affected the price of Canadian Superior stock. ¶93. Specifically, on February 12, 2009,

Canadian Superior announced that its participating interest in the PSC was placed in a receivership, causing its stock price to fall 44%. ¶¶11-14, 41-49. The Denning Affidavit, upon which the receivership was based, revealed that Canadian Superior: (i) failed to comply with material terms of the JOA; (ii) misrepresented its obligations under the JOA; (iii) concealed the non-payment of Maersk's November invoice; and (iv) overstated the likely productivity of the Intrepid Block 5(c). ¶¶41-49. The market's swift and negative reaction demonstrates not only the materiality of this information, but also that the market was previously unaware of these issues. ¶105; Compare *In re MBIA, Inc.*, 2010 U.S. Dist. LEXIS 31430 at *81-87 (finding corporate disclosure followed by stock drop sufficient to allege loss causation) with *In re Sec. Capital Assur. Secs. Litig*., 07 Civ. 11086 (DAB), 2010 U.S. Dist. LEXIS 33954 at *82-84 (S.D.N.Y. Mar. 31, 2010) (finding the absence of any "sharp drop" in market price following an alleged disclosure negated plaintiffs' loss causation theory).

Likewise, on February 17, 2009, Canadian Superior disclosed that its failed participation in the Joint Venture, which led to the imposition of a receivership, also caused Canadian Western to demand repayment of its $45 million credit facility within a week. ¶¶13-14, 106-107. This announcement drove the Company's stock price down precipitously, causing it to lose 30% of its remaining value. *Id.* While Defendants point to the Company's earlier announcement that Canadian Western "did not anticipate remaining as the Company's lender indefinitely" as a disclosure of this information, that statement made no disclosure about the bank potentially calling its loan and certainly did not apprise investors of the negative information revealed in the Denning Affidavit (which served as the catalyst for the Company's downfall). *See Freudenberg,* 2010 U.S. Dist. LEXIS at 85 (no requirement of "mirror image" corrective disclosure so long as revelations of company's true "underlying condition" caused economic harm); *In re Motorola Sec. Litig*., 505 F.

Supp. 2d 501, 546 (N.D. Ill. 2007) (noting that "a corrective disclosure [need not], on its face, . . . explicitly correct a previous representation, or expressly disclose the particular fraudulent scheme plaintiff alleges"). Accordingly, loss causation has been adequately plead.

### E.    Plaintiff has Adequately Alleged a Claim Under Section 20(a)

Plaintiff has also properly alleged a claim under Section 20(a) of the Securities Exchange Act of 1934. To allege a claim under Section 20(a), a plaintiff must plead: (1) a primary violation by the controlled person; (2) control of the primary violator by the defendant; and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud. *Hall*, 2008 U.S. Dist. LEXIS 54790, at *26. A control person claim is governed by the liberal pleading standards of Rule 8. *See In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 401 (S.D.N.Y. 2007).

Defendants tacitly concede that Defendants are control persons of Canadian Superior, and a wealth of case law supports this concession. *See e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) (control person liability is sufficiently plead where the complaint alleges that defendant was an officer of the company and that he had primary responsibility for the dealings of the company); *Katz v. Image Innovations Holdings*, *Inc.,* 542 F. Supp. 2d 269, 276 (S.D.N.Y. 2008) (defendants in executive and/or directorial positions had control over the company); *In re Scottish Re Group*, 524 F. Supp. 2d at 401. Thus, their argument focuses on their contention that the AC does not allege an underlying primary violation of the securities laws upon which to base the control person claims. Def. Brf. at 32. However, as established above, Plaintiff has more than sufficiently pled a Section 10(b) claim against Defendants and thus liability also exists for Defendants under 20(a). *See, e.g., In re Scottish Re Group*, 524 F. Supp. 2d, at 401; *In re Emex Corp. Sec. Litig.*, No. 01 Civ. 4886 (SWK), 2002 U.S. Dist. LEXIS 17528, at *28 (S.D.N.Y. Sept. 18, 2002). Further, to the extent that it must, the AC alleges that Defendants were "culpable

participants" in the fraud with facts supporting an inference that they not only exerted control over Canadian Superior, but also participated in the alleged improprieties with scienter. *See In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 351 (S.D.N.Y. 2007). Accordingly, the Section 20(a) claim should be sustained. [19]

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' motion to dismiss in its entirety.[20]

DATED:  July 2, 2010                ROBBINS GELLER RUDMAN
                                       & DOWD LLP
                                    SAMUEL H. RUDMAN
                                    (srudman@rgrdlaw.com)
                                    DAVID A. ROSENFELD
                                    (drosenfeld@rgrdlaw.com)
                                    CAROLINA C. TORRES
                                    (ctorres@rgrdlaw.com)


                                    _____
                                         /s/ *David A. Rosenfeld*
                                    DAVID A. ROSENFELD

---

[19]    In light of the recent Supreme Court decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. __, 2010 U.S. LEXIS 5257 (June 24, 2010), which limits the reach of §10(b) to "the purchase or sale of a security listed on an American stock exchange or sale of any other security in the United States," *Id*. at *45, Plaintiff will only seek to certify a class of investors that purchased shares of Canadian Superior stock on the American Stock Exchange.

[20]    Although Plaintiff believes that it has more than adequately stated claims against all Defendants, in the event the Court determines the AC is deficient in any respect, Plaintiff respectfully requests an opportunity to amend in accordance with Fed. R. Civ. P. 15(a) ("leave shall be freely given when justice so requires"). *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also In re Amaranth Natural Gas Commodities Litig.*, No. 07 Civ. 6377 (SAS), 2008 U.S. Dist. LEXIS 79235, at *87 (S.D.N.Y. Oct. 4, 2008).

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

HOLZER HOLZER & FISTEL, LLC
MICHAEL I. FISTEL, JR.
(mfistel@holzerlaw.com)
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

*Co-Lead Counsel for Plaintiff*

DYER & BERENS LLP
JEFFREY A. BERENS
300 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that July 2, 2010, I caused a true and correct copy of the attached:

MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE    AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

to be served electronically on all counsel registered for electronic service for this case.

*/s/ David A. Rosenfeld*
David A. Rosenfeld