UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID SGALAMBO, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br>   -against-<br><br>CRAIG MCKENZIE, et al.,<br><br>      Defendants. | Civil Action No. 1:09-cv-10087-SAS |

### DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

                MORRISON & FOERSTER LLP
                1290 Avenue of the Americas
                New York, New York  10104
                (212) 468-8000
                *Attorneys for Defendants*

ny-932487

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... ii-iv

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT .................................................................................................................................3

I. PLAINTIFF MUST MEET A HEIGHTENED PLEADING STANDARD TO WITHSTAND A MOTION TO DISMISS A SECURITIES FRAUD CLAIM ................3

II. PLAINTIFF DOES NOT ALLEGE THAT DEFENDANTS' STATEMENTS WERE FALSE WHEN MADE ......................................................................................4

    A. Accurate Statements Describing Test Results at the Wells Were Not False or Misleading and Future Economic Viability Was Not Implied ..........................4

    B. Defendants Did Not Imply That the Wells Would be Economically Viable in the Future, and If They Had, Any Such Implied Representation Would Be Inactionable as a Forward-Looking Statement ..................................................7

    C. Plaintiff Misinterprets or Ignores the Salient Facts Surrounding Challenger's Cost Responsiblity, the JOA, and the Maersk Invoice .....................9

III. PLAINTIFF FAILS TO ALLEGE SCIENTER AGAINST ANY DEFENDANT ..........11

    A. Stock Holding and Purchases Undermine Any Inference of Scienter .................11

    B. Plaintiff Cannot Allege Conscious Misbehavior Or Recklessness When the Complaint Fails to Show Alleged Misstatements Were False When Made ........13

IV. PLAINTIFF CANNOT ALLEGE LOSS CAUSATION BECAUSE HE CANNOT POINT TO ANY CONCEALED RISKS THAT CAUSED THE LOSS .......14

CONCLUSION ............................................................................................................................15

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*ATSI Comms., Inc. v. The Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................................... 4

*Beleson v. Schwartz*,
   599 F. Supp. 2d 519 (S.D.N.Y. 2009) ................................................................................. 10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007) ..................................................... 3

*Denny v. Barber*,
   576 F.2d 465 (2d Cir. 1978) ................................................................................................. 6

*ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*,
   553 F.3d 187 (2d Cir. 2009) ............................................................................................... 13

*Freudenberg v. E*Trade Financial Corp.*,
   07 Civ. 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010) ................................................ 8

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000) .............................................................................................. 6, 12

*Greenberg v. Compuware Corp.*,
   889 F. Supp (E.D. Mich. 1995) ............................................................................................ 8

*Heller v. Goldin Restructuring Fund*,
   590 F. Supp. 2d 603 (S.D.N.Y. 2008) ................................................................................. 13

*In re Aspeon Secs. Litig.*,
   168 Fed. Appx. 836 (9th Cir. Cal. 2006) ............................................................................ 12

*In re Centerline Holdings Co. Sec. Litig.*,
   678 F. Supp. 2d 150 (S.D.N.Y. 2009) (SAS) ....................................................................... 5

*In re Ramp Corp. Sec. Litig.*,
   No. 05 Civ. 6521, 2006 WL 2037913 (S.D.N.Y. July 21, 2006) ........................................ 15

*In re Regeneron Pharms., Inc. Sec. Litig.*,
   2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ........................................................................ 12

*In re Sofamor Danek Group, Inc.*,
   123 F.3d 394 (6th Cir. 1997) ................................................................................................ 7

ny-932487

*In re Sun Healthcare Group, Inc. Sec. Litig.*,
    181 F. Supp. 2d 1283 (D.N.M. 2002) .................................................................................. 12

*In re Symbol Techs. Class Action Litig.*,
    950 F. Supp. 1237 (E.D.N.Y. 1997) ..................................................................................... 12

*Kalnit v. Eichler*,
    264 F.3d 131, 142 (2d Cir. 2001) ......................................................................................... 13

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................................. 14

*McCasland v. FormFactor Inc.*,
    2008 WL 2951275 (N.D. Cal. July 25, 2008) ...................................................................... 12

*Morrison v. Nat'l Australia Bank Ltd.*,
    __ U.S. __, 2010 WL 2518523 (June 24, 2010) ................................................................... 15

*Nathel v. Siegal*,
    592 F. Supp. 2d 452 (S.D.N.Y. 2008) .................................................................................. 14

*Pew v. Cardarelli*,
    2005 WL 3817472 (N.D.N.Y Mar. 17, 2005), *aff'd*, 164 Fed. Appx. 41, 2006 U.S.
    App. LEXIS 2132 (2d Cir. N.Y., Jan. 24, 2006) .................................................................. 11

*Phillips v. Am. Int'l Group, Inc.*,
    498 F. Supp. 2d 690 (S.D.N.Y. 2007) .................................................................................. 10

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) ................................................................................................... 6

*Slayton v. American Express Co.*,
    604 F.3d 758 (2d Cir. 2010) ............................................................................................ 3, 14

*Steinberg v. Ericsson LM Telephone Co.*,
    2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008) ........................................................................ 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308,127 S. Ct. 2499 (2007) .................................................................................. 3, 4

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ................................................................................................................. 3

15 U.S.C. § 78u-4(b)(2) ................................................................................................................. 3

15 U.S.C. § 78u-5(c)(1)(B)(ii)(II) ................................................................................................ 14

15 U.S.C. § 78u-5(i)(1)(C) ................................................................................................................ 7

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b) ......................................................................................................................... 3

Fed. R. Civ. P. 12(b)(6) ............................................................................................................. 3, 6

**PRELIMINARY STATEMENT**

At a bare minimum, a plaintiff bringing a fraud claim must allege that defendants' statements were false and that defendants acted with a culpable state of mind.  Plaintiff's opposition to Defendants' motion to dismiss confirms that here, Plaintiff has failed to do either.

With respect to scienter, allegations that the individual Defendants were motivated to commit fraud for personal gain are completely undermined by the fact that two of the Defendants did not sell a single share during the class period, and another *purchased more shares*.  In the absence of any viable allegation of motive, Plaintiff's circumstantial allegations of conscious misbehavior or recklessness would need to be particularly compelling.  Yet Plaintiff has not even pled facts to show that Defendants' statements were false when made.

As to misstatements, Plaintiff relies on the theory that by disclosing *accurate* results of tests conducted at exploratory natural gas wells, Defendants *implied* that these wells would be economically viable in the future.  In so doing, Plaintiff ignores that Defendants *never* represented that the wells would be economically viable – to the contrary, statements about test results at the wells were accompanied by the specific caution that any "discovered resource *may not be economically viable* or technically feasible to produce." (*See* Ex. 1, row 3 at 3 (emphasis added).)[1]

Furthermore, Plaintiff provides no factual allegations that Defendants had any contemporaneous information contradicting these accurate disclosures about the well test results. Instead, Plaintiff simply latches onto self-serving and untested opinions in the Denning Affidavit[2] – filed by BGI at the end of the class period long *after* Defendants' statements about

---

[1]  References to "Ex." are to the exhibits to the Declaration of Damion K. Stodola, filed June 4, 2010 with Defendants' Memorandum of Law in Support of Their Motion to Dismiss.

[2]  Capitalized terms used herein are as defined in Defendants' Memorandum of Law in Support of Their Motion to Dismiss Plaintiff's Amended Complaint, filed June 4, 2010 ("Def. Mem.").

test results were made and after both the credit markets and the market price of natural gas had collapsed.  In that very different market environment, Denning opined that the Intrepid Block *might* not be economically viable, but even Denning conceded that further testing was required.  Denning's opinion in February 2009 does not make Defendants' earlier test result disclosures false and is, in any event, entirely contradicted by BGI's decision to purchase the assets for almost $145 million (on top of the $125 million BGI had already invested).  In sum, Plaintiff's attempt to cast backward from the Denning Affidavit to show that Defendants' earlier, accurate disclosures about testing were misleading is nothing more than fraud by hindsight of the most tenuous kind.

Moreover, insofar as Plaintiff alleges that Defendants were impliedly guaranteeing a rosy *future* for the Intrepid Block on the basis of the disclosed test results (which they were not), any such representation was necessarily forward-looking and accompanied by specific cautions, and thus protected by the PSLRA safe harbor.  Plaintiff tries to have it both ways by arguing that the "statements of existing fact" describing the test results – which are nowhere alleged to be false or inaccurate – were "misleading" and thus outside the statutory safe harbor. (Pf. Opp. at 13.)  But courts have repeatedly held that accurate statements of present or historical fact do not support a securities fraud claim.

Plaintiff also glosses over pertinent facts and key terms in the relevant contracts to create the impression that Defendants failed to disclose that Canadian Superior was *at all times* responsible for more than its 26-2/3d share of the costs of the Intrepid Block development.  But the contracts show that Challenger was responsible for its share of costs regardless of whether it obtained Minister approval and that Canadian Superior had remedies available to extract payment regardless of Challenger's default.  Most importantly, as a matter of timing, Challenger did not begin to face a liquidity crisis until the fall of 2008, it was entitled to 30 days to cure its

2

ny-932487

default under the JOA once it occurred, and the Maersk invoice in question was not even due until almost the end of the class period in January 2009.  There is no basis for Plaintiff's assertions that Defendants should have rushed to disclose Challenger's *potential* default at the first sign of trouble, particularly when Challenger itself had fully disclosed its liquidity problems to the market, including the specific disclosure that it risked defaulting under the JOA.  As the documents incorporated into the complaint clearly show, and as the companies fully disclosed, Canadian Superior and Challenger faced a liquidity crunch between November 2008 and February 2009 in a credit market that was historically tight.  Plaintiff's attempts to turn these disclosed challenges late in the class period into a securities fraud claim must be dismissed.

## ARGUMENT

**I.  PLAINTIFF MUST MEET A HEIGHTENED PLEADING STANDARD TO WITHSTAND A MOTION TO DISMISS A SECURITIES FRAUD CLAIM**

While Plaintiff is correct that to survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure (FRCP), the allegations must meet a standard of "plausibility," Plaintiff cannot stop there.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 564, 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007).  Instead, Plaintiff is held to heightened standards under the Private Securities Litigation Reform Act ("PSLRA") and FRCP 9(b) requiring particularized allegations for pleading securities fraud, and not the notice pleading standard Plaintiff invokes.  *See* 15 U.S.C. § 78u-4(b)(1); (Pf. Opp. at 9.)[3]  *See also Slayton v. American Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

Moreover, allegations supporting an inference of scienter must be "powerful or cogent" and "at least as compelling as any opposing inference" that could be drawn from the facts alleged.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323, 127 S. Ct. 2499, 2504-

---

[3]  References to "Pf. Opp." or "Opposition" are to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss filed July 2, 2010.

05 (2007) (interpreting 15 U.S.C. § 78u-4(b)(2)).  Under this standard, "[t]he inquiry is inherently comparative" and requires consideration of "competing inferences," including "plausible nonculpable explanations for the defendant's conduct."  *Id.* at 2510; *see also ATSI Comms., Inc. v. The Shaar Fund, Ltd.*, 493 F.3d 87, 104 (2d Cir. 2007) (facts must show that there is no "plausible nonculpable explanation" for the defendants' actions that is more likely than the inference of fraudulent intent.)  As set out below, the Complaint falls far short of these standards.  Plaintiff's Opposition underscores that no false or misleading statements are alleged and Defendants had no intent to defraud investors.

## II.     PLAINTIFF DOES NOT ALLEGE THAT DEFENDANTS' STATEMENTS WERE FALSE WHEN MADE.

### A.     Accurate Statements Describing Test Results at the Wells Were Not False or Misleading and Future Economic Viability Was Not Implied

Plaintiff unsuccessfully attacks Defendants' statements made throughout 2008 describing the results of tests performed at two of the three Intrepid Block wells.  (*See* Pf. Opp. at 18; Compl. ¶ 42.)  Plaintiff does *not* assert that the test results were inaccurate.  Instead, Plaintiff argues that these entirely accurate results somehow *guaranteed* that the wells would be economically viable in the future.  Yet Defendants neither affirmatively stated nor implied anything about the future "economic viability" of the Intrepid Block.  To the contrary, Defendants accompanied factual test result disclosures with express warnings to investors that the wells may *not* be economically viable.  Despite this reality, Plaintiff asserts that Defendants "misleadingly portrayed the results of the well tests as highly positive and meaningful" and "[spoke] of the wells' future productivity in very positive terms," and argues that these statements were false and misleading as to the future because of alleged "limited reserves identified in the wells . . ."  (Pf. Opp. at 17, 10, 11.)  Plaintiffs' theory based on future implications – particularly those expressly disclaimed by Defendants – misses the mark.

*First*, as noted above (and as Plaintiff ignores), Defendants specifically warned investors in the test result disclosures that any "discovered resource *may not be economically viable* or technically feasible to produce." (Ex. 1, row 3 at 3, row 4 at 2 (emphasis added).)  Indeed, Plaintiff concedes that "[the] economic viability of a natural gas discovery depends on numerous factors, including the size of the discovered reserves, production rate, capital development and operating costs, *as well as the price of gas.*"  ( Pf. Opp. at 10 (emphasis added).)  Yet Plaintiff also overlooks Canadian Superior's specific warning to investors that economic viability could change over time, such that "[c]ertain wells or other projects *may become uneconomic* as a result of a decline in . . . natural gas prices . . . ." (Ex. 1, row 11 at 37.)  Given the sharp decline in gas prices over the relevant period, this warning was prophetic.  In the face of these disclosures alerting investors that the economic viability of a well could *not* be assured and could change over time, Plaintiff fails to allege particularized facts showing that any information available at the time of each disclosure about testing at the wells (from January to August 2008) that contradicted Defendants' public statements.  In light of this failure, the complaint must be dismissed.  *In re Centerline Holdings Co. Sec. Litig.*, 678 F. Supp. 2d 150, 159-60 (S.D.N.Y. 2009) (SAS) (dismissing fraud claim where alleged misstatements predated alleged contrary information.)

*Second*, Plaintiff hangs his fraud case on Denning's opinion about the economic viability of the wells *in February 2009* – at the very end of the class period – without any basis to tie that opinion back to what Defendants believed throughout 2008.  (Pf. Opp. at 19.)  What Denning believed based on his view of the market in February 2009 has no bearing on what Defendants believed and stated as far back as January 2008 – and in fact Denning does not even purport to opine as to the economic viability of the Intrepid Block wells over the previous year.  (*See* Ex. 6.)  *Centerline Holdings* , 678 F. Supp. 2d at 159  (plaintiffs failed to allege that "defendants

knew or should have known that the statements were false *at the time any their misstatements were made*" where alleged misstatements predated alleged contrary information)  And even if Denning's opinion in February 2009 – made *after* the market price of natural gas had been cut in half over the prior year – was relevant to what Defendants believed a year earlier (and it is not), Denning himself specifically acknowledged that further testing was necessary "so that a decision on development of the entire Intrepid Block can be made."   (Ex. 6 ¶ 49.)[4]  As it turns out, despite this date-specific opinion, BGI ultimately sought to take over the Intrepid Block, to pay almost $50 million in outstanding costs, and to pay another $142.5 million for Canadian Superior's 45% interest in the Block (above the $125.2 million BGI already invested).  (Ex. 10 § 1.8(a).)  Plaintiff rests his fraud claim on a competitor's unsupported opinion – made long after the allegedly false statements – with no attempt to link this opinion back in time.  Such hindsight has never been sufficient to support a fraud claim.  *See Denny v. Barber*, 576 F.2d 465 (2d Cir. 1978); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994).[5]

---

[4] Plaintiff argues "[i]t is [] reasonable to presume" that Denning had access to data showing the wells were not viable, but, as Plaintiff acknowledges, as a partner in Intrepid Block, BG had access to data *all along* and certainly would not have continued to invest millions in the project throughout 2008 if data showed the wells were not viable. (Pf. Opp. at 20.)  The inference Plaintiff asks the Court to draw is patently *un*reasonable and cannot support even the standard of plausibility Plaintiff invokes, much less the strong and compelling inference required under the PSLRA. (*See infra*, Part III.B.)

[5] Plaintiff has added new allegations that are not in the Amended Complaint and should accordingly be stricken.  For example, Plaintiff now claims, without reference to any authority, that flowing rates and pressures and the shut-in pressure buildup data averred to in the Complaint are "*necessary* in order to determine the economic viability of an exploratory well." (*Compare* Compl. ¶ 58(a) *with* Pf Opp. at 18.)  Similarly, Plaintiff asserts in his Opposition that "gas pressure data, the quality and continuity of the natural gas reservoir, the volume of reservoir and the cost of the well's infrastructure . . . are known at the time of, or shortly after, the time of initial testing." (Pf. Opp. at 19).  These new allegations are made in connection with Plaintiff's assertion that the "available data" when Defendants disclosed the test results "did not support" the alleged implied representations about the wells' "progress and prospects." (Pf. Opp. at 20 n. 12.)  Entirely speculative assertions that are not even alleged in the Complaint cannot properly be considered on a motion to dismiss.  *Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir.

**B.   Defendants Did Not Imply That the Wells Would be Economically Viable in the Future, and If They Had, Any Such Implied Representation Would Be Inactionable as a Forward-Looking Statement.**

Plaintiff tries to assert in his Opposition that "Defendants' announcements of the drilling results were statements of present fact that mis[led] investors." (*See* Pf. Opp. at 13 )  But in fact, *nowhere* does the Complaint suggest that the test results were inaccurately reported.  Instead, as set out above, Plaintiff's fraud claim rests on the attenuated notion that these statements somehow implied to investors that the *future* prospects for the wells were also positive.  To the extent any such implied representation about future performance was made (which Defendants dispute), it would be protected by the PSLRA safe harbor.  15 U.S.C. 78u-5(i)(1)(C) (defining "statement of future economic performance" as forward-looking).  Indeed, Defendants specifically identified as forward-looking any "estimates, projections, interpretations, prognoses, and *other information that may relate to current or future production*, development(s), testing, well test results, project start-ups and future capital [costs]."  (*See*, *e.g*., Ex. 1, row 6 at 2.)

As disussed above, Defendants never represented, expressly or impliedly, that the wells would be economically viable and specifically disavowed any such guarantee in its cautionary language.  Moreover, this attempt to read promises of future performance into statements of historical fact has been consistently rejected by the courts.  *See*, *e.g*., *Steinberg v. Ericsson LM Telephone Co*., 2008 WL 5170640, *8 (S.D.N.Y. Dec. 10, 2008) (rejecting theory that when they accurately disclosed market share increases, defendants thereby impliedly and "falsely promis[ed] increased revenue and profits"); *In re Sofamor Danek Group, Inc*., 123 F.3d 394, 401 n. 3 (6th Cir. 1997) ("disclosure of accurate historical data does not become misleading even if less favorable results might be predicted by the company in the future" and "a violation of the

---

2000) (finding it error for court to rely on factual allegations outside of complaint in ruling on Rule 12(b)(6) motion).  Moreover, these alleged facts do not overcome Plaintiff's basic problem that Defendants expressly cautioned that the wells may not be economically viable.

federal securities laws cannot be premised [on] a company's disclosure of accurate historical data"); *Greenberg v. Compuware Corp.*, 889 F. Supp, 1012, 1017 (E.D. Mich. 1995) (rejecting theory that a "recitation of [defendant's] accomplishments in the past would mislead investors to expect a performance that is at least equally rosy" in the future).

Notwithstanding that Defendants' accurate statements about testing at the wells cannot support a fraud claim, Plaintiff cites *Freudenberg v. E*Trade Financial Corp.*, 07 Civ. 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010), *citing McMahan & Co. v. Wherehouse Entertainment*, 900 F.2d 576, 579 (2d Cir. N.Y. 1990) for the proposition that even if Defendants' statements describing the results of testing at the wells were "literally accurate," the statements could still be misleading because of the "context and presentation." (Pf. Opp. at 9.) Remarkably enough, Plaintiff invokes these cases, but then blithely ignores the context and cautionary statements Defendants made, which taken together cannot be found to have misled investors. Defendants' test result disclosures were consistently accompanied by the specific caution that any "discovered resource *may not be economically viable* or technically feasible to produce." (Ex. 1, row 3 at 3 (emphasis added).) Defendants' risk disclosures further identified a litany of possible factors that could negatively impact the prospects for any well, including volatility in the natural gas market, a lack of available capital to fund operations, and environmental hazards. (*See* Ex. 1, row 10 at 15.) When read in this context, no reasonable investor could conclude that defendants guaranteed the wells' economic viability. *Greenberg*, 889 F. Supp at 1017. Indeed, *Wherehouse Entertainment* and its progeny can have no application here, where specific disclosures *about the very thing Plaintiff asserts was misleading*

8

accompanied the alleged misstatement.[6] Accordingly, Plaintiff's claim that Defendants misstated the "likely economic viability" of the wells must be dismissed.

### C. Plaintiff Misinterprets or Ignores the Salient Facts Surrounding Challenger's Cost Responsiblity, the JOA, and the Maersk Invoice

Plaintiff also asserts that defendants failed to disclose (i) that Canadian Superior was "ultimately responsible for 60%" of the Intrepid Block development costs; (ii) that Challenger's financial difficulties resulted in the alleged non-payment of Maersk's November invoice; and (iii) that Canadian Superior was in "material breach" of the JOA by failing to observe certain accounting procedures. (*See* Pf. Opp. at 14.) Plaintiff ignores not only relevant terms of the very documents he cited in the Complaint, but also other pertinent public disclosures that bear directly on these issues and fully informed investors of the risks facing the Intrepid Block development.

As to Challenger's share of costs, there is no question that Challenger was responsible for its share of costs regardless of whether it obtained Minister approval. In addition, Plaintiff concedes that Challenger had 30 days to cure any default under the JOA and that Canadian Superior had "remedies to extract [Challenger's] share of the costs regardless of the fact that Challenger defaulted under the JOA." (Pf. Opp. at 21.) Plaintiff simply sidesteps these facts and states that "[w]hile that may be, it cannot be disputed that Canadian Superior was liable under the JOA" for the full amount of its costs and Challenger's. (*Id*.) But Canadian Superior did not know if Challenger would cure its default, and even if Challenger could not pay, under the JOA, Canadian Superior could seek to enforce other remedies under the JOA. Plaintiff cannot invoke the JOA selectively to highlight supposed financial obligations without also acknowledging

---

[6] Plaintiff's only response to is argue that these cautions were "vague" and did not specifically address completely unrelated issues, *i.e.*, that (i) Canadian Superior was responsible for a greater share of costs because of Challenger's default, (ii) the Company had not complied with certain accounting procedures, or (iii) the Maersk invoice had not been paid. (Pf. Opp. at 14.) These allegations are discussed *infra*, Part II.C.

Canadian Superior's rights under the JOA that undermine Plaintiff's allegations that the Company would be left liable for 60% of the costs.[7] *Phillips v. Am. Int'l Group, Inc.*, 498 F. Supp. 2d 690, 693 (S.D.N.Y. 2007) ("[w]here a plaintiff selectively quotes language from a document that is integral to a complaint," Court should consider full text).

      Similarly, in connection with the Maersk's November 2008 invoice, Plaintiff now argues that because Defendants did not disclose that Challenger *might* default and that Maersk *might* not be paid (the invoice was not due until January 2009), investors "were [not] adequately advised of the risk that Company assets could be placed in receivership." (Pf. Opp. at 15.) Correspondence between Canadian Superior and Maersk included with the Denning Affidavit shows that Canadian Superior had no advance warning of BGI's receivership maneuver, and instead, spent January and February 2009 negotiating in good faith with Maersk to ensure that the drilling contractor would be fully paid. (Ex. 7.) Plaintiff seemingly suggests that Canadian Superior should have rushed to disclose that Maersk might not be paid, prior to the payment due date and even as the Company was negotiating a payment schedule. This is precisely what the law says that a company facing such a crisis is *not* required to do. *Beleson v. Schwartz*, 599 F. Supp. 2d 519, 527 (S.D.N.Y. 2009) (where market knew of company's financial problems, it was under no obligation to make further disclosures as it "ma[de] careful deliberations about its future" and negotiated with creditors). Also, Defendants could not have known that BGI would move for the appointment of a receiver months *after* Challenger's liquidity problems first arose.

---

[7] Moreover, Challenger itself disclosed, in the plainest terms, (i) that it would "require additional financing to fulfill its obligations on the third exploration well in the three exploration well commitment in the [Intrepid] Block 5(c) program."( Ex. 1, row 21 at 3); (ii) that its current funding was "less than Challenger's remaining share of the costs" for the Intrepid Block (*id*. at 7); and (iii) that Challenger "plans to fund the shortfall with debt or equity financing" but that there was "no guarantee that such financing will be available on commercially suitable terms or at all." (*Id*.) Though these disclosures are nowhere mentioned in Plaintiff's Complaint or Opposition, investors were clearly apprised of the risk that Challenger might default on its payment obligations.

ny-932487

10

*Pew v. Cardarelli*, 2005 WL 3817472, *8 (N.D.N.Y Mar. 17, 2005) (where undisclosed information was outside defendants' control, court dismissed securities fraud claim based on "defendants' omission to predict the future," which lacked merit "particularly in view of [defendants'] cautionary language), *aff'd*, 164 Fed. Appx. 41, 2006 U.S. App. LEXIS 2132 (2d Cir. N.Y., Jan. 24, 2006).

Finally, Plaintiff argues that investors could not have known that the Company's *disclosed* accounting control failures could affect Canadian Superior's obligations under the JOA. (Pf. Opp. at 22.) But indeed the market was well informed. Canadian Superior could not have been more blunt when it disclosed that "[t]here are *no effective controls or procedures* related to *all significant accounts and processes* to provide reasonable assurance that transactions *are recorded accurately, are recorded timely and are complete*." (Ex. 1, row 10 at 11) (emphasis added).) Faced with this kind of frank and fulsome disclosure, Plaintiff cannot reasonably suggest that investors would have been surprised to discover that the Company's accounting control issues *could* have (but in fact did not) affect the Intrepid Block joint venture – which Plaintiff asserts was one of the Company's "significant accounts". (Pf. Opp. at 22-24.) And as for significance, even Denning did not claim that the supposed accounting irregularities amounted to a breach of the JOA. (*See* Ex. 6.)

Because the allegations in the Complaint either (i) fail to show that Defendants had access to any contemporaneous information undermining their public disclosures, or (ii) are belied by the very documents referenced in the Complaint, the Complaint should be dismissed.

## III. PLAINTIFF FAILS TO ALLEGE SCIENTER AGAINST ANY DEFENDANT

### A. Stock Holding and Purchases Undermine Any Inference of Scienter

Plaintiff acknowledges the weakness of his motive allegations by now arguing that such allegations are not really "necessary" to establish a strong inference of scienter. (Pf. Opp. at 24.)

ny-932487

11

Yet a securities fraud claim cannot survive dismissal where the supposed fraudsters held onto their shares and even purchased *more* shares as they were allegedly perpetrating a fraud.

Undaunted, Plaintiff argues that "it is not necessary to allege that all insiders sold shares" in order to plead scienter and that "[f]or this same reason, one insider purchasing shares does not defeat Plaintiff's motive allegations." (Pf. Opp. at 26 n. 18). Plaintiff does not cite a single case in support of this latter proposition, and for good reason. Courts consistently find that where an insider defendants has purchased shares, a strong inference of scienter is undermined. *See In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, *22 (S.D.N.Y. Feb. 1, 2005) ("[i]t is well settled that such an action – *i.e.*, the purchase of additional company shares during the class period – is inconsistent with an intent to commit fraud"); *In re Symbol Techs. Class Action Litig.*, 950 F. Supp. 1237, 1245 (E.D.N.Y. 1997) (finding no inference of scienter where company and defendant purchased stock during class period); *In re Aspeon Secs. Litig.*, 168 Fed. Appx. 836, 840 (9th Cir. Cal. 2006) ("[t]he purchase of stock by Aspeon's CEO tends to negate the inference of scienter"); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F. Supp. 2d 1283, 1296 (D.N.M. 2002) (where insiders had purchased more shares than they sold, "[plaintiffs] utterly failed to present a logical motive for [d]efendants' alleged fraud"); *McCasland v. FormFactor Inc.*, 2008 WL 2951275, *10 (N.D. Cal. July 25, 2008) (no inference of scienter where "as a group, [defendants] maintained 88.5% of their holdings).[8]

The other allegations of motive, as described in Defendants' opening brief, are based on

---

[8] As set out in Defendants' opening brief (*see* Def. Mem. at 15), there is no allegation in the Complaint that Western Canada-based Defendants Snethun and Bilton had any involvement in the Intrepid Block project, and Plaintiff only now argues that these defendants "must have known" about the project because of its significance to the Company. (*See* Pf. Opp. at 25-26.) Such allegations outside the Complaint cannot be considered on a motion to dismiss. *Friedl*, 210 F.3d at 83-84. Accordingly, Plaintiff's allegations of scienter for these Defendants rest exclusively on stock sales when the stock was declining. This is plainly not enough to raise the required "strong" and "compelling" inference of scienter. (*See* Def. Mem. at 15.)

the Company's alleged desire to issue two private placements, but Plaintiffs do not explain how these transactions presented any concrete benefits to the individual Defendants, as required to plead scienter.  (*See* Def. Mem. at 13, citing  *In re Duane Reade Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *8-9 (S.D.N.Y. Nov. 25, 2003).)  Moreover, these are precisely the sort of motives held by officers and directors of every company that are routinely dismissed as insufficient.  *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (motives generally possessed by officers and directors are insufficiently concrete and personal to qualify as a motive supporting the inference of scienter).

### B. Plaintiff Cannot Allege Conscious Misbehavior Or Recklessness When the Complaint Fails to Show Alleged Misstatements Were False When Made

Because Plaintiff has not sufficiently pled motive, "'the strength of the circumstantial allegations must be correspondingly greater '" *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citation omitted).  But his circumstantial allegations of conscious misbehavior or recklessness are just as fundamentally flawed.

In addition to the "hindsight" problem outlined above (see supra, Part II.A.), Plaintiff alleges, with no particularized facts, that Defendants had access to unspecified documents contradicting the public statements simply by virtue of their status as company insiders.  (*See* Compl. ¶ 29.)  Plaintiff argues that "allegations that defendants had knowledge of facts that explicitly contradicted their public statements [are], alone, enough to satisfy the pleading requirement for scienter."  (Pf. Opp. at 22.).  The cases Plaintiff cites did not involve *generic* allegations, but rather *specific* allegations of contradictory information or documents available to defendants *at the time* of their alleged misstatements.  *See*, *e.g.*, *Heller v. Goldin Restructuring Fund*, 590 F. Supp. 2d 603, 622 (S.D.N.Y. 2008) (plaintiff adequately pled motive and plaintiff had alleged facts showing that at the time defendants were soliciting investment from plaintiff,

they knew fund in question was severely undercapitalized); *Nathel v. Siegal*, 592 F. Supp. 2d 452, 465 (S.D.N.Y. 2008) (plaintiffs alleged that defendants had access to specific contemporaneous reports showing that oil drilling partnerships were dry, abandoned, or already drilled prior to plaintiffs' investment); *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 241 (S.D.N.Y. 2006) ("[p]laintiff allege[d] *in specific detail* that Goldman analysts issued recommendations that were contrary to their true evaluations of their covered securities" and specific emails and statements made by senior Goldman personnel supported the allegation that Goldman knew its research reports did not reflect analysts' true opinions) (emphasis added).  By contrast, here, Plaintiff has not shown that Defendants had *any* contemporaneous information contradicting their public disclosures.[9]  Accordingly, because Plaintiff had not pled any facts to support the required strong inference of scienter, the Complaint must be dismissed.

### IV.   PLAINTIFF CANNOT ALLEGE LOSS CAUSATION BECAUSE HE CANNOT POINT TO ANY CONCEALED RISKS THAT CAUSED THE LOSS

Plaintiff plays fast and loose with the alleged corrective disclosures at issue in this case. Plaintiff alleges that the stock dropped 44% on February 12, 2009, when Canadian Superior announced that its interest in the Intrepid Block had been placed in receivership, and carefully states that the receivership "was based" on the Denning Affidavit.  (*See* Pf. Opp. at 28.)  The problem for Plaintiff is that the February 12, 2009 disclosure says *nothing* about the Denning Affidavit, nor does it aver to the materialization of any "undisclosed risks" that Plaintiff asserts were "revealed" in the Denning Affidavit (such as Canadian Superior's alleged non-compliance with accounting procedures; the alleged misstatements concerning Canadian Superior's share of

---

[9] For any forward-looking statement that the court determines was not accompanied by sufficient cautionary language, Plaintiff must plead with particularity defendant's "actual knowledge" that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(B)(ii)(II); *Slayton*, 604 F.3d at 773, *citing Institutional Investors Group v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009).  Because Plaintiff has not pled a strong inference of scienter, the "actual knowledge" standard under the statutory safe harbor has not been met.

Intrepid Block costs; or the alleged payment issue with Maersk).  (*Id*.)  The stock fell because receivership was granted, not because of the affidavit offered in support of the application.

Similarly, the February 17, 2009 disclosure states only that due to Canadian Superior's fully disclosed liquidity problems, Canadian Western Bank demanded repayment of a credit facility (which was eventually repaid in full).  Once again, this disclosure made no mention of the Denning Affidavit, nor did it indicate that any of the alleged "undisclosed risks" had materialized.  (*Id*.)  Indeed, the closing of Canadian Superior's credit facility was clearly the materialization of the *disclosed* risks surrounding the Company's liquidity crunch.  Plaintiff has pled nothing more than artificial inflation of the stock price, which is insufficient to plead loss causation for a Section 10(b) claim based on misstatements and omissions.  *In re Ramp Corp. Sec. Litig.*, No. 05 Civ. 6521, 2006 WL 2037913, at *9 (S.D.N.Y. July 21, 2006) ("[u]nless plaintiffs can allege that their losses were attributable to some form of revelation to the market of wrongfully concealed information, they are not recoverable in a private securities action").

## CONCLUSION

Defendants respectfully request that the Complaint be dismissed with prejudice.[10]

Dated: New York, New York  
July 19, 2010

MORRISON & FOERSTER LLP

By:  /s/ Jack C. Auspitz_____
Jack C. Auspitz (jauspitz@mofo.com)
Jamie A. Levitt (jlevitt@mofo.com)
Damion K. L. Stodola (dstodola@mofo.com)
Hilary M. Williams (hwilliams@mofo.com)
1290 Avenue of the Americas
New York, New York 10104-0050
(212) 468-8000
*Attorneys for Defendants*

---

[10] In light of *Morrison v. Nat'l Australia Bank Ltd.*, __ U.S. __, 2010 WL 2518523 (June 24, 2010), Plaintiff will only seek to certify a class of investors that purchased shares on the American Stock Exchange.  (Pf. Opp. at 30 n. 19.)  Thus, Defendants request that any claims brought on behalf of purchasers of shares on any foreign exchange be dismissed with prejudice.