UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

DAVID SGALAMBO, Individually And
On Behalf of All Others Similarly
Situated,

                          Plaintiff,

           - against -

CRAIG MCKENZIE, LEIF SNETHUN,
MICHAEL E. COOLEN, GREGORY S.
NOVAL AND LEIGH BILTON,

                    Defendants.

------------------------------------------------ X

**OPINION AND ORDER**

**09 Civ. 10087 (SAS)**



SHIRA A. SCHEINDLIN, U.S.D.J.:

## I.   INTRODUCTION

Lead plaintiff Gino Ströker brings this putative securities fraud class action on behalf of himself and all purchasers of Canadian Superior Energy Inc. ("Canadian Superior") common stock between January 14, 2008 and February 17, 2009 (the "Class Period").[1]  Ströker asserts claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, against five former officers of Canadian Superior – Craig

---

[1]  *See* Amended Complaint ("Compl.") ¶¶ 1, 22.

McKenzie, Gregory S. Noval, Michael F. Coolen, Leigh Bilton, and Leif Snuthun

(collectively, "The Officers").[2]  The Officers now move to dismiss under Rule

12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim.  For

the reasons set forth below, The Officers' motion is granted in part and denied in

part.

## II.    BACKGROUND[3]

### A.    Parties

Canadian Superior is an Alberta-based company[4] engaged "in the

exploration for, acquisition, development, and production of petroleum and natural

---

[2]    *See id.* ¶¶ 24, 111-117.

[3]    All facts are drawn from the Amended Complaint ("Complaint") and
are presumed true for the purposes of this motion.  In addition, I have taken
judicial notice of documents incorporated into the Complaint by reference and
public disclosures on file with the Securities and Exchange Commission ("SEC").

[4]    *See* 11/19/08 Registration Statement (Form F-3/A), Ex. 1, Row 24 to
6/4/10 Declaration of Damion K.L. Stodola, counsel for Officers, in Support of
The Officers' Motion to Dismiss ("Stodola Decl.").  Instead of providing exhibits
of this and other documents incorporated by reference in the Complaint, The
Officers submitted an index of twenty-eight web addresses from which this Court
could access these documents and proceeded to cite to these documents
throughout their briefs.  The Officers' thinly veiled attempt to skirt Rule III.H of
this Court's Individual Rules – which expressly limits parties to a total of fifteen
exhibits of fifteen pages each – is offensive.  While I nonetheless considered these
documents in deciding this motion, all future submissions in this case *must* comply
with the Court's Individual Rules or they will be rejected.

gas . . . in western Canada, offshore Nova Scotia, offshore Trinidad and Tobago,

the United States, and North Africa."[5]  Canadian Superior common stock was

traded on the American Stock Exchange ("AMEX") at all times during the Class

Period.[6]  Because Canadian Superior "sought protection under Canadian

bankruptcy and reorganization laws and has since reorganized," the Complaint

does not name Canadian Superior as a defendant.[7]

          Defendant McKenzie served as Canadian Superior's Chief Executive

Officer ("CEO") between October 1, 2007 and December 4, 2008 and as a

Director of Canadian Superior's Board of Directors between November 15, 2007

and December 4, 2008.[8]  Defendant Noval served as Chairman and CEO of

Canadian Superior from August 2000 to October 2004.[9]  Noval then served as

---

[5]      Compl. ¶ 23.

[6]      *See id.* ¶ 20.  Ströker is a citizen of Belgium who purchased his
Canadian Superior shares on the AMEX. *See Sgalambo v. McKenzie*, No. 09 Civ.
10087, 2010 WL 1222062, at *3 (S.D.N.Y. Mar. 29, 2010).

[7]      *Id.*

[8]      *See id.* ¶ 24(a).  The Complaint does not identify the date on which
McKenzie's employment with Canadian Superior ended.  A record of stock
purchases by McKenzie "filed publicly pursuant to the laws of Canada" of which I
take judicial notice reveals that McKenzie left Canadian Superior on December 4,
2008.  Insider Transaction Detail, Ex. 11 to Stodola Decl.

[9]      *See* Compl. ¶ 24(d).

3

Executive Chairman of Canadian Superior between June 26, 2007 and April 24, 2009.[10] Defendant Coolen served as President and Chief Operating Officer ("COO") of Canadian Superior from April 2006 to sometime prior to April 2009, and as a director of Canadian Superior's Board of Directors from November 2005.[11] By April 2009, Coolen was additionally serving as Canadian Superior's CEO, although exactly when he acquired that title is unclear.[12]

Defendant Snethun served as a Vice President for Canadian Superior's Western Canada operations from March 2008 to April 30, 2009.[13] Since April 30, 2009, Snethun has served as President and COO of Canadian Superior.[14] Defendant Bilton served as a Vice President for Canadian Superior's Western Canada operations between February 5, 2008 and April 29, 2009 and has served as COO since April 29, 2009.[15]

---

[10]   *See id.*

[11]   *See id.* ¶ 24(c).

[12]   *See id.* ¶ 97.

[13]   *See id.* ¶ 24(b).

[14]   *See id.*

[15]   *See id.* ¶ 24(e).

## B.   The Joint Venture in Intrepid Block 5(c)

Canadian Superior entered into a Production Sharing Contract ("PSC") with the government of Trinidad and Tobago on July 20, 2005.[16]  The PSC granted Canadian Superior the right, beginning Autumn 2007, to drill wells in an offshore area known as Intrepid Block 5(c).[17]  Canadian Superior then entered into a Participation Agreement with another oil and gas exploration company, Challenger Energy Corp. ("Challenger"), that gave Challenger the "right to earn a 25% interest in the PSC."[18]  In order to earn the twenty-five percent interest, Challenger agreed to pay one-third of the drilling project's costs.[19]  An August 11, 2007 amendment to the Participation Agreement stated that "Canadian Superior shall use its best efforts to convey to [Challenger] a 25% interest in the [PSC], subject to approval by the Ministry [of Energy of Trinidad and Tobago],

---

[16]     *See id.* ¶ 37.

[17]     *See id.*

[18]     *Id.*

[19]     *See id.* ¶ 40; 12/30/05 Amended and Restated Participation Agreement ("Participation Agreement"), Ex. 2 to Stodola Decl. § 4.1.  Noval served as Chairman of Challenger's Board of Directors between 2004 and October 23, 2008.  *See* Compl. ¶ 24(d).

5

within 90 days from the date of this letter."[20]

In August 2007, Canadian Superior and Challenger announced that BG International Limited ("BG") – "a global energy company similarly engaged in the exploration, development and production of oil and natural gas"[21] – would participate in the Intrepid Block drilling project as a Joint Venture pursuant to a Farm-In Agreement[22] with Canadian Superior and a Joint Operating Agreement ("JOA") with Canadian Superior and Challenger.[23]  Although Challenger's twenty-five percent interest in the Joint Venture remained subject to assignment by Canadian Superior, Challenger was nevertheless a party to and was bound by the JOA.[24]  Regarding the obligations between Canadian Superior and BG, the JOA stated,

As between BG[] and [Canadian Superior], prior to [assignment

---

[20]     8/11/07 Amendment and Ratification to Amended and Restated Participation Agreement ("Participation Agreement Am."), Ex. 3 to Stodola Decl. ¶ 2(a).

[21]     Compl. ¶ 39.

[22]     "A Farm-In Agreement is an arrangement whereby one operator 'buys in' or acquires an interest in a lease or concession owned by another company." *Id.* at 12 n.2.

[23]     *See id.* ¶ 39.

[24]     *See* Joint Operating Agreement ("JOA"), Ex. 4 to Stodola Decl. § 3.2(c).

of interest to Challenger], and notwithstanding anything in the
Challenger Agreement, [Canadian Superior] shall have be [sic]
fully responsible for all obligations and liabilities in respect of a
70% Participating Interest and BG[] shall under no circumstances
be required to enforce, or make claim in respect of, any obligation
or liability of [Challenger] under the any [sic] agreement between
[Canadian Superior] and [Challenger] in respect of [Challenger's]
rights to such Participating Interest.[25]

Canadian Superior and its partners (collectively, "The Companies")

"spudded" – *i.e.*, began drilling – the Victory well, the first of three planned-for

wells ("Victory," "Bounty," and "Endeavour") on June 28, 2007.[26]  The

Companies discovered natural gas at the Victory well on June 14, 2008.[27]  The

Companies spudded the Bounty Well on February 20, 2008 and discovered natural

gas on August 13, 2008.[28]  Drilling began on the Endeavour well on August 28,

2008.[29]

## C.    Events Leading to Canadian Superior's Bankruptcy

On February 9, 2009, BG sought an order from a Calgary court

---

[25]    *Id.*

[26]    *See* 2/9/09 Affidavit of Ewen Denning, Vice President, Commercial,
BG Trinidad and Tobago, in Support of BG's Application to Appoint an Interim
Receiver ("Denning Aff."), Ex. 6 to Stodola Decl. ¶¶ 43-44.

[27]    *See id.* ¶ 44.

[28]    *See id.* ¶ 45.

[29]    *See id.* ¶ 46.

7

appointing Deloitte as "Receiver and Manager of Canadian Superior's rights,

interests, duties and obligations as Operator [of the Joint Venture] under the JOA,

pending BG becoming Operator."[30]  BG submitted the affidavit of Ewen Denning

("Denning Affidavit") in support of its Application to Appoint an Interim

Receiver.[31]  The Denning Affidavit and its exhibits revealed that Canadian

Superior was in severe financial trouble and that neither Canadian Superior nor

Challenger had the funds to meet their outstanding obligations to the Joint

Venture.[32]

Denning's Affidavit stated that BG conducted an audit of Canadian

Superior in November and December 2008[33] and found that Canadian Superior

had violated the JOA's accounting procedures by (1) failing to maintain separate

bank accounts; (2) commingling BG's funds with those of Canadian Superior; and

---

[30]     Compl. ¶ 41.

[31]     *See* Denning Aff. ¶ 72.

[32]     *See id.* ¶ 39; 2/2/09 Meeting Notes, Ex. 7 to Denning Aff. at 8-9; *see
also* 3/4/09 Affidavit of Michael Coolen in Connection with Canadian Superior's
Bankruptcy Proceedings ("Coolen Aff."), Ex. 5 to Stodola Decl. ¶ 24 ("[Canadian
Superior] did not have sufficient funds to meet its obligations in November,
December, and January.").

[33]     The JOA permitted BG to audit the Joint Venture operator, which was
Canadian Superior's role in the Joint Venture.  *See* Denning Aff. ¶ 22.

(3) failing to account for interest.[34] Denning further revealed that Maersk

Contractors ("Maersk"), the drilling contractor operating the rig, had not received,

as of January 26, 2009, a payment of \$12,075,000.00 due January 2.[35] Letters

attached to the Denning Affidavit showed that Maersk was threatening to remove

its rig from Intrepid Block 5(c) if it did not receive payment[36] – an event that BG

estimated would cost the Joint Venture a year of delay and thirty-five million

dollars in additional expenses.[37] The Denning Affidavit additionally stated that

Canadian Superior first informed BG on February 2, 2009 that the Minister of

Energy of Trinidad and Tobago had rejected Challenger's twenty-five percent

interest in the Joint Venture.[38]

Finally, the Denning Affidavit stated BG's position as to the

economic viability of the three wells in the Intrepid Block. With regard to the

Victory well, Denning stated that "tests indicated that there are only limited

---

[34]    *See id.*

[35]    *See id.* ¶ 23.

[36]    *See* 1/26/09 Letter from Maersk to Canadian Superior, Ex. 7 to
Stodola Decl. at 1-2; 1/30/09 Letter from Maersk to Canadian Superior, Ex. 7 to
Stodola Decl. at 3-4.

[37]    *See* Denning Aff. ¶ 58.

[38]    *See id.* ¶ 27.

9

reserves connected to the well and it is BG[]'s view that the Victory well is likely

to be a sub-economic discovery."[39]  Regarding the Bounty well, Denning stated,

> In BG[]'s opinion, the Bounty discovery on its own is not
> economic.  BG[] believes that the Bounty well may become
> economic if the Endeavour Well discovers sufficient reserves to
> make the joint development of the two prospects together
> economic by reason of costs savings realized through shared
> infrastructure.[40]

And with respect to the Joint Venture overall, Denning stated that

"BG[]'s opinion is that the currently discovered reserves in the Intrepid Block are

below the economic threshold for development."[41]

On February 11, 2009, the District of Calgary appointed Deloitte as

Interim Receiver of Canadian Superior's interest in the Joint Venture.[42]  When

Canadian Superior announced the Interim Receivership on February 12, 2009, the

AMEX price of Canadian Superior's common stock fell forty-four percent from

$0.90 per share to $0.40 per share.[43]  The stock fell an additional thirty percent,

from $0.54 per share to $0.38 per share, on February 17, 2009, when Canadian

---

[39]     *Id.* ¶ 44.

[40]     *Id.* ¶ 45.

[41]     *Id.* ¶ 49.

[42]     *See* Compl. ¶ 48.

[43]     *See id.* ¶¶ 49-50.

10

Superior announced that Canadian Western had demanded repayment of monies outstanding under Canadian Superior's forty-five million dollar credit facility.[44] Canadian Superior filed for protection under Canada's bankruptcy laws on March 6, 2009.[45]

### D.    Allegedly False and Misleading Statements of Omissions

#### 1.    Test Results at the Victory and Bounty Wells

Ströker alleges that The Officers issued over twenty materially false and misleading statements between January 14, 2008 and February 17, 2009.[46] Many of these statements reported positive test results – indicating that the wells would be productive and/or economical to develop – from either the Victory well, the Bounty well, or both.[47]

#### a.    The Victory Well

Canadian Superior issued a press release on January 14, 2008, in which McKenzie reported "positive" initial test results from the Victory well, stating, "The 'Victory' well has an estimated flowing rate of over 100 mmscf/d of

---

44    *See id.* ¶¶ 51-52.

45    *See id.* ¶ 53.

46    *See id.* ¶¶ 55-89.

47    *See, e.g., id.* ¶¶ 55, 57, 74.

11

natural gas and is condensate rich. . . . The flowing wellhead pressure on a

restricted basis and bottomhole pressures are comparable or better than other

producing wells and fields in the immediate area."[48]  McKenzie reported further

positive results from the Victory well testing in a February 4, 2008 press release,

and stated that "[Canadian Superior] estimate[s] on a preliminary basis that the

'Victory' discovery contains up to 1.1 tcf gross natural gas sales reserves with

associated liquid natural gas of 3.70 million barrels, with the most likely case

being 615 bcf gross sales reserves with associated natural gas liquids of 2.37

million barrels."[49]  A March 31, 2008 press release reported further positive results

from the Victory well and stated that "[Canadian Superior] estimates that the well

is capable of producing at sales gas flow rates of well over 100 mmcf/d from the

lower zone alone."[50]

 Ströker claims that the statements regarding the Victory well were

---

[48] *Id.* ¶ 55; *see also id.* ¶ 57 (January 28, 2008 press release quoting McKenzie as stating, "We are very pleased with the natural gas tests from our 'Victory' well on Block 5(c) offshore Trinidad.  Although drilling of the 'Victory' well took longer than initially anticipated, we feel the results were well worth waiting for.").  The January 28 press release was titled, "Canadian Superior Tests Second Prolific Natural Gas Zone in 'Victory' Well on 'Intrepid' Block 5(c) Offshore Trinidad."  *See* 1/28/08 Press Release, Ex. 1, Row 5 to Stodola Decl.

[49] Compl. ¶ 59.

[50] *Id.* ¶ 65; *see also id.* ¶ 68 (May 14, 2008 press release).

false and misleading by omitting material facts because "The Officers [] only reported the positive test results for the Victory well but failed to report other essential data, such as initial and final flowing rates and pressure and the shut-in pressure build-up data, which *indicated there were only limited reserves connected to the well and that the well would likely be a sub-economic discovery.*"[51]  The assessment that the Victory well was likely to be sub-economic derives from the Denning Affidavit.[52]  Ströker further claims that The Officers knew of this "other essential data" at the time they reported the positive test results from the Victory well.[53]

### b.    The Bounty Well

In a press release issued August 13, 2008, Noval stated, "We are very pleased with the results of the 'Bounty' well and production testing indicates that we have drilled one of the best natural gas wells offshore Trinidad and Tobago."[54]  In that same press release, McKenzie stated, "I am confident the 'Bounty' well

---

[51]     *Id.* ¶ 60(a) (emphasis added).

[52]     *See id.*; Denning Aff. ¶ 44.

[53]     *See* Compl. ¶ 60.

[54]     *Id.* ¶ 74; *see also id.* ¶ 70 (June 26, 2008 press release in which McKenzie stated, "We are very pleased with what we see on the logs that indicate encouraging hydrocarbons prior to fully penetrating all objectives in the well.").

will initially produce at approximately 200 mmcf/ of sales natural gas . . . . This compares favorably with production from the nearest analogous filed, Dolphin Deep . . . ."[55] On January 23, 2009, a press release quoted Coolen as stating, with respect to all three wells, "Having information from three successful wells along with extensive 3D seismic coverage we have over the block and the nearby fields really makes a difference and encourages us to initiate the further appraisal of resources discovered."[56]

Ströker alleges that these statements were false and misleading because The Officers knew that the Bounty well "on its own would not be economic to develop"[57] – an important factor given the probable "sub-economic" nature of the Victory well.[58] Ströker bases his claims as to the Bounty well's

---

[55]    *Id.* ¶ 74; *see also id.* ¶ 76 (August 15, 2008 press release stating, "Given the magnitude of the 'Bounty' discovery, [Canadian Superior] plans to move forward expeditiously with appraisal and development drilling and production . . . ."); *id.* (McKenzie stating, "With high-potential exploration continuing offshore Trinidad . . . we believe the best is still to come for our shareholders."); *id.* ¶ 83 (November 17, 2008 press release reporting Bounty test results and production estimates).

[56]    *Id.* ¶ 88.

[57]    *Id.* ¶ 75.

[58]    *See id.* ¶ 4.

economic viability on the Denning Affidavit.[59]

### 2.   Violation of the JOA's Accounting Procedures

Ströker further claims that Canadian Superior's statements regarding

the Joint Venture were materially false and misleading throughout the Class

Period because The Officers failed to disclose that Canadian Superior was

violating the JOA by failing to comply with the JOA's mandated accounting

procedures.  Ströker alleges that Canadian Superior's failure "to maintain a

separate joint account for funds associated with the JOA;" its commingling of

"funds received from BG with Canadian Superior's general funds;" and its failure

"to maintain the joint funds in a separate interest-bearing account," "jeopardiz[ed]

[Canadian Superior's] role in the Joint Venture."[60]

### 3.   Financial Liability Under the JOA

Nearly every Canadian Superior press release regarding the Joint

Venture included the following description of the participating parties' interests

and obligations vis-à-vis the Joint Venture:

> Canadian Superior is paying 26-2/3% of the Block 5(c)
> exploration cost to maintain a 45% working interest in Block 5(c),

---

[59]    *See id.* ¶ 75; Denning Aff. ¶ 45.

[60]    Compl. ¶¶ 58(c), 60(c), 62(b), 64(a), 67(a), 69(c), 73(b), 77(c), 79(a),
82(e), 84(d), 87(e), 89(e).

with its partners, BG [], a wholly owned subsidiary of the BG Group plc, paying 40% for a 30% working interest and Challenger [] paying a 33-1/3% for a 25% working interest through Canadian Superior.[61]

Ströker contends that this statement was false and misleading because Canadian Superior was in reality liable for sixty percent of the Joint Venture's costs, because "Challenger Energy was required to, but never did, receive approval from the Minister [of Energy of Trinidad and Tobago] prior to participating in the drilling on Intrepid Block 5(c)."[62]

### 4.    Inability to Satisfy Financial Obligations to the Joint Venture and Failure to Pay Maersk

Ströker finally alleges that Canadian Superior's statements from November 2008 through January 2009 were each materially false and misleading because Canadian Superior failed to disclose that it lacked sufficient funds to meet its obligations to the Joint Venture and did not have a reasonable probability of being able to raise additional funds.[63] Moreover, Ströker alleges that Canadian Superior failed to disclose the risk that Maersk would abandon the rig due to non-

---

[61]    *Id.* ¶¶ 55, 57, 59, 61, 68, 70-72, 74, 81, 85-86, 88. At other times, Canadian Superior press releases contained substantially similar language. *See, e.g., id.* ¶ 65.

[62]    *Id.* ¶¶ 58(b), 60(b), 62(a), 69(b), 73(a), 77(b), 81(d), 87(d), 88(d).

[63]    *See id.* ¶¶ 84(a)-(b), 87(a)-(b), 89(a)-(b).

payment.[64]

## III.  LEGAL STANDARD

### A.  Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the

court must "accept as true all of the factual allegations contained in the

complaint"[65] and "draw all reasonable inferences in the plaintiff's favor."[66]

However, the court need not accord "[l]egal conclusions, deductions or opinions

couched as factual allegations . . . a presumption of truthfulness."[67]

In deciding a motion to dismiss, the court is not limited to the face of

the complaint.  The court "may [also] consider any written instrument attached to

the complaint, statements or documents incorporated into the complaint by

reference, legally required public disclosure documents filed with the SEC, and

documents possessed by or known to the plaintiff and upon which it relied in

---

[64]    *See id.* ¶¶ 82(c), 84(c), 87(c), 89(c).

[65]    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[66]    *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[67]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

17

bringing the suit."[68]

### 1.   Pleading Requirements

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[69]  To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[70]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[71]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[72]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[73]

---

[68]     *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[69]     *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[70]     *See Twombly*, 550 U.S. at 564. *Accord Ashcroft v. Iqbal*, — U.S. —, 129 S. Ct. 1937, 1949 (2009) (noting that *Twombly*'s standard of plausibility is not limited to antitrust cases).

[71]     *Iqbal*, 129 S. Ct. at 1949 (quotation marks omitted).

[72]     *Id.* (quotation marks omitted).

[73]     *Id.* (quotation marks omitted).

18

### 2.    Securities Fraud

"Securities fraud claims are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss."[74] These heightened pleading requirements are imposed by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (the "PSLRA").[75]

### a.    Rule 9(b)

A complaint alleging securities fraud must satisfy Rule 9(b)'s requirement that "the circumstances constituting fraud . . . be stated with particularity."[76] "This pleading constraint serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits."[77] To comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were

---

[74]    *ATSI*, 493 F.3d at 99.

[75]    *See* 15 U.S.C. § 78u-4(b).

[76]    Fed. R. Civ. P. 9(b). *Accord ATSI*, 493 F.3d at 99.

[77]    *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

19

fraudulent."[78] "Allegations that are conclusory or unsupported by factual assertions are insufficient."[79]

### b.    The PSLRA

The PSLRA requires plaintiffs to state with particularity "both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."[80] The PSLRA specifies that the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[81] When evaluating allegations of scienter, the court must look at the complaint as a whole and "take into account plausible opposing inferences."[82]

"[A]n inference of scienter must be more than merely plausible or

---

[78]    *Rombach*, 355 F.3d at 170 (quotation marks omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[79]    *ATSI*, 493 F.3d at 99.

[80]    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quotation marks omitted) (citing 15 U.S.C. § 78u-4(b)(1), (2)). *Accord ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).

[81]    *Tellabs*, 551 U.S. at 314 (quoting 15 U.S.C. § 78u-4(b)(2)).

[82]    *Id.* at 323. These plausible opposing inferences may be based only on the complaint and other public documents on which courts ordinarily rely in deciding a motion to dismiss, "while constantly assuming the plaintiff's allegations to be true." *Id.* at 322, 326-27.

20

reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."[83]  In other words, a plaintiff must present a "strong inference" of scienter.[84]  The inference need not, however, be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences."[85]  The inquiry on a motion to dismiss is as follows:  "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[86]  "If the plaintiff alleges a false statement or omission, the PSLRA also requires that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.'"[87]

---

[83]     *Id.* at 314.

[84]     *ECA*, 553 F.3d at 196.

[85]     *Tellabs*, 551 U.S. at 324 (citation omitted).

[86]     *Id.* at 326. *Accord id.* at 324 ("A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.").

[87]     *ATSI*, 493 F.3d at 99 (quoting 15 U.S.C. § 78u-4(b)(1)).

**B.     Section 10(b) and Rule 10b-5**

To state a claim under Rule 10b-5 for misrepresentations, a  "plaintiff must allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury."[88]

**1.     Misstatements or Omissions of Material Fact**

In order to satisfactorily allege misstatements or omissions of material fact, a complaint must "state with particularity the specific facts in support of [plaintiffs'] belief that [defendants'] statements were false when made."[89]  In situations "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."[90] Mere "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim

---

[88]     *Id.* at 105 (affirming the dismissal of plaintiffs' misrepresentations claims) (citing *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)).

[89]     *Rombach*, 355 F.3d at 172 (quotation marks omitted).

[90]     *Novak*, 216 F.3d at 309 (citation omitted).

22

of securities fraud."[91]

Certain statements are protected by the PSLRA's safe harbor provision and the bespeaks caution doctrine. Under the PSLRA's safe harbor provision, forward-looking statements are deemed immaterial and non-actionable when they are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements."[92] "To avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information."[93] Moreover, statements are not protected where defendants "had no basis for their optimistic statements and already knew (allegedly) that certain risks

---

[91] *Id.* (citation omitted). *Accord Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) ("The fact that management's optimism about a prosperous future turned out to be unwarranted is not circumstantial evidence of conscious fraudulent behavior or recklessness: People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (quotation marks omitted).

[92] 15 U.S.C. §78u-5(c)(1)(A).

[93] *Slayton v. American Express Co. ("Slayton II")*, 604 F.3d 758, 772 (2d Cir. 2010).

had become reality."[94] Similarly, under the judicially created bespeaks caution

doctrine, "alleged misrepresentations . . . are deemed immaterial as a matter of law

[if] it cannot be said that any reasonable investor could consider them important in

light of adequate cautionary language. . . ."[95] Under the "truth-on-the-market"

doctrine, information already known on the market is also immaterial.[96]

Statements may also be deemed immaterial as merely vague expressions of

optimism or puffery.[97] Lastly, pleadings based on fraud by hindsight are not

actionable as a matter of law.[98]

---

[94] *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 629 (S.D.N.Y. 2003). *Accord Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 419 (S.D.N.Y. 2000) (observing that the bespeaks caution doctrine "does not apply where a defendant knew that its statement was false when made").

[95] *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).

[96] *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159 (2d Cir. 2000) ("The truth-on-the-market defense is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality."); *see also Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006).

[97] *See ECA*, 553 F.3d at 206; *In re Gildan Activewear, Inc.*, 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009); *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 34 (S.D.N.Y. 2004).

[98] *See Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 410-11 (S.D.N.Y. 2007).

## 2.    Scienter

A plaintiff may plead scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."[99] "Sufficient motive allegations entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."[100] "Motives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."[101] "To prove liability against a corporation . . . a plaintiff must prove that an agent of the

---

[99]    *ATSI*, 493 F.3d at 99 (citing *Ganino*, 228 F.3d at 168-69). *Accord In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (holding that plaintiffs adequately pleaded scienter because the allegations supported the inference that the company and the officers were at least reckless in not knowing that the financial statements were false and in failing to disclose internal control weaknesses); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 292 (S.D.N.Y. 2006) (holding that plaintiffs must "specifically allege defendants' knowledge of facts or access to information contradicting their public statements").

[100]    *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (describing "[i]nsufficient motives" as including "(1) the desire for the corporation to appear profitable and (2) the desire to keep stock prices high to increase officer compensation") (quotation marks omitted).

[101]    *Id.  Accord ECA*, 553 F.3d at 198.

25

corporation committed a culpable act with the requisite scienter, and that the act (and accompanying mental state) are attributable to the corporation."[102]

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[103] Under this theory of scienter, a plaintiff must show that the defendant's conduct is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."[104] "To state a claim based on recklessness, plaintiffs may either specifically allege defendants' knowledge of facts or access to information contradicting defendants' public statements, or allege that defendants failed to

[102]    *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008).

[103]    *Kalnit*, 264 F.3d at 142. *Accord South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009); *In re Novagold Res. Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 297 (S.D.N.Y. 2009) (quoting *ECA*, 553 F.3d at 198-99).

[104]    *South Cherry St.*, 573 F.3d at 109. (quotation marks and emphasis omitted). *Accord ECA*, 553 F.3d at 203.

26

check information they had a duty to monitor."[105]

### 3.    Loss Causation

To satisfy the fifth prong of a Section 10b-5 claim, a plaintiff must

plead loss causation.[106]  Loss causation is "the proximate causal link between the

alleged misconduct and the plaintiff's economic harm."[107]  "A misrepresentation is

'the proximate cause of an investment loss if the risk that caused the loss was

within the zone of risk *concealed* by the misrepresentations. . . .'"[108]  "To plead

loss causation," therefore, "the complaint[] must allege facts that support an

inference that [defendants'] misstatements and omissions concealed the

circumstances that bear upon the loss suffered such that plaintiffs would have been

spared all or an ascertainable portion of that loss absent the fraud."[109]

---

[105]     *Gildan Activewear*, 636 F. Supp. 2d at 272 (quotation marks and citation omitted).

[106]     *See ATSI*, 493 F.3d at 106.

[107]     *Id.* at 106-07 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005); *Lentell*, 396 F.3d at 172). *Accord Emergent Capital Inv. Mgmt. v. Stonepath Group, LLC*, 343 F.3d 189, 197 (2d Cir. 2003).

[108]     *In re Omnicom Group, Inc. Secs. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (quoting *Lentell*, 396 F.3d at 173) (emphasis in original).

[109]     *Lentell*, 396 F.3d at 175.

## C.     Section 20(a)

"To establish a prima facie case of control person liability, a plaintiff

must show (1) a primary violation by the controlled person, (2) control of the

primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud."[110]

"Allegations of control are not averments of fraud and therefore need not be

pleaded with particularity."[111] Thus, "'[a]t the pleading stage, the extent to which

the control must be alleged will be governed by Rule 8's pleading standard.'"[112]

## D.     Amendments to Pleadings

"Rule 15(a) provides that, other than amendments as a matter of

course, a party may amend the party's pleading only by leave of court or by

written consent of the adverse party; and leave shall be freely given when justice

so requires."[113] "[W]hether to permit a plaintiff to amend its pleadings is a matter

---

[110]     *ATSI*, 493 F.3d at 108 (citing *SEC v. First Jersey Sec., Inc.*, 101 F.3d
1450, 1472 (2d Cir. 1996)).

[111]     *In re Parmalat Sec. Litig.*, 414 F. Supp. 2d 428, 440 (S.D.N.Y. 2006).

[112]     *In re Scottish Re*, 524 F. Supp. 2d at 385.  *Accord In re Converium
Holding AG Sec. Litig.*, No. 04 Civ. 7897, 2006 WL 3804619, at *14 (S.D.N.Y.
Dec. 28, 2006) (quoting *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392,
415-16 (S.D.N.Y. 2003)).

[113]     *Slayton v. American Express Co. ("Slayton I")*, 460 F.3d 215, 226
n.10 (2d Cir. 2006) (quotation marks omitted).

28

committed to the Court's sound discretion."[114]  However, the Supreme Court has

explained that

> [i]f the underlying facts or circumstances relied upon by a plaintiff may
> be a proper subject of relief, he ought to be afforded an opportunity to
> test his claim on the merits.  In the absence of any apparent or declared
> reason — such as undue delay, bad faith or dilatory motive on the part
> of the movant, repeated failure to cure deficiencies by amendments
> previously allowed, undue prejudice to the opposing party by virtue of
> allowance of the amendment, futility of amendment, etc. — the leave
> sought should, as the rules require, be "freely given."[115]

Accordingly, "'[i]t is the usual practice upon granting a motion to dismiss

to allow leave to replead.'"[116]

## IV.  DISCUSSION

### A.  Defendants Bilton and Snethun

The Complaint does not attribute any false or misleading statement to

either Bilton or Snethun.  Indeed, the Complaint fails to identify any connection

---

[114]   *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir.
2007) (quotation marks omitted).

[115]   *Foman v. Davis*, 371 U.S. 178, 182 (1962). *Accord Jin v.
Metropolitan Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002).

[116]   *Vacold LLC v. Cerami*, No. 00 Civ. 4024, 2002 WL 193157, at *6
(S.D.N.Y. Feb. 6, 2002) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949
F.2d 42, 48 (2d Cir. 1991)). *Accord Hayden v. County of Nassau*, 180 F.3d 42, 53
(2d Cir. 1999) ("When a motion to dismiss is granted, the usual practice is to grant
leave to amend the complaint.").

between either Bilton or Snethun – who both presided, apparently exclusively, over Canadian Superior's operations in Western Canada[117] – and the Joint Venture offshore Trinidad and Tobago.  Although the Complaint is hardly clear on this point, Ströker apparently relies on Bilton and Snethun's alleged status as "senior executive officers and/or directors" to allege that Bilton and Snethun are liable for misstatements made by others.[118]

The Second Circuit, in its recent decision in *Pacific Investment Management Co. LLC v. Mayer Brown LLP* ("*PIMCO*"),[119] considered, but did not decide, whether a corporate insider may be held liable under Section 10(b) and Rule 10b-5 for statements not specifically attributed to that corporate insider.[120] *PIMCO* did not foreclose liability in such cases, nor did it provide much guidance as to the circumstances under which this indirect corporate insider liability might arise.[121]  However, *PIMCO*'s broader discussion of the attribution requirement in

----

[117]    *See* Compl. ¶ 24(b), (e).

[118]    *See id.* ¶ 25.

[119]    603 F.3d 144 (2d Cir. 2010).

[120]    *See id.* at 158 n.6 ("Because this appeal does not involve claims against corporate insiders, we intimate no view on whether attribution is required for such claims . . . .").

[121]    *See id.*

securities fraud cases establishes that reliance is of central importance in
considering whether to extend liability to defendants who did not make the
statements at issue.[122]  The Second Circuit suggested that a plaintiff might be able
to show that she relied on a corporate insider's known role in issuing public
statements – thus providing a basis for liability absent direct attribution.[123]  The
Second Circuit ultimately declined to guarantee that such a showing is possible,
and *PIMCO* certainly does not suggest that the requisite reliance would be
presumed in every case.[124]

Based on the Second Circuit's analysis in *PIMCO*, I conclude that
Ströker has failed to plausibly allege that Bilton and Snethun are liable for any
misstatements issued by Canadian Superior, McKenzie, Noval, or Coolen.  Ströker
provides no facts to show that Bilton or Snethun had a discernible role in issuing
Canadian Superior's public statements, let alone facts to show that he or any other
investor relied on Bilton or Snethun's role in issuing those public statements.  As

---

[122]     *See id.* at 156 ("More generally, [*Stoneridge Inv. Partners, LLC v.
Scientific-Atlanta*, 552 U.S. 148 (2008)] stands for the proposition that reliance is
the critical element in private actions under Rule 10b-5.").

[123]     *See id.* at 158 n.6 ("There may be a justifiable basis for holding that
investors *rely* on the role corporate executives play in issuing public statements
even in the absence of explicit attribution.").

[124]     *See id.*

such, the Section 10(b) and Rule 10b-5 claims against Bilton and Snethun are dismissed.

### B.  Defendants McKenzie, Noval, and Coolen:  Section 10(b) and Rule 10b-5[125]

#### 1.  Misstatements or Omissions of Material Fact

The Officers argue that many statements regarding the wells are non-actionable because (1) "allegations of falsity are speculative and do not adequately specify how the statement was false when made,"[126] and (2) because the statements are forward-looking and "accompanied by meaningful cautionary language"[127] and were not "made or approved by [an executive] officer with actual knowledge . . . that the statement was false or misleading."[128]  The Officers further contend that their failure to disclose Canadian Superior's violations of the JOA's accounting

---

[125]   Although Ströker identifies statements directly attributable to McKenzie, Noval, and Coolen, the Complaint alleges no facts that would render any of these defendants liable for the misstatements of the others or for the statements attributed to Canadian Superior generally (i.e., all statements regarding the extent of Canadian Superior's liability under the JOA, which appear in Canadian Superior press releases, but which are not attributed to any particular individual).  As such, McKenzie, Noval, and Coolen may only be held liable for the misstatements attributed directly to them as individuals.

[126]   Officers' Memorandum of Law in Support of Officers' Motion to Dismiss ("Officers' Mem.") at 27.

[127]   *Slayton II*, 604 F.3d at 766.

[128]   15 U.S.C. § 78u-5(c)(1)(B)(ii)(II).

procedures is shielded by the "truth-on-the-market" doctrine due to prior

disclosures of Canadian Superior's accounting control problems.[129]  The Officers

also invoke the truth-on-the-market doctrine to argue that Canadian Superior's

tenuous financial state had been sufficiently revealed to the market in late 2008.[130]

Finally, The Officers claim that Canadian Superior's representations of its

financial obligations under the JOA were accurate.[131]

       Ströker counters that statements regarding the wells are indeed

actionable because (1) the Complaint's allegations of falsity specify how the

statements were false or misleading by pointing to specific documents that

contradicted The Officers public statements,[132] (2) many of The Officers'

statements were not forward-looking because they either stated existing facts or

incorporated forward-looking aspects with existing facts,[133] and (3) any forward-

---

[129]    *See* Officers' Mem. at 22.

[130]    *See id.* at 23.

[131]    *See id.*  The Officers primarily frame these arguments in terms of scienter. *See id.* at 21-26.  However, since many of The Officers' scienter arguments boil down to a claim that their statements were not misstatements to begin with, it is appropriate to first consider whether the statements are actionable before turning to scienter.

[132]    *See* Ströker's Memorandum of Law in Opposition to Officers' Motion to Dismiss ("Ströker Mem.") at 9.

[133]    *See id.* at 13.

33

looking statements were accompanied solely by boilerplate disclaimers and were made with actual knowledge that they were false or misleading.[134]  Ströker next argues that The Officers could not have publicly disclosed Canadian Superior's breach of the JOA's accounting procedures because the terms of the JOA were not public during the Class Period.[135]  Ströker also asserts that disclosures of Canadian Superior's financial difficulties failed to reveal the extent of Canadian Superior's troubles, and that this was the case precisely because The Officers failed to disclose the problems Canadian Superior faced vis-à-vis the Joint Venture.[136] Finally, Ströker contends that characterizations of the extent of Canadian Superior's liability under the JOA were inaccurate and misleading because Canadian Superior did not reveal that it was ultimately responsible for Challenger's share of the costs under the JOA.[137]  For the reasons discussed below, I find that all of the alleged misstatements are adequately pled, with the exception of misstatements of Canadian Superior's liability under the JOA, which are not attributed to any Officer.

---

[134]   *See id.*

[135]   *See id.* at 3.

[136]   *See id.* at 15 n.9, 21 n.14.

[137]   *See id.* at 21.

## a.    Statements Regarding the Wells

Ströker identifies actionable misstatements and omissions regarding

the wells.  The Complaint adequately specifies how the statements regarding the

Victory and Bounty wells were false or misleading when made.  The Complaint

alleges, relying on the Denning Affidavit,[138] that the statements regarding the

Victory well were false and misleading when made because unreported test results

would have "indicated that there were only limited reserves connected to the well

and that the well would likely be a sub-economic discovery."[139]

The Officers argue that this statement is impermissibly vague because

it fails to identify how low the reserves needed to be in order to render the well

uneconomic.[140]  However, the level of reserves needed to render a well economic

varies from well to well and depends on company-specific information, such as

"capital development and operating costs."[141]  Because such information is known

only to Canadian Superior and The Officers, Ströker cannot be expected to allege

this information prior to discovery.  At this early stage, the Denning Affidavit

---

[138]    *See infra* Part IV.B.2.c for a discussion of timing and the Denning Affidavit.

[139]    Compl. ¶ 58(a).

[140]    *See* Officers' Mem. at 27.

[141]    Ströker Mem. at 10.

35

provides an adequate factual basis for Ströker's allegations that The Officers'
statements regarding the Victory well were false and misleading when made.

       With respect to the Bounty well, Ströker sufficiently alleges, based on
the Denning Affidavit, that The Officers' statements were false and misleading
because "the Bounty discovery on its own would not be economic to develop,"[142]
an important fact given the sub-economic status of the Victory well.[143]  The
Officers claim that this allegation is flatly contradicted by the fact that BG later
purchased forty-five percent of Canadian Superior's interest in the Joint Venture.
According to The Officers, this purchase demonstrates that BG had greater faith in
the economic viability of the Joint Venture than expressed in the Denning
Affidavit.[144]  However, any apparent contradiction between Denning's sworn
statement, which was authorized by and made on behalf of BG,[145] and BG's later
conduct at most raises an issue of fact that cannot be decided at the motion to
dismiss stage.[146]  Accordingly, Ströker has adequately alleged that the statements

[142]    Compl. ¶ 75.

[143]    *See* Ströker Mem. at 1.

[144]    *See* Officers' Mem. at 11, 27.

[145]    *See* Denning Aff. ¶¶ 1-2.

[146]    Nor is the motion to dismiss stage the proper juncture to assail the
credibility of Denning's sworn statement, though The Officers do so repeatedly in
their moving papers. *See, e.g.*, Officers' Mem. at 1 ("Plaintiff's claim is based on

regarding the Bounty well were false and misleading when made.

Nor does the PSLRA safe harbor provision for forward-looking statements render these alleged misstatements non-actionable. Many of the alleged misstatements are not forward-looking because they either state a present or historical fact alone or incorporate forward-looking aspects into statements of present or historical fact.[147] For instance, all statements in which The Officers report being "encouraged by" or "pleased with" some aspect of the Joint Venture's progress[148] are statements of The Officers' present views. And many of the statements regarding well testing are simply statements of present or historical

---

the untested and unsupported statement of Ewen Denning . . . ."); *id.* at 10 n.5 ("Denning's testimony was never tested under cross-examination and contains numerous unsupported and unsubstantiated statements of opinion that Denning was in no position to make.").

[147]     *See In re Nortel Networks*, 238 F. Supp. 2d at 629 ("'[I]t is well recognized that even when an allegedly false statement 'has both a forward-looking aspect and an aspect that encompasses a representation of present fact,' the safe harbor provision of the PSLRA does not apply.'" (quoting *In re APAC Teleservice, Inc. Sec. Litig.*, No. 97 Civ. 9145, 1999 WL 1052004, at *7 (S.D.N.Y. Nov. 19, 1999))).

[148]     *See* Compl. ¶ 55 (Noval: "We are encouraged by the initial test results in the first zone [of the Victory well] . . . ."); *id.* ¶ 70 (McKenzie: "We are very pleased with what we see on the logs that indicate encouraging hydrocarbons . . . ."); *id.* ¶ 74 (Noval: "We are very pleased with the results of the 'Bounty' well . . . .").

fact.[149] Statements reporting test results from the wells and predicting future well performance based on those results incorporate forward-looking aspects into statements of present fact.[150]

Moreover, none of the statements identified in the Complaint were accompanied by meaningful cautionary language. The cautionary language The Officers identify amounts to an identical blanket, boilerplate disclaimer appended to every Canadian Superior statement issued during the Class Period.[151] Though this disclaimer mentioned myriad, general factors – such as natural gas prices or environmental hazards – that might cause actual results to differ from Canadian Superior's projections,[152] the disclaimer provided no company-specific information, failed to link any specific projections to specific risks,[153] and

---

[149]    *See, e.g., id.* ¶¶ 56, 57, 61, 63, 66, 70-72, 78-79, 81, 83, 86, 88.

[150]    *See id.* ¶ 55 (McKenzie: "The 'Victory' well has an estimated flowing rate of over 100 mmscf/d of natural gas and is condensate rich. We have just completed the extended flow testing of the first zone to be tested in the well which was flowed on a restricted flow basis with high pressures and flowed with measured flow rates averaging between 40 and 45 mmscf/d."); *id.* ¶ 59 (linking estimates of well size to test results); *id.* ¶ 65 (linking estimates of well production to test results); *id.* ¶¶ 65, 74, 76 (same).

[151]    *See, e.g.,* 1/28/08 Press Release, Ex. 1, Row 5 to Stodola Decl.; 1/23/09 Press Release, Ex. 1, Row 27 to Stodola Decl.

[152]    *See* 1/28/08 Press Release.

[153]    The Second Circuit in *Slayton II* noted with approval that both the Third and Fifth Circuits look to company-specific cautionary language and

### b.    Statements Regarding Compliance with and Liability Under the JOA[157]

Ströker has adequately alleged that The Officers failed to disclose

that Canadian Superior was violating the JOA by failing to adhere to the JOA's

accounting procedures, thereby jeopardizing Canadian Superior's role in the Joint

Venture.[158]  In opposition, The Officers point to Canadian Superior's 2007

Management's Discussion and Analysis ("MD&A") as conclusive proof that

Canadian Superior had disclosed its ongoing accounting control problems to the

market.  This disclosure makes no mention of the Joint Venture or the JOA.[159]

---

[157]    I note that given The Officers' persistently positive public statements about the Joint Venture, The Officers had a duty to disclose that Canadian Superior was in breach of the JOA.  The disclosure of this breach would have "significantly altered the 'total mix' of information available" to investors regarding the Joint Venture.  *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). As such, the breach of the JOA was a material fact, the disclosure of which was necessary to render The Officers' other public statements about the Joint Venture not misleading.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993).

[158]    *See, e.g.*, Compl. ¶ 58(c)-(d).

[159]    *See* 2007 Management's Discussion and Analysis ("2007 MD&A"), Ex. 1, Row 10 to Stodola Decl. at 11 ("There are no effective controls or procedures related to all significant accounts and processes to provide reasonable assurance that transactions are recorded accurately, are recorded timely and are complete.").  Interestingly, the 2007 MD&A filed with the SEC stated that "[t]here are no effective controls or procedures related to significant accounts."  The word "all" did not appear.  *See* SEC 2007 Management's Discussion and Analysis ("SEC 2007 MD&A) at 11, available at http://www.sec.gov/Archives/edgar/data/1177470/000110465908021398/a08-931

40

Thus, The Officers had not previously disclosed that their accounting problems

left Canadian Superior in violation of the JOA, and the truth-on-the-market

defense is consequently unavailing.[160]

Ströker also sufficiently alleges that Canadian Superior[161]

misrepresented its obligations under the JOA by failing to disclose the true extent

of its liability.[162]  The Officers argue that Canadian Superior was never financially

liable for Challenger's portion of the Joint Venture's costs, because Canadian

Superior could pursue remedies against Challenger to recover Challenger's share

---

0_1ex99d3.htm.  Additionally, neither the SEDAR – the Canadian securities
document database – nor the SEC MD&A represented that remediation efforts
would continue "through '2008 year-end,'" as The Officers state in their opening
brief.  *See* Officers' Mem. at 22.  Rather, the two MD&As each state that Canadian
Superior "has implemented an aggressive plan that by the end of 2008 all noted
material weaknesses at December 31, 2007 will be substantially eliminated."  *See*
2007 MD&A at 11; SEC 2007 MD&A at 11.

[160]    I note further that "[t]he truth-on-the-market defense is intensely fact-
specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for
failure to plead materiality."  *Ganino*, 228 F.3d at 159.

[161]    Statements regarding the Joint Venture division of participating
interests are not attributed to any of The Officers.  At this point then, The Officers
cannot be liable for these statements under Section 10(b) and Rule 10b-5.  *See*
discussion *supra* note 125.  Nevertheless, as discussed below, *see infra* note 203,
The Officers may be liable for this misstatement under Section 20(a).  *See In re
Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 285-86 (3d Cir. 2006).

[162]    *See* Compl. ¶ 58(b).

of the costs in the event Challenger defaulted under the JOA.[163]  But this does not

obviate the fact that the express terms of the JOA hold Canadian Superior solely

responsible for a seventy percent interest in the Joint Venture pending assignment

of a twenty-five percent interest to Challenger that never occurred.[164]  In fact,

Coolen stated that BG considered Canadian Superior to be "directly liable" for the

seventy percent interest, which suggests that this interpretation of the JOA is a

plausible one.[165]  Again, The Officers' argument at most raises a question of fact to

be decided at a later stage in this litigation.

> **c.  Statements Regarding Canadian Superior's Inability
> to Meet Its Financial Obligations to the Joint Venture
> in Late 2008**

Finally, The Officers cannot, at this stage, invoke the truth-on-the-

market doctrine to avoid liability for their failure to disclose Canadian Superior's

inability to meet its obligations to the Joint Venture between November 2008

(when the problems arose) and January 2009.  Though Canadian Superior did

disclose that it was experiencing liquidity problems in its Third Quarter 2008

---

[163]   *See* Officers' Mem. at 24.  Challenger was in default beginning
November 2008.  *See* Coolen Aff. ¶ 24.

[164]   *See* JOA § 3.2(c); Denning Aff. ¶ 27.

[165]   Coolen Aff. ¶ 28.

MD&A, filed November 2008,[166] these disclosures made no mention of potential problems with the Joint Venture, and certainly did not disclose that Canadian Superior lacked sufficient funds to meet its obligations to the Joint Venture.[167] Moreover, Canadian Superior issued a distinctly upbeat press release on January 23, 2009, in which Coolen discussed plans to begin developing the three "successful" wells.[168] The January 23 press release does not so much as hint that the Joint Venture faced any financial shortfalls, even though the unpaid twelve million dollar Maersk invoice was by that point twenty-one days past due.[169] Although The Officers may eventually establish that the market was fully aware of Canadian Superior's financial state by November 2008, the Complaint's allegations of misstatements or material omissions regarding Canadian Superior's inability to meets its financial obligations to the Joint Venture are sufficient to survive a motion to dismiss.

---

[166]    *See* Third Quarter 2008 Management's Discussion and Analysis ("3d Q 2008 MD&A"), Ex. 1, Row 21 at 6.

[167]    *See* Coolen Aff. ¶ 24.

[168]    *See* Compl. ¶ 88.

[169]    *See* 1/26/09 Letter from Maersk to Canadian Superior, Ex. 7 to Stodola Decl. at 1-2.

43

## 2.    Scienter[170]

The Officers argue that Ströker fails to adequately plead scienter

based on conscious misbehavior or recklessness because the Complaint does not

identify specific reports or documents to support its allegation that The Officers

either "'knew facts or had access to information suggesting that their public

statements were not accurate.'"[171]  The Officers further contend that the Complaint

fails to allege a factual basis for allegations of conscious misbehavior or

recklessness as to each defendant.[172]  The Officers finally claim that the Denning

---

[170]    Ströker cannot establish motive and opportunity scienter, as the
Complaint fails to allege a coherent theory of motive.  Ströker alleges that The
Officers made false and misleading statements "to allow Canadian Superior to
benefit from the closing of two private placements."  *See* Compl. ¶ 99.  However,
The Officers correctly point out that the officers and directors of every company
seek to raise capital for their companies, and that "motives generally possessed by
officers and directors are insufficiently concrete and personal to qualify as a
motive supporting the inference of scienter."  Officers' Mem. at 14 (citing *ECA*,
553 F.3d at 198).  Nor can Ströker establish motive through insider sales of stock,
as neither Coolen nor Noval are alleged to have sold any stock during the Class
Period, while McKenzie actually purchased stock on several occasions in 2008.
*See* Insider Transaction Detail; *see also San Leandro Emergency Med. Group
Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996) ("[T]he
fact that other defendants did not sell their shares during the relevant class period
sufficiently undermines plaintiffs' claim regarding motive."); *In re Regeneron
Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111, 2005 WL 225288, at *22 (S.D.N.Y.
Feb. 1, 2005) ("[T]he purchase of additional company shares during the class
period [] is inconsistent with an intent to commit fraud.").

[171]    Officers' Mem. at 16 (quoting *ECA*, 553 F.3d at 199).

[172]    *See id.* at 17.

44

Affidavit does not support an inference that The Officers knew their statements regarding the wells were false at the time the statements were issued.[173]

Ströker argues that (1) the Complaint alleges with adequate specificity that The Officers knew facts suggesting their public statements were not accurate, (2) the Complaint sufficiently alleges a factual basis for scienter as to each defendant, and (3) the Denning Affidavit supports a strong inference that The Officers knew of or had access to negative results from the wells at the time of the testing.[174]  Ströker additionally argues that The Officers' positions at Canadian Superior and the importance of the Joint Venture to Canadian Superior's core operations further support a strong inference of scienter.[175]  As discussed below, I find that Ströker adequately alleges scienter as to all The Officers for all statements attributed to them, with the exception of the failure to disclose that Canadian Superior's accounting problems left the company in breach of the JOA.[176]

_____

[173]    *See id.* at 20.  The Officers' related argument that Ströker fails to allege facts suggesting that the statements regarding the wells were false at all was addressed *supra* at Part IV.B.1.a.

[174]    *See* Ströker Mem. at 16-23.

[175]    *See id.* at 23-24.

[176]    As misstatements regarding the extent of Canadian Superior's liability under the JOA are not actionable as to The Officers, I will not discuss

### a.    Knowledge of or Access to Contrary Facts

The Complaint satisfactorily identifies specific reports or documents

that would have indicated that The Officers' public statements regarding the wells

and Canadian Superior's inability to meets its financial obligations beginning late

2008 were inaccurate.  Regarding the wells, the Complaint does considerably more

than allege that a set of unspecified contrary facts must have been available to

someone, somewhere inside Canadian Superior.  Rather, the Complaint claims that

these allegedly negative test results accompanied the results that were reported.[177]

The Officers surely relied on some sort of document or report – as opposed to raw,

unanalyzed data – in reporting the test results contained in their public

---

scienter with respect to those misstatements except as it relates to Section 20(a)
liability. *See infra* Part IV.C.1.

[177]    This fact distinguishes Ströker's allegations from those in the cases
The Officers cite to support their position that plaintiffs must identify specific
reports containing allegedly contrary facts. *See* Officers' Mem. at 16 (citing
*Teamsters*, 531 F.3d at 196 ("[Plaintiffs'] broad reference to raw data lacks even
an allegation that these data had been collected into reports that demonstrated that
loan origination practices were undermining the collateral's performance."); *In re
Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[W]e held that an
'unsupported general claim of the existence of confidential company sales reports
that revealed [a] larger decline in sales is insufficient to survive a motion to
dismiss.'" (quoting *San Leandro*, 75 F.3d at 812-13))).  Ströker's allegations are
not unsubstantiated; they are supported by the existence of the test results that
were reported by The Officers.

46

statements.[178]   And it is probable that these documents or reports contained the

allegedly negative tests results that The Officers allegedly withheld, as well as the

positive tests results that The Officers reported.[179]   Moreover, Ströker notes that

The Officers, by virtue of their experience as senior officers of an oil and gas

exploration company,[180] may be reasonably assumed to have been competent to

interpret any test results presented to them.[181]

        Ströker also adequately identifies specific reports or documents

suggesting that The Officers' statements regarding Canadian Superior's financial

---

[178]     *See* Compl. ¶ 59 (McKenzie: "I am pleased to report that we have
now *analyzed* and *evaluated* much of the initial data from the 'Victory' well . . . .")
(emphasis added).

[179]     *See id.* ¶¶ 55, 58(a).

[180]     *See* Ströker Mem. at 17.

[181]     *See id.* at 18.  Ströker does not, as The Officers claim, rely solely on
The Officers' positions at Canadian Superior to allege access to and awareness of
contrary facts regarding the wells. *See In re Sec. Capital Assur. Sec. Litig.*, No. 07
Civ. 11086, 2010 WL 1372688, at \*25 (S.D.N.Y. Mar. 31, 2010) ("[B]road
allegations that [d]efendants received and were aware of information contradicting
their public statements because they held management roles is not enough to
allege scienter.") (citation omitted); *In re Sotheby's Holdings, Inc.*, No. 00 Civ.
1041, 2000 WL 1234601, at \*7 (S.D.N.Y. Aug. 31, 2000) ("[B]oilerplate
allegations that defendants knew or should have known of fraudulent conduct
based solely on their board membership or executive positions are insufficient to
plead scienter."). Ströker actually alleges, quite plausibly, that The Officers'
positions suggest that they have some expertise in oil and gas exploration such
that test results from the wells were meaningful to them. *See* Ströker Mem. at 17-
18.

condition vis-à-vis the Joint Venture in late 2008 were inaccurate.  The Complaint specifically identifies the Maersk invoice presented to Canadian Superior in November 2008 and Coolen's admission that Canadian Superior lacked sufficient funds to meet its obligations in November 2008.[182]  It is plausible that The Officers knew, but failed to disclose, that Canadian Superior could not pay its vendors beginning November 2008.

With respect to the JOA accounting procedures, however, Ströker fails to allege facts indicating that The Officers knew, or ought to have known, that Canadian Superior's accounting controls were not in compliance with the JOA.  Although The Officers were undoubtedly aware of the JOA's accounting requirements, there are no factual allegations to support the inference that they were aware that Canadian Superior's actual accounting procedures were defective.  Thus, the Complaint fails to allege that any of The Officers had knowledge that Canadian Superior was in breach of the JOA.

### b.    Scienter as to Each Defendant

Ströker adequately alleges a factual basis for scienter as to each defendant.  McKenzie, Noval, and Coolen each made direct statements regarding

---

[182]    *See* Ströker Mem. at 22.

test results from the wells throughout the Class Period.[183]  It is highly plausible

that each Officer had knowledge of and access to the test results on which their

own public statements were based.  Thus, there is a factual basis for the allegation

that each Officer knew of the negative test results accompanying the positive

results contained in his public statements.  As for allegations regarding Canadian

Superior's inability to meet its financial obligations to the Joint Venture beginning

November 2008, the Coolen Affidavit supports a strong inference that Coolen –

the only defendant who made public statements regarding the Joint Venture from

November 2008 on[184] – was aware of Canadian Superior's financial difficulties

vis-à-vis the Joint Venture.[185]

        However, because Ströker bases his Rule 10b-5 claim on omissions

and selective disclosures, Ströker must do more than allege that The Officers were

aware of negative test results and looming financial shortfalls.  Rather, Ströker's

allegations must give rise to an inference that The Officers were reckless (or

consciously misbehaving) in failing to disclose or only partially disclosing these

---

[183]    *See* Compl. ¶¶ 55, 74, 88.

[184]    *See id.* ¶¶ 86, 88.

[185]    *See* Coolen Aff. ¶ 24 (stating that Canadian Superior was unable to
meet its financial obligations from November 2008 through January 2009).

facts.[186]  I find that the Complaint successfully raises such an inference.

Regarding the wells, the Complaint alleges that The Officers suppressed negative facts and highlighted positive ones to create the distorted and misleading impression that Canadian Superior was well on its way to developing one of the most successful natural gas production sites offshore Trinidad and Tobago.[187]  The Complaint further alleges that had test results from the well been reported in full, the resulting impression of the Joint Venture's prospects would have been considerably bleaker.[188]  These allegations give rise to a strong inference that The Officers were reckless, and not merely negligent, in touting positive results from the wells, while simultaneously failing to disclose the negative results that would have undermined The Officers' confident statements regarding the Joint Venture's prospects.

Regarding The Officers' – or more specifically, Coolen's – failure to disclose Canadian Superior's inability to meet its obligations to the Joint Venture beginning November 2008, Ströker alleges that Coolen made several highly optimistic statements about the Joint Venture's progress and plans from November

---

[186]    *See Kalnit*, 264 F.3d at 143.

[187]    *See* Compl. ¶ 74.

[188]    *See id.* ¶ 58(a).

2008 through January 2009.[189] Coolen made these statements even though the

following risks to the Joint Venture had become a reality: (1) Canadian Superior

did not have sufficient funds to meet its financial obligations to the Joint Venture,

(2) Challenger was in default under the JOA, and (3) Maersk was not going to be

paid on time and had not been paid by the end of January 2009. These realities

manifestly threatened the viability of the Joint Venture. For Coolen to have issued

unguardedly optimistic statements about the Joint Venture's future in the face of

these threats raises a strong inference of his recklessness or conscious

misbehavior.

### c.    The Denning Affidavit

The Officers finally argue that Denning's February 2009 statements

regarding the wells and the economic viability of the Joint Venture do not support

a strong inference of The Officers' scienter for "an entire year *prior* to [February

2009]."[190] The Officers correctly note that the Denning Affidavit is not precise as

to when exactly test results indicated that the Victory well was likely to be sub-

economic and that the Bounty well was not worth developing on its own.[191]

---

[189]    *See id.* ¶¶ 86, 88.

[190]    Officers' Mem. at 20 (emphasis added).

[191]    *See* Denning Aff. ¶¶ 44-45.

51

Nevertheless, the Denning Affidavit may be reasonably read to indicate that The Officers would have known of negative test results and their import for the Joint Venture at the time of testing.[192] Thus, The Officers' timing argument is insufficient to defeat a strong inference of scienter throughout the Class Period.[193] Overall, the inference that The Officers were actually aware of contrary facts that made their public statements inaccurate and misleading and were reckless in failing to disclose these negative facts is at least as compelling as any other inference and is sufficient to raise a strong inference of scienter at the motion to dismiss stage.

---

[192]    *See id.* ¶ 44 ("[T]ests indicated that there are only limited reserves connected to the [Victory] well . . . .").

[193]    The Officers posit an alternative inference – that neither Denning nor BG nor anyone else involved with the Joint Venture had reached any conclusions about any of the wells during the Class Period. *See* Officers' Mem. at 20. The Officers suggest that this inference is more compelling than an inference of scienter because BG continued to invest in the Joint Venture through 2008, thus indicating that BG itself believed that the wells were viable through at least the end of 2008. *See* Officers' Reply Memorandum in Further Support of Officers' Motion to Dismiss ("Reply Mem.") at 6 n.4. Though this inference is certainly possible, I do not find it *more* compelling than an inference of scienter, as there are a range of plausible explanations for BG's behavior that do not undermine an inference of The Officers' scienter. BG might, for instance, have been quite pessimistic regarding both the Victory and Bounty wells, but chose to remain with the project and gamble on the success of the Endeavour well because its finances were sufficiently secure to withstand the costs of a failed exploration.

### 3.   Loss Causation

To allege loss causation, Ströker must allege that The Officers'
"misstatements and omissions concealed the circumstances that bear upon the loss
suffered such that plaintiffs would have been spared all or an ascertainable portion
of that loss absent the fraud."[194]  Ströker alleges that The Officers
misrepresentations concealed significant risks that materially jeopardized the
success of the Joint Venture and Canadian Superior's role in it – namely, that the
Victory and Bounty wells were not economically viable, that Canadian Superior
was in breach of the JOA, that Canadian Superior was exposed to liability for a
seventy percent interest in the Joint Venture because Challenger's twenty-five
percent interest had never been assigned, and that Canadian Superior was unable
to meet its financial obligations to the Joint Venture.[195]  Ströker claims that these
concealed risks significantly increased the risk that the Joint Venture would fail,[196]
and indeed the Joint Venture did fail as far as Canadian Superior and its
shareholders were concerned when Canadian Superior's interest in the Intrepid

---

[194]     *Lentell*, 396 F.3d at 175.

[195]     *See* Compl. ¶¶ 58, 75, 88.

[196]     *See id.* ¶ 58(d).

53

Block project was placed in receivership on February 11, 2009.[197] The market

reacted harshly to this news, and Canadian Superior's stock dropped forty-four

percent on the day the receivership was announced.[198]  Ströker further alleges that

the failed participation in the Joint Venture caused Western Canada to demand

repayment of its credit facility, leading to an additional thirty percent stock decline

on February 17, 2009.[199]  Because failure of the Joint Venture was within the

"zone of risk concealed by the misrepresentations,"[200] and because Canadian

Superior's stock dropped precipitously in response to the corrective disclosure,

Ströker's loss causation claims are sufficient to survive a motion to dismiss.[201]

---

[197]    See id. ¶ 48.

[198]    See id. ¶ 50.

[199]    See Ströker Mem. at 28.

[200]    In re Omnicom Group, 597 F.3d at 513 (quoting Lentell, 396 F.3d at 173) (emphasis omitted).

[201]    The Officers do not contest that news of the "receivership order over one of [Canadian Superior's] most valuable assets" caused Canadian Superior's stock to drop on February 17. Officers' Mem. at 12. Rather, The Officers claim that the receivership and not the concealed problems with the Joint Venture caused the loss. See Reply Mem. at 15. This ignores that Ströker is actually alleging that the concealed problems with the Joint Venture substantially increased the risk that BG would seek to terminate Canadian Superior's interest in the Joint Venture and that these concealed problems in fact caused BG to seek a receivership. Thus, Ströker adequately alleges that the risks concealed by The Officers' non-disclosures and selective disclosures caused his loss.

54

C.    Section 20(a)

      1.    Primary Violation

      The Officers move to dismiss the control person liability claims on the ground that Ströker has failed to allege a primary violation by any controlled person.[202]   However, Ströker successfully states a claim for primary violations of Section 10(b) and Rule 10b-5, with only three exceptions: *First*, Ströker's primary liability claims against Bilton and Snethun fail because the Complaint fails to attribute any actionable misstatements to either individual.  *Second*, the Complaint fails to attribute misstatements regarding Canadian Superior's financial liability under the JOA to any named defendant, thus precluding any named defendant's primary liability for those misstatements.  *Third*, the Complaint fails to allege scienter as to any named defendant regarding the failure to disclose that Canadian Superior's faulty accounting procedures left the company in breach of the JOA.

      Because the Complaint does not allege any primary violation by either Bilton or Snethun, any section 20(a) claims against the remaining Officers regarding Bilton or Snethun's conduct must be dismissed.  However, The Officers may still be liable as control persons for misstatements regarding Canadian Superior's liability under the JOA and the failure to disclose Canadian Superior's

---

[202]    *See* Officers' Mem. at 32 n.17.

breach of the JOA's accounting procedures if the Complaint successfully alleges

that Canadian Superior would have been liable under Section 10(b) and

Rule 10b-5.[203]

      Earlier in this opinion I concluded that but for the failure of

attribution, misstatements of Canadian Superior's liability under the JOA were

actionable.[204] Because these misstatements, contained in Canadian Superior press

releases, were manifestly attributable to the company, the misstatements are

actionable as to Canadian Superior. Moreover, I find that the Complaint

adequately alleges Canadian Superior's scienter as to misstatements of liability

under the JOA,[205] as it is utterly implausible that senior corporate officers –

---

[203]    So long as the Complaint adequately alleges the elements of a Rule 10b-5 claim against Canadian Superior as a corporation, it is of no moment that Canadian Superior is not a named defendant due to bankruptcy. *See In re Suprema*, 438 F.3d at 285 ( "[T]here is no requirement in the language of [Section 20(a)] that the controlled person be named as a defendant as a predicate to imposing liability upon the controlling individual defendants."). As the Third Circuit has noted, "'[I]t would be inconsistent with the broad remedial purposes of the securities laws to permit senior executives of a bankrupt corporation whose actions allegedly contributed to the bankruptcy – to avoid liability by relying on the corporation's bankruptcy.'" *Id.* at 285-86 (citation omitted). Courts in this and other districts have permitted this type of Section 20(a) liability. *See, e.g., id.*; *Payne v. DeLuca*, 433 F. Supp. 2d 547, 612 n.67 (W.D. Pa. 2006); *In re Surebeam Corp. Sec. Litig.*, No. 03 Civ. 1721JM, 2005 WL 5036360, at *5 n.3 (S.D. Cal. Jan. 3, 2005); *Marcus v. Frome*, 329 F. Supp. 2d 464, 476 (S.D.N.Y. 2004).

[204]    *See supra* Part IV.B.1.b.

[205]    The Second Circuit has noted that a complaint may adequately allege corporate scienter without alleging scienter as to any particular defendant. *See*

including McKenzie, Noval, and Coolen – would not have been aware of the true

terms of the JOA, which suggested that public statements regarding the division of

interest under the JOA were inaccurate. As the breach of the JOA was material in

light of Canadian Superior's other, consistently positive statements regarding the

Joint Venture, the Complaint raises a strong inference that some senior officer

within Canadian Superior was reckless in failing to disclose the fact of the breach.

And Ströker adequately alleges that the company's misstatements of the extent of

Canadian Superior's liability under the JOA caused at least part of his loss.[206]

Accordingly, the Complaint sufficiently alleges a primary violation by Canadian

Superior based on misstatements of the company's liability under the JOA.

　　　　The Complaint does not, however, adequately plead a primary

violation by Canadian Superior as to the failure to disclose its breach of the JOA's

accounting procedures. Just as the Complaint makes no allegations to suggest

whether or when The Officers knew that Canadian Superior's accounting

procedures were faulty and in violation of the JOA, the Complaint makes no such

allegations as to any senior officer or anyone else inside the company. As such,

---

*Teamsters*, 531 F.3d at 195; *see also Makor Issues & Rights, Ltd. v. Telllabs Inc.*,
513 F.3d 702, 710 (7th Cir. 2008) ("[I]t is possible to draw a strong inference of
corporate scienter without being able to name the individuals who concocted and
disseminated the fraud.").

[206]    *See* discussion *supra* Part IV.B.3.

any Section 20(a) claims based on the failure to disclose Canadian's Superior

violation of JOA accounting procedures must be dismissed.

### 2.    Control Person[207]

Having adequately alleged primary violations – except as to Bilton

and Snethun and the accounting failures – Ströker must also allege "control of the

primary violator by the defendant."[208]   The Officers challenge control solely as to

Bilton and Snethun on the grounds that the Complaint fails to allege how either

Bilton or Snethun – neither of whom appear to have been senior officers during the

Class Period and who each presided over operations in Western Canada throughout

the Class Period – were in a position to control Canadian Superior's statements

regarding the Intrepid Block 5(c) Joint Venture.[209]   Indeed, the Complaint's sole

mentions of Bilton and Snethun are a description of their titles and allegations that

each sold Canadian Superior stock within the Class Period.[210]   Because the

Complaint contains literally no factual allegations that would support an inference

that Bilton or Snethun were control persons under Section 20(a), all claims for

---

[207]    The Officers do not challenge the "culpable participation" prong of
Ströker's Section 20(a) claims.

[208]    *ATSI*, 493 F.3d at 108.

[209]    *See* Officers' Mem. at 32 n.17.

[210]    *See* Compl. ¶¶ 24(b), (e), 29, 99.

control person liability against Bilton and Snethun must be dismissed. Ströker

nevertheless successfully states a claim for control person liability against

McKenzie, Noval, and Coolen, as each was a senior officer and member of

Canadian Superior's Board of Directors during the Class Period,[211] and as such

"possessed 'the power to direct or cause the direction of the management and

policies of [Canadian Superior].'"[212]

### D.    Plaintiffs Who Purchased on a Foreign Exchange

The parties concede that the Supreme Court's recent decision in

*Morrison v. National Australia Bank Ltd.*[213] forecloses any potential class members

who purchased Canadian Superior common stock on a foreign exchange – in this

case, the Toronto Stock Exchange ("TSX")[214] – from recovering in this action.[215]

The parties are correct that *Morrison* prevents such plaintiffs from recovering in

this Court,[216] and the claims of any potential class members who purchased

---

[211]    *See id.* ¶ 24.

[212]    *First Jersey*, 101 F.3d at 1472-73 (citation omitted).

[213]    — U.S. — , 130 S. Ct. 2869 (2010).

[214]    *See* Officers' Mem. at 32.

[215]    *See* Ströker Mem. at 30 n.19; Reply Mem. at 15 n.10.

[216]    *See Morrison*, 130 S. Ct. at 2888 ("Section 10(b) reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States."); *see also Cornwell v.*

Canadian Superior common stock on a foreign exchange are therefore dismissed.

### E.      Leave to Replead

Although leave to replead is typically granted, repleading should not be permitted when amendment would be futile. Thus, in light of *Morrison*, Ströker may not amend his complaint to seek to include plaintiffs who purchased Canadian Superior stock on a foreign exchange.

Amendment would not, however, be futile with respect to the other claims dismissed by this Order. Ströker might be able to allege new facts providing a factual basis for attributing misstatements to either Bilton or Snethun or facts supporting a finding that Bilton or Snethun were control persons under Section 20(a). Ströker could also allege facts that would attribute misstatements regarding Canadian Superior's liability under the JOA to one or more of the The Officers,[217] as well as facts supporting an inference of The Officers' scienter

———————

*Credit Suisse Group*, No. 08 Civ. 3758, slip op. at 7 (S.D.N.Y. July 27, 2010) (holding that *Morrison* precluded recovery by United States residents who purchased shares on a foreign exchange).

[217]    Such amendment should not be onerous as the documents submitted to the Court show that Canadian Superior's 2007 and 2008 SEC and SEDAR filings contain statements regarding Canadian Superior's interest in and liability to the Joint Venture that are substantively identical to the unattributed statements identified in the Complaint. *See* 2007 MD&A at 7 (attributed to management and the board of directors); 3d Q 2008 MD&A at 16 (signed "on behalf of the Board" by McKenzie).

regarding breaches of the JOA's accounting procedures.[218]  Because amendment to

these claims would not be futile, I grant Ströker leave to replead his claims as to

(1) Bilton and Snethun's liability under Sections 10(b) and 20(a); (2) actionable

misstatements by The Officers regarding the extent of Canadian Superior's liability

under the JOA; (3) scienter as to failure to disclose accounting failures that

violated the JOA; and (4) any corresponding Section 20(a) claims as to (1)-(3).

## V.    CONCLUSION

For the reasons discussed above, The Officers' motion is granted in

part and denied in part.  Any claims on behalf of potential class members who

purchased Canadian Superior shares on a foreign exchange are dismissed with

prejudice.  All claims against Bilton and Snethun are dismissed without prejudice

and with leave to amend.  Finally, all claims derived from misstatements of

Canadian Superior's liability under the JOA or relating to the failure to disclose

accounting failures in breach of the JOA are dismissed without prejudice and with

leave to amend.  Any amended complaint must be filed within thirty (30) days of

---

[218]    In this regard, I note that The Officers acknowledge that Canadian Superior disclosed accounting control problems in its 2007 MD&A. *See* 2007 MD&A at 11.  The Officers may therefore have been expected to know that Canadian Superior suffered from accounting problems and that these accounting failures meant that Canadian Superior was in violation of the JOA, even though the market could not have been expected to make this inferential leap. *See supra* Part IV.B.1.b.  However, I will not read scienter allegations into the Complaint that have not been pled.

the date of this Order. The Clerk of the Court is directed to close this motion

(Docket No. 41). A conference is scheduled for Tuesday, August 24, 2010 at

4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      August 6, 2010
            New York, New York

62

## -Appearances-

**For Lead Plaintiff Gino Ströker:**

David A. Rosenfeld, Esq.
Samuel H. Rudman, Esq.
Carolina C. Torres, Esq.
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 2000
Melville, N.Y. 11747
(631) 367-7100

Michael I. Fistel, Jr., Esq.
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA. 30338
(770) 392-0090

Jeffrey A. Berens, Esq.
Dyer & Berens LLP
300 East 17th Avenue, Suite 300
Denver, CO. 80203
(303) 861-1764

**For Defendants:**

Jack C. Auspitz, Esq.
Jamie A. Levitt, Esq.
Damion K.L. Stodola, Esq.
Hilary M. Williams, Esq.
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, N.Y. 10104-0050
(212) 468-8000